## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
MOHAMED ABEDELKARIM, et al., )
                             )
             Plaintiffs,     )
     v.                      )   Civil. Action No. 05-01783 (EGS)
                             )
                             )
JAMES K. GLASSMAN,¹          )
Chairman, Broadcasting Board )
     Of Governors,           )
                             )
             Defendant.      )
_____ )
```

### MOTION FOR SUMMARY JUDGMENT

The defendant, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves the Court for summary judgment on the grounds that there are no disputes of material fact and the defendant is entitled to judgment as a matter of law.

In support of this motion, the defendant submits the attached Memorandum of Points and Authorities, the Report of Investigation (ROI), and Exhibits.

---

¹ Mr. Glassman became the Chairman of the Broadcasting Board of Governors effective June 8, 2007, and is automatically substituted under Fed. R. Civ. P. 25(d).

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
MOHAMED ABEDELKARIM, et al.,  )
                              )
              Plaintiffs,     )
      v.                      )    Civil. Action No. 05-01783  (EGS)
                              )
                              )
JAMES K. GLASSMAN,            )
Chairman, Broadcasting Board  )
    Of Governors,             )
                              )
              Defendant.      )
_____)
```

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The plaintiffs, Mohamed Abdelkarim, Zeinab Abdelrahman, Hayat Alkhateeb, Amina El-Bishlawy, and Faiza Elmasry, employees of the Broadcasting Board of Governors ("BBG"), filed suit under Title VII alleging national origin (Egypt and Syria), religion (Sunni Muslim), and age discrimination (born between 1943 and 1956), and reprisal when they were not selected for GS-12 International Radio Broadcaster (hereinafter, "IRB") positions and when they were not selected for the GS-13 Supervisory International Radio Broadcaster positions with Radio SAWA (Complaint ¶ 1).  Plaintiffs contend that they were treated differently than persons of Lebanese origin and that they were "shunned and harassed" while working at Radio SAWA (Complaint ¶¶ 29-28).

After voluminous discovery, the undisputed facts demonstrate

that the plaintiffs failed to properly exhaust their administrative remedies and, alternatively that they cannot present sufficient evidence that would permit a reasonable fact finder to conclude that they were discriminated against because of their national origin, religion or age, harassed or that they were retaliated against because of prior EEO activity (Rule 56). Thus, the defendant is entitled to summary judgment as a matter of law.

**BACKGROUND**

### I.   **Plaintiffs**

Plaintiff Mohamed Abdelkarim (age 48) is a United States citizen who was born in Egypt (Compl. ¶ 3).[1]  He is a practicing Sunni Muslim. <u>Id</u>.  He received a bachelor's degree in languages from Ain Shams University and also took courses at the Institute of Radio & TV, both of which are in Cairo, Egypt (Abdelkarim ROI, Exhibit 6, Tab a).  Prior to working for defendant, Mr. Abdelkarim worked as a reporter and announcer with Radio Cairo and the Japanese Broadcasting Corporation (Compl. ¶ 3). Mr. Abdelkarim was hired in 1989 by the Voice of America's Arabic Service as a GS-11, IRB, and was promoted to GS-12 in April 1992. <u>Id</u>.  He is presently a Television Production Specialist, GS-12 with the Voice of America (VOA). <u>Id</u>.

---

[1] The ages identified throughout this memorandum are the ages of the individuals at the time of selections at issue.

Plaintiff Zeinab Abdelrahman (age 55) is a United States citizen who was born in Egypt (Id. ¶ 4).  She is a practicing Sunni Muslim.  Id.  She received a bachelor's degree in economics from Cairo University and completed a one-year program on German languages in West Germany (Abdelrahman Dep., Vol. I, pp. 6-7). Prior to working for VOA, Ms. Abdelrahman worked as a reporter, newscaster, programmer, and announcer with Radio Cairo, Iranian radio, and German radio (Deutsche Welle)(Compl. ¶ 4).  Ms. Abdelrahman was hired in 1988 by the Arabic Service as a GS-11, IRB, and was promoted to GS-12 in October 1993.  Id.  Since December 2002, she has held the position of Radio Broadcast Technician in Broadcasting Operations of the Voice of America.  Id.

Plaintiff Hayat Alkhateeb (age 59) is a United States citizen who was born in historic Palestine (Id. ¶ 5).  She is Sunni Muslim (ROI, Ex. 13).  Ms. Alkhateeb later moved to Syria when she was five years old and she is a practicing Sunni Muslim (Id.; Alkhateeb Dep., pp. 5-6).  Ms. Alkhateeb received a bachelor's degree in philosophy and sociology from the University of Damascus and later took courses from Texas University, the University of Maryland and Career University in the District of Columbia (Alkhateeb Dep., pp. 7-10).  Prior to working for defendant, she worked as a broadcaster for Syrian radio (Compl. ¶ 5).  Ms. Alkhateeb was hired by the Arabic Service as a GS-11, IRB, in 1981, and was promoted to GS-12 in 1986.  Id.  She retired from the employ of the United States

Government in March of 2004. <u>Id</u>.

Plaintiff Amina El-Bishlawy (age 55) is a United States citizen who was born in Egypt (<u>Id</u>. ¶ 6). She is a practicing Sunni Muslim (<u>Id</u>.; El-Bishlawy Dep., p. 6). Ms. El-Bishlawy earned a bachelor's degree in political science and economics and a high diploma in radio and television journalism from Cairo University. <u>Id</u>. Prior to working for VOA, plaintiff El-Bishlawy worked as a broadcaster for Radio Cairo. <u>Id</u>. Ms. El-Bishlawy was hired in 1986 as a GS-11, IRB for the VOA's Arabic Service, and was promoted to GS-12 in November 1991. <u>Id</u>. On December 29, 2002, she was selected for a GS-13, Foreign Language Information Specialist position in the International Information Programs Office at the Department of State. <u>Id</u>.

Plaintiff Faiza Elmasry (age 46) is a citizen of the United States who also was born in Egypt (<u>Id</u>. ¶ 7). She is a practicing Sunni Muslim (<u>Id</u>.; Elmasry Dep., pp.6-7). Ms. Elmasry earned a bachelor's degree in economics and politics from Cairo University and a diploma (similar to a master's degree) in political change in Yemen (Elmasry Dep., pp. 7-8). Prior to working for VOA she worked as a broadcaster, announcer, and programmer for Radio Cairo (Compl. ¶ 7). Ms. Elmasry was hired in 1989 as a GS-11, IRB, for VOA's Arabic Service and was promoted to GS-12 in April 1992. <u>Id</u>.

## II.  <u>Radio SAWA Compared to VOA Arabic Service</u>

Prior to 2001, VOA broadcasting to the Middle East was simply

ineffective.  The VOA Arabic Service had been losing audience share for sometime.  Studies and a fact-finding mission in 2001 confirmed that Arabic Service broadcasts were having little impact, reaching only about two percent of the population (Proposal for Middle East Radio Network ("Proposal")Bates No. 002317).  Delivery of VOA programs was outmoded and the programs appealed only to a very small audience (Id., Bates No. 002323).  The delivery was by short-wave signals (Id., Bates No. 002318).

In early 2001, the Broadcasting Board of Governors (BBG) initiated a project to replace the VOA Arabic Service with a new channel called the Middle Eastern Radio Network ("MERN"), a joint BBG/IBB/VOA project (Proposal, Bates No. 002318).  MERN eventually became known as Radio SAWA.[2] The establishment of Radio SAWA was more than simply a reorganization of the VOA Arabic Service, it was the creation of a radically new and different approach to programming to the Middle East (Marsh Dep. Vol. I, pp. 116-117; Gandji Dep. Vol. I, pp. 68-69; Vol. II, pp. 169-173, 196-197; Harb Dep. Vol. I, pp. 100-103; King Dep. p. 199; Proposal, Bates No. 002317).[3]  The delivery systems and sites would change and medium-wave or FM signals would be used through agreements with various

---

[2] SAWA will be used interchangeably to refer to both MERN and SAWA.

[3] The International Broadcasting Board (IBB) encompasses the Voice of America (VOA), Office of Cuba Broadcasting, and the offices of Administration and Engineering.  It reports directly to the BBG.

regional and local  affiliates to broadcast throughout the Middle
East (Proposal, Bates No. 002320; Harb Dep. Vol. I, pp. 39-42;
Dahiyat Dep., pp. 21, 57-58).

Sawa's new target audience was between the ages of eighteen
(18) and thirty (30)(Proposal, Bates No. 002319; Abdelkarim Dep. p.
87; Harb Dep. Vol. I, pp. 12-13; Vol III, pp. 606-607, 671-672).
Sixty percent (60%) of the audience in the Middle East is under age
25 (Id., Bates No. 002319).  SAWA's goal was to broadcast 24 hours
a day, seven days a week (Id., Bates No. 002319).  Four hours per
day, broadcasts tailored to local areas would be presented "by
friendly on-air people who spoke the colloquial Arabic" not
classical Arabic (Id., Bates No. 002321).  In this way, SAWA hoped
to "connect on a more personal level" (Id., Bates No. 002318).  The
news segments would be carried at 15 minutes and 45 minutes after
the hour (Id., Bates No. 002322).  The programming would also
include individual features of five minutes or less on various
subjects (e.g., computers, women's issues, health, etc.)(Id., Bates
No. 002322).  Music would be broadcast for most of the hour to
attract the younger audience (Id., Bates No. 002322).

There was also a significant change in how news would be
obtained by the SAWA staff and how it would be presented.  SAWA
would obtain the news directly from three wire services (AP,
Reuters, AFPC (Agence France Presse)) as it happened, rather than
translating the news stories provided by the VOA English language

Central Newsroom (Harb Dep. Vol. I, pp. 100-103; Gandji Dep. Vol. II, p. 194; Marsh Dep., pp. 116-117).  SAWA employees would be writing, for the first time, the news directly from the raw wire service copy, which would provide for a much quicker turn around time for on-air delivery. Id.  In addition, the news stories would need to be written in such a way as to accommodate the new and quicker delivery style that would be used by SAWA.  Because of this radical change in the way the news would be gathered, written, and broadcast, SAWA employees would be required to exercise greater individual news and editorial judgment (Harb Dep. Vol I, pp. 100-103; Gandji Dep. Vol. I, p. 69; Marsh Dep. Vol. I, pp. 116-117).

Finally, during the broadcast, the broadcaster would have to not only voice the material, but use the material stored on the digital DALET software system, which permits use and editing of sound bites, during the course of the broadcast (Harb Dep. Vol I, pp. 100-103).  This meant that the broadcaster would have to use this digital equipment during their presentation without the help of a technician or engineer during their broadcast presentation (Abdelkarim, Dep., pp. 65-67; Harb Dep. Vol I, pp. 100-103; Marsh Dep. Vol. I,  pp. 116-117).

The VOA Arabic Service, on the other hand, primarily produced block programming in a long format.  It used the classical Arabic language traditionally used in the Middle East by state and government broadcasts (Proposal, Bates No. 002318).  The Arabic

Service translated into classical Arabic and adapted already prepared news stories from the VOA English language Central Newsroom (Harb Dep. Vol I, pp. 100-103; Gandji Dep. Vol. II, pp. 169-171; Marsh Dep. Vol. I, pp. 116-117). Since the intent of SAWA was to use more informal and colloquial Arabic, many standard expressions in the VOA stylebook were changed to reflect SAWA's different style of programming (Abdelkarim Dep., p. 47).

Once the plan for SAWA was approved by Congress, the Agency took the initial steps to implement it. In April 2001, Mr. Gary Thatcher, Associate Director for Program Support, was assigned as Director and Ms. Sheila Gandji (age 48, American, no religious affiliation), Executive Producer and Program Manager for the European Division of VOA, was assigned as Project Manager to create the infrastructure for SAWA (Gandji Vol. I, pp. 10, 23; ROI, Ex. 1, p. 14). On December 10, 2001, Mr. James Hooper (age 56; American Protestant) was hired as the Staff Director for the project (Hooper Dep., p. 8). Mr. Hooper is a retired Foreign Service Officer (1971-1997) (Id., p. 17). Thereafter, he was employed as the Office Director for the International Crisis Group in charge of the Balkans, the Managing Director for The Public International Law and Policy Group, Executive Director of the Balkan Action Council and the Co-Director of the Balkan Institute (Hooper Dep. pp. 8-10).

On February 2, 2002, Mr. Mouafac Harb (age 37) was hired as the Director of Network News for SAWA (Harb Dep. Vol. I, p. 34).

Mr. Harb was formerly the Washington Bureau chief for the <u>Al Hayat</u> newspaper and headed a radio/TV station in Lebanon. He also served as a part-time editor for Newsweek's Arabic edition (Harb Dep. Vol I, pp. 31-38; ROI, Ex. 7). He is Lebanese and a non-practicing Shia Muslim (<u>Id</u>., pp. 4-5).

Although SAWA has never been a part of VOA, it drew its initial staff from the VOA Arabic Service (Harb Dep. Vol I, pp. 83-98; ROI, Ex. 35). After the employees of the Arabic Service were interviewed by a three member panel, a core group of employees were initially assigned the task of providing support for Radio SAWA broadcasts while the Arabic Service was still functioning (Harb Dep. Vol. I, pp. 83-84). These initial employees were identified as the best able to adapt to the new fast-paced news translation and delivery of Radio SAWA (<u>Id</u>. at 101-103). These employees would write the news themselves from wire service copy versus translating from news stories provided by the VOA newsroom, as well as using new technical (DALET) system that allowed the broadcaster to cut in actualities, sound bites and music (Harb Dep. Vol I, pp. 100-103; Gandji Dep. Vol. II, pp. 171-172; Marsh Dep., pp. 116-117). This core group allowed Radio SAWA to meet its target date to begin broadcasting by early 2002, making its first broadcast on March 22, 2002 (Harb Dep. Vol. I, p. 23). The Arabic Service discontinued broadcasting in April 2002 (Harb Dep. Vol I, pp. 26-28; Dahiyat Dep., pp. 12-13; 46-47).

### III. **Overall Plan for the Selection Process**

On February 6, 2002, Mr. John Welch, Director of Personnel for IBB, circulated an email which described a proposed approach to staffing SAWA (ROI, Ex. 7 (February 6, 2002 email from J. Welch re: Proposed Approach to Staffing MERN)(Bates Nos. 001069-001073; King Dep., Ex. 4). The email was distributed to Mr. Thatcher, Ms. Gandji, Mr. Hooper, Mr. Steve Smith, Associate Director for Management for IBB, and Mr. Horace Cooper, then-Chief of Staff for VOA and Mr. Andrew Baird, then Senior Advisor for VOA (Welch Dep. Vol. I, p. 83; King Dep., Exhibit 4).

Senior management of the International Broadcasting Bureau determined the number of full-time employees SAWA was authorized for the initial staffing (Gandji Dep. Vol. II, p. 85, April 12, 2002 Memo from G. Thatcher to J. Welch re: GS-13 Positions for MERN, Bates No. 001129; February 12, 2002 Email from J. Welch re: MERN Staffing, Bates No. 002314; March 26, 2002 Email from J. Welch re: MERN GS-13s, Bates No. 002315). Before any vacancy announcements were released, Senior Agency officials met with the VOA Arabic Service to discuss the process for filling the new positions with SAWA (Welch Dep. Vol. I, p. 98). In addition, management contacted the Union, AFGE Local 1812, to discuss the transition to and staffing of SAWA. The agency entered into an agreement with the Union designed to place as many current Arabic Service employees with SAWA as possible. For those not selected

for SAWA, positions would be found elsewhere within the agency (ROI, Exhibit 35).

The Union accepted this proposal and an agreement with the Union was memorialized in a Memorandum of Understanding ("MOU") on February 15, 2002 (Gandji Dep. Vol. II, pp. 204-206; ROI, Ex. 35). This agreement was limited solely to the initial staffing phase of SAWA. Under this agreement, a current Arabic Service employee did not have to submit an application for a position at his/her current grade level for this initial staffing of SAWA (ROI, Ex. 35). Current Arabic Service employees who sought a promotion to the next grade level would have to submit an application and compete under the normal merit promotion procedures. Id. The new SAWA positions were opened to all qualified candidates including all government and non-government employees (outside candidates) and U.S. citizens and non-citizens (GS-13 File, Bates Nos. 000025-000033; GS-12 File, Bates Nos 000587-000593). Although the procedures used to process those applications would differ somewhat, they would still be controlled by normal competitive procedures, under the merit promotion system and the agency's Manual of Operations and Administration ("MOA")(King Dep., pp. 61-69).

The position descriptions for the new GS-13, Supervisory IRB and GS-12, IRB positions within SAWA were established on January 30, 2002. Crediting plans were established for both positions (ROI, Ex. 7, Bates Nos. 000034-000036; Bates Nos. 000618-000620;

13

King Dep., p. 34; Hooper Dep., Ex. 3).  The position descriptions and crediting plans were forwarded to Personnel on March 14, 2002. (King Dep. Vol I, p. 34).  At some point after the vacancy announcements were written, Mr. Hooper drafted questions for the upcoming GS-13 and GS-12 interviews. (Gandji Dep. Vol. II, p. 93).

The vacancy announcements for the GS-13, Supervisory International Radio Broadcaster (Arabic) positions, and for the GS-12, International Radio Broadcaster (Arabic) positions, opened on February 21, 2002 and closed on March 13, 2002 (Harb Dep. Vol. II, p. 565; Welch Dep. Vol. I, pp. 14-15; Bates No. 000033; Bates Nos. 000587-000593; ROI, Ex. 27).  The functional title of the GS-13 position was Shift Editor and the GS-12 position had a functional title of Newswriter.  Once the announcements closed, Ms. Susan King, Human Resource Specialist in the Office of Personnel, reviewed the applications and determined which candidates met the basic qualifications for the positions and whether the application packages were complete (King Dep., p. 27).

The interviews and final selections for the new positions within Radio SAWA occurred between the end of March 2002 and August 20, 2002 (Id. at 28; Harb Dep., Vol. I, p. 217).  Once the selections were made, those employees not selected for positions remained working in SAWA while VOA found positions for them in accordance with the MOU with the Union (Harb Dep. Vol III, p. 643; ROI, Ex. 35).

A three-person panel was used to interview the candidates for the GS-13 and GS-12 positions in this case.  The panel was comprised of Ms. Sheila Gandji, Mr. William Marsh, and Mr. Mouafac Harb (Harb Dep. Vol I, pp. 124-130; Gandji Dep. Vol. II, p. 154; Marsh Dep. Vol. I, p. 104; King Dep., p. 130).[4]  Although the final selections were made solely by Mr. Harb, the panel members discussed the applicants qualification for the new positions and concurred in Mr. Harb's assessments (Harb Dep. Vol I, pp. 124-130). The interview panel asked the same questions of each candidate (Gandji Dep. Vol. I, p. 93).

### IV.  GS-13 Selection Process

Ms. King determined that there were thirty-nine applicants for the GS-13 positions, of which seventeen met the minimum qualifications of the position (King Dep., p. 40).  Since there were more than ten qualified candidates, Ms. King convened a rating and ranking panel consistent with section 460 of the Agency's Manual of Operations and Administration ("MOA")(King Dep., p. 30). A rating and ranking panel is used for merit promotions to assist with the selection of applicants for inclusion on a certificate of eligible candidates. (King Dep., p. 70).  Ms. King averaged the ratings given by the panelists for each candidate and issued a merit promotion certificate with ten names (King Dep., pp. 78-79).

---

[4]Mr. Marsh was Senior Advisor to the Director of VOA and formerly the Chief of the Arabic Service (Marsh Dep. Vol. I, April 8, 2004, p. 8, 15, and 16).

However, after sending this certificate to SAWA management, Ms. King was advised by her new supervisor, Mr. Michael Conboy, that because the merit promotion certificate should have had only five names on it, she should retrieve it from Mr. Harb. (Harb Dep. Vol I, pp. 45-54; King Dep., pp. 78, 80). Ms. King retrieved the certificate and the interviews were suspended. (King Dep., pp. 71-73). After the certificate containing ten names had been withdrawn, but before a certificate containing five names was re-issued, Mr. Welch, Director of Personnel, became aware of the situation (Welch Dep. Vol. I, p. 22; King Dep, pp. 70-71).

Although there was a ten-point difference between the candidate ranked number 1 for the GS-13 position and the candidate ranked number 17 (the number of qualified candidates), Mr. Welch believed that the difference between each candidate's individual score was not significant enough to prevent all seventeen applicants from being certified (Welch Dep. Vol. I, p. 42, Vol. II, pp. 156-157; King Dep., p. 73). Given the number of vacancies to be filled and the close relative scores, Mr. Welch recommended to management that the appropriate approach was to issue another certificate that included all qualified candidates that applied for the position (Welch Dep. Vol. I, pp. 22, 42; King Dep., pp. 70-71, 73). Senior management accepted Mr. Welch's recommendation (Harb Dep. Vol. III, p. 624).

Following this approval, Ms. King issued a new merit promotion

16

certificate with all seventeen names (Welch Dep. Vol. I, pp. 59-60; Bates No. 000007-00008). The names appeared in alphabetical order in accordance with the procedures contained in the MOA merit promotion guidelines (Welch Dep. Vol. I, pp. 61-62; King Dep. 56; Welch Dep. Vol. II, p. 139). On March 28, 2002, Mr. Welch notified the Arabic Service staff by email that a new certificate had been issued and that all qualified applicants would be considered (ROI, Ex. 6). In addition, Ms. King issued a reassignment (non-competitive) certificate with one name (Bates No. 000010).

At the same time, the Delegated Examining Unit (DEU), which rates the outside candidates and those already employed by the agency that chose to apply under this procedure, issued a certificate of eligibles on March 20, 2002 (Welch Dep. Vol. I, pp. 52-53; Bates No. 000006). This certificate of eligible candidates contained both U.S. citizens and non-U.S. citizens who were found to be qualified for consideration. Id. DEU certificates are issued in rank and score order (Id.; King Dep., p. 64; Welch Dep. Vol. I, p. 139). Under the DEU procedures, the selecting official must then follow the "rule of three," which means that at each step of the process, the selected individual must be one of the three highest ranked applicants still available (King Dep., p. 64; Welch Dep. Vol. II, p. 139).

In summary, there were four certificates of eligibles prepared for the GS-13 position. There were two merit promotion

certificates, one of which was withdrawn. There was one noncompetitive reassignment certificate and one competitive DEU certificate. (Bates Nos. 000010, 000006). As noted in the vacancy announcement, applicants could apply under either procedure if they were eligible. Consequently, applicants for the GS-13 position appear on multiple certificates.

The interview panel conducted interviews of all qualified candidates for the GS-13 position certified by the Office of Personnel (ROI Ex. 8; Harb Dep. Vol I, pp. 52-54; Gandji Dep. pp. 28, 35-36, 154). The interviews were held between approximately April 1, 2002 and April 11, 2002 (Gandji Interview Notes, Bates Nos. 002224-002247; Marsh Interview Notes, Bates Nos. 002248-002304). All candidates were asked the same list of questions initially prepared by Mr. Hooper and given the same opportunity to respond (ROI, Ex. 8; Gandji Dep. Vol. I, p. 35). After the interviews, the panel discussed the candidate's responses and their qualifications for the new programming format of SAWA.[5] (Harb Dep. Vol I, pp. 124-130; Gandji Dep. Vol. I, pp. 35-37; Marsh Dep. vol. I, pp. 221-222; ROI, Ex. 8).

_____

[5] Mr. Harb did not recall checking any references for the selectees from the Arabic Service (Harb Dep. Vol. I, pp. 80-81; Harb Vol. III, p. 632). He had supervised the Arabic Service for a number of months prior to the transition to Radio SAWA and had personally observed all Arabic Service broadcasters (Harb Vol. II, pp. 633-634). Similarly, Mr. Marsh had been the Chief of the Arabic Service, and therefore was also familiar with the skills and abilities of the Arabic Service broadcasters (Marsh Dep. Vol. I, pp. 16-18).

In accordance with agency policy, a "memorandum" to the Director of VOA is required for selections to GS-13 positions and above, identifying the basis for those selections. (<u>See</u> Ex. 34). This notification can take the form of a written memorandum or a verbal briefing (Bates No. 000001). In the case of the selections for the GS-13 Supervisory IRB positions, the notification was verbal. (Harb Dep., Vol I, p. 78).

**V.    <u>GS-13 Selections</u>**

Plaintiffs Abdelkarim, Alkhateeb, El-Bishlawy, and Abdelrahman applied for the GS-13 Shift Editor positions. (Harb Vol. I, pp. 117-122). Plaintiff Elmasry applied and then withdrew her name from consideration for this position. (Harb Vol. I, p. 117; Hooper Dep. pp. 89-90, Email from J. Hooper re MERN Selection Panel: Faiza El-Masry, Bates No. 001124; Hooper Note dated March 29, 2002 re: Faiza Elmasry, Bates No. 001125). The remaining four plaintiffs were among the candidates interviewed. Although Mr. Harb was the only selecting official, after the interviews the panel discussed the candidates' interview responses, and their relative qualifications for the new positions (Harb Vol I. pp. 124-130; Gandji Dep. Vol I. pp. 35-37; Marsh Dep. Vol I, pp. 221-222).

Mr. Harb believed that Mohamed Abdelkarim, Zeinab Abdelrahman, Hayat Alkhateeb, and Amina El-Bishlawy failed to demonstrate that they possessed the news judgment and reporting skills necessary for the GS-13, shift editor position under the new format and the

radical change in programming (Harb Dep. Vol. I, p. 113-130; Vol. II, pp. 419-425, 441-442). In addition, they did not demonstrate that they possessed the necessary information on or sources for the target area. (Gandji Vol. II, pp. 234-236). As shift editors, the selectees would have to perform as team leaders (Marsh Dep., pp. 116-117; Ex. 15). Plaintiffs did not demonstrate that they had the political savvy or the management skills necessary for the task.

Plaintiff Hayat Alkhateeb missed a few scheduled news readings in the studio (Harb Dep. Vol. II, p. 507). She also made mistakes on air related to the technical aspects of the studio work required for Radio SAWA. (Harb Vol. II, pp. 293-294).

Although Plaintiff Faiza Elmasry withdrew her application for the GS-13 position (Hooper Dep., pp. 89-90; Gandji Dep. Vol. I, p. 83), Mr. Marsh noted that as a broadcaster in the Arabic Service, her strong points were more in feature writing than news and that she was very, very good in the longer format programming (Gandji Dep. Vol. II, p. 230). In relation to the new SAWA positions, however, Ms. Elmasry had demonstrated problems writing news stories for the new format (Harb Dep. Vol. II, p. 441).

Plaintiff Zeinab Abdelrahman's experience was more in interviews and features rather than hard news (Gandji Dep. Vol. I, pp. 81, 135). Writing hard news from wire copy is very different from reporting on the news (Gandji Dep. Vol. II, pp. 135-36). As an Arabic Service IRB, Mr. Marsh praised her for her interview

20

skills and said she was a very dedicated and hard worker whose skills were more in the feature area (Gandji Dep. Vol. II, p. 229). While working under the new format in SAWA, Ms. Abdelrahman had missed a few studio news readings (Harb Dep. Vol. II, p. 297-298).

The panel unanimously agreed that plaintiff Mohamed Abdelkarim performed poorly at his interview (Harb Dep. Vol I., pp. 113-116, 128-130; Gandji Dep. Vol. II, p. 140, 157-158; Marsh Dep. Vol I, pp. 105-107, 121-122). It was the consensus of the interview panel that he was not as well qualified for the SAWA position as those who were selected, particularly in the areas of overall quality of the interview experience, news judgment, writing, and editorial skills for the new format. Id. Although not selected, Mr. Marsh noted that Mr. Abdelkarim was a dedicated and loyal person whom he thought highly of and was always there when Mr. Marsh needed him to pitch in and help (Gandji Dep. Vol II, p. 229). However, during the interview when asked specific questions, Mr. Abdelkarim failed to name a specific source (Id., p. 237). Mr. Abdelkarim had also demonstrated problems writing news stories under the new format. (Harb Dep. Vol. II, pp. 296-297).

The selectees for the GS-13 shift editor positions were as follows:

Hala Arafa (age 41) is Muslim of Egyptian national origin. She was employed by the Arabic Service since 1986 and had been a GS-12, IRB, news editor since 1993. She is a graduate of Cairo University

21

(Bates Nos. 0000413-000042).  Ms. Arafa changed the writing style of "The Video Club" from formal Arabic and adapted it to the Arabic vernacular and conventional style (Bates No. 000045; see also Bates No. 00047).

Wassila Beldi (age 46) is Muslim of Tunisian national origin who graduated from the Tunisian College of Journalism.  She was employed by the Arabic Service since 1986 and was a GS-12, IRB who hosted a weekly panel discussion (Bates No. 000079).  Ms. Beldi had previously worked for National Radio and Television in Tunisia (Bates No. 000081). She had prior experience accessing the wire services (Id. ¶ 3). She served as a news editor and a backhalf editor for VOA (Id. ¶ 4).  Ms. Beldi had a strong news background and performed well during the interview.

Mohammed Cherkaoui (age 41) is a Muslim of Moroccan national origin and a Political Science graduate from Mohamed V University in Morocco, who continued his studies of International Relations at the London School of Economics (Bates No. 00062).  He had been employed by the Arabic Service since 1989 as an IRB.  Mr. Cherkaoui was the coordinator and host of prime-time news hours, receiving many awards for excellence in programming and was Employee of the Year in 2000 (Bates No. 00062-00063).  He conducted an average of 370 interviews a year with politicians, opposition leaders, scholars, and ordinary citizens in English, Arabic, or French (Bates No. 00065).

George Shammas (age 66) is a Christian of Palestinian national origin who was a GS-13, supervisory IRB (Arabic)(Newswriter) with VOA since September 2000  (Bates No. 000168).  He is a graduate of the University of Kentucky, College of Communication (Bates No. 000170).  He served as Senior Editor for the Arabic Service and has had significant supervisory and management responsibilities (Bates No. 000171). He was laterally reassigned to the position.

Nicola Zaboura (age 63) is a Christian of Jordanian national origin (Bates No. 000095) and an employee with the Arabic Service since 1971 who was a GS-13, Supervisory IRB since 1997 (Bates No. 000099).  Prior to his employment with VOA, he was the Political Commentator for Radio Amman and then became chief of the Special Program Section for Radio Amman (Bates No. 000100).  He served as a team leader and was one of the most reliable news and backhalf editors in the Arabic Service (Bates No. 000121).

Mohammed Saad (age 55) is a Muslim of Egyptian nationality who was a GS-12, IRB employed by the Arabic Service since 1997 (Bates No. 000148).  He had previously worked with the U.N. Secretariat in New York translating and editing speeches for the U.N. Security Council, the U.N. General Assembly, the Al Jazeera newspaper (Saudi Arabia), and for the Egyptian Broadcasting Service (Bates No. 000150-000151).  He graduated from Cairo University (Bates No. 000152).  He served as shift editor (backhalf) and news editor in the Arabic Service. Id.

Daniel Nassif (age 44) is of Lebanese national origin,[6] who received a BA and Ph.D. from the University of Michigan. (Bates Nos. 000140-000142)  He has become a recognized authority on the Middle East, testifying on the subject before Congress on multiple occasions and working with the Department of Defense and the Department of State (Bates No. 000142).  Previously, he worked with Al-Hayat newspaper as an editorial contributor, the Charles Malik foundation as Research Director and Global Core Strategies as a Business Development Manager for the public sector (Bates No. 000139).

Munir Nasser (age 65) is of Palestinian national origin.  He has over 20 years' experience in news writing, reporting, editing, and translation in Arabic and English (Bates No. 000128).  He received his BA in Political Science/Journalism from the American University in Cairo, his MA in Journalism from the University of South Carolina, and his Ph.D. in Mass Communication from the University of Missouri (Bates No. 000128).  Mr. Nasser was editor and translator for Newsweek (Arabic Edition) and trained Arab journalists for the International Center for Journalists. Previously, he had served as Managing Editor for Asharq Al-Awsat (Washington Bureau) and was a Washington correspondent providing stories and news analysis for newspapers and magazines in Kuwait,

---

[6] Several witnesses speculated that Mr. Nassif was Christian (ROI, Ex. 38). Similarly, it is believed Mr. Nasser's religion is Christian. Id.

Jordan, Qatar, East Jerusalem, Saudi Arabia, Detroit, and London (Bates No. 000129). He also had significant management experience (Bates No. 000131).

In summary, the plaintiffs did not demonstrate in their interviews and their work with Radio SAWA during the transition period that they had the qualities or skill-sets needed for the new GS-13 positions or that they were as qualified for the positions as those selected (Harb Dep. Vol. II, pp. 443-444).

### VI. GS-12 Selection Process

After selection for the GS-13 positions was completed, selections for the GS-12 IRB positions began and followed the same process (King Dep., pp. 132, 197). A total of forty applications were received ((Applicant listing vacancy M/P-02-41), Bates Nos. 000570-000572). Twenty-seven candidates were qualified for consideration under the competitive DEU procedures ((DEU tabulation sheets) Bates Nos. 000575-000546). Under the DEU procedure, a rating and ranking panel was convened and ranked the candidates. On April 5, 2002, a DEU certificate was issued which contained the names of five U.S. citizens and six non-citizens applicants. The sixth non-citizen was included due to a tie score (Bates No. 000557).[7]

A non-competitive reassignment certificate of six candidates

---

[7] The GS-11's who applied for promotion under the GS-12 vacancy announcement were referred to the DEU because they were non-citizens. (King Dep. at 146)

25

eligible for reassignment was submitted on December 14, 2002.  The plaintiffs, other than Ms. El-Bishlawy, do not appear on this certificate because they did not apply for nor were they required to for this position under the MOU with the Union (ROI, Ex. 35).  All GS-12s in the Arabic Service were invited to be interviewed and were considered for the initial staffing of GS-12 positions with SAWA (ROI, Ex. 35; King Dep., p. 166).

The interview panel for the GS-12 positions was the same as the GS-13 panel (Harb Dep. Vol I, pp. 199-200; Marsh Dep. Vol. I, pp. 115-116, 130; Gandji Dep. Vol. II, p. 154).[8]  There were twelve candidates selected, all of whom were VOA employees or purchase order vendor/independent contractors (POVs) with the Arabic Service (Harb Dep., Vol. I, pp. 220-224).

### VII. GS-12 Selections

The skills needed for the GS-12, IRB newswriter positions included using multiple news sources to produce an original story in Arabic, correct lead, language, and an accurate translation of quotes from English to Arabic (Harb Dep., Vol. II, p. 442).  The selectees needed the ability to deliver and execute a live newscast, starting music with Dalet at the appropriate time, starting actualities (a group of sound bites) on time, and editing actualities (Id. at 449).  The SAWA positions required a different

---

[8] There were also GS-12s who applied for reassignment from the Arabic Service even though they did not have to do so.

26

skill-set than required for the IRBs in Arabic Service (Harb Dep. Vol. II, pp. 421-423; Gandji Dep. Vol. II, pp. 193-194; Marsh Dep. Vol, I, pp. 116-117). The plaintiffs' background interviews and their work with SAWA failed to demonstrate that they had the skill-sets for the new GS-12 positions. Id.

Mr. Harb drafted a justification memorandum explaining his selection of five non-citizens over U.S. citizens (Welch Dep. Vol. II, p. 235; Bates Nos. 00561-000562). Mr. Harb made this selection based on the applicants' answers to interview questions, as well his own personal observations of the applicants during the start-up of SAWA. ((Justification for Selection of Non-citizens for SAWA, IRBs), Bates No. 000561-000562) Mr. Harb selected the five non-citizens rather than the plaintiffs because he had observed their performance in the newsroom for four months very closely and they had a proven track record (Id. at 000561). All five selectees demonstrated the ability to write news stories directly from multiple sources that were "brief, factual and up-to-the minute." Id. Their pronunciation on air was "correct, vigorous, energetic and punchy," consistent with the new SAWA style. Their selection of news for the pan Arab and Iraqi news stream was the most reliable and objective. Id. They had excellent knowledge of and skill in dealing with Arabic Language "idiomatic expressions." One selectee was the best among the staff in the Iraqi dialect. (Bates No. 000562). And finally, they fully mastered the complex Dalet

27

software and sustained the ability to arrive in studio on time for
the twice hourly news casts. Id.  The voices of Elzubeir El-Tayeb,
Aida Akl, Maha Rabie, and Zahrat Abuzaid were better suited for
SAWA than the plaintiffs' voices because the selectees' voices fit
the new SAWA format and they had a better delivery. (Harb Dep. Vol.
III, p. 663).

The seven U.S. citizens selected for the GS-12 positions were
as follows (Bates No. 000556):

Aida Akl (age 44) was an employee of the Arabic Service who is
a Christian of Jordanian nationality.  She had been a GS-12, IRB,
since 1986 (Abdelkarim Dep., p. 71) and a graduate of Beirut
University in Mass Communication, theater, film, and creative
writing. (Bates Nos. 00275-00280).

Gamal Al Adle (age 49) was an employee of the Arabic Service
who is a Muslim of Egyptian nationality. (Abdelkarim Dep., p. 74).
He had been a GS-12, IRB since 1985.  He has a BA from Al Azhar
University in Cairo, Egypt.  He had advanced studies at Shams
University and at the Radio and TV Training Institute in Cairo.
(Bates Nos. 01038-01059).

Elzubeir El-Tayeb (age 48) was an employee of the Arabic
Service who is a Muslim of Sudanese nationality. (Abdelkarim Dep.,
P. 72).  He had been a GS-12 IRB since 1985 (Bates No. 000641) He
attended Cairo University and obtained an associate degree in Mass
Media and Broadcasting. (Bates No. 00044).

Rachid Jaafar (age 44) was an employee of the Arabic Service who is a Muslim of Moroccan nationality. (Abdelkarim Dep., p. 70). He has been a GS-12, IRB since 1984. (Bates Nos 00075).  Mr. Jaafar has a BS from Georgetown University in Linguistics and an MA in International Public Policy from the School of Advanced International Studies, Johns Hopkins University. (Bates No. 000076).

Maha Rabie (age 43) was an employee of the Arabic Service who is a Muslim of Palestinian nationality (Marsh Dep Vol. I, p. 55). She had been a GS-12, IRB since 1988. (Bates No. 000680) Ms. Rabie has a BA in English from the University of Kuwait and an MA in Journalism and Public Affairs from American University. (Bates No. 1000681).

Mohammad Suelibi (age 56) was an employee of the Arabic Service who is Muslim of either Jordanian or Palestinian nationality.  (Abdelkarim Dep., p. 75) He had been a GS-12, IRB since 1988.  (Bates No. 000707).  Mr. Suelibi has a BA in Arabic Literature from Jordan University and an MS in Mass Media from Michigan State (Bates No. 000708).

Emad Al-Khafaji (age 42)was employed as a purchase order vendor (POV) with the Arabic Service who is a Muslim of Iraqi nationality.  He is a graduate of the Fine Arts Academy of Baghdad. He had significant experience with music radio and programs targeted to a younger audience. (Applications).

The five non-citizen selectees for the GS-12 positions were as
follows:

Reem Abaza (age 30) was an employee of the Arabic Service who
is a Muslim of Egyptian national origin (Abdelkarim Dep., p. 68).
He had been a GS-11, IRB since 2000 (see also Harb Dep. Vol. II,
pp. 363-366) and was a graduate of Cairo University in
Broadcasting.

Dalia Alaqidi (age 34) was an employee of the Arabic Service
who is a Muslim of Iraqi nationality (Abdelkarim Dep., p. 72).  She
had been a GS-11 IRB since 1998. (Bates Nos. 000636-000639; Id.).
She has a BA from the Institute of Fine Arts, Baghdad.

Elmigdad Gebril (age 43) was an employee of the Arabic
Service, who is a Muslim of Sudanese national origin.  He was a GS-
12, IRB with the Arabic Service since 1991. (Bates No. 002275; Harb
Dep., Vol. I, p. 92).  He had experience as a news editor and a
producer in charge of the daily news in English with the Sudan
National Radio. (Bates Nos. 00532-00553).

Nassreddine Hssaini (age 38) was an employee of the Arabic
Service, who is a Muslim of Moroccan nationality.  He has a BA in
Journalism. (Bates No. 00068) He was a GS-11, IRB since 1999 (Id.;
Harb Vol. I, p. 204)

Zahrat Abuzaid (age 45) was an employee of the Arabic Service
who is a Muslim of Sudanese nationality.  He has a BA in languages
from Khartoum University and an MA in African History from Howard

University. (Bates No. 001063) He had been a GS-12 IRB since 1993.
<u>Id</u>.

**ARGUMENT**

I.    **Summary Judgment Standards**

Summary judgment is appropriate when the record shows that no
genuine issue exists as to any material fact and the moving party
is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322 (1986); <u>Matsushita Elec. Indus. Co. v.
Zenith Radio Corp</u>, 475 U.S. 574, 587 (1986); <u>Tao v. Freeh</u>, 27 F.3d
635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue
of material fact exists, the trier of fact must view all facts, and
reasonable inferences drawn therefrom, in the light most favorable
to the non-moving party.  <u>Matsushita</u>, 475 U.S. at 587.  The mere
existence of a factual dispute, however, will not defeat summary
judgment.  The non-moving party must show that the dispute is
genuine and material to the case.  That is, the factual dispute
must be capable of affecting the substantive outcome of the case
and supported by sufficiently admissible evidence that a reasonable
trier of fact could find for the non-moving party.  <u>Anderson</u>, 477
U.S. at 247-48; <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242-43
(D.C. Cir. 1987).  If the evidence favoring the non-moving party is
merely colorable, or is not significantly probative, summary
judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50 (citations

31

omitted).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  Celotex Corp., 477 U.S. at 323 (citations omitted).

Moreover, Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). Further, the non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  See also Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II.  Shifting Burden of Proof in Title VII and ADEA Cases

In any Title VII case, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that intentional discrimination was a motivating factor in the non-selection.  This burden remains at all times with the plaintiff, Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) A plaintiff

may satisfy it either by direct evidence of a discriminatory motive
or by indirect evidence of intentional discrimination.  In the
latter case, the plaintiff relies on the framework articulated in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for the
creation of a presumption of discrimination and "to bring the court
expeditiously and fairly to this ultimate question."  Burdine, 450
U.S. at 253.

     To prevail on the merits in a discrimination case brought
under Title VII, a plaintiff must initially establish a prima facie
case of prohibited discrimination.  See McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973); Aka v. Washington Hospital Center, 156
F.3d 1284, 1288 (D.C. Cir. 1998) (en banc) ("under the McDonnell
Douglas framework, the complainant must first establish a prima
facie case . . .") (citation omitted).  The burden of articulation,
not proof, then shifts to the defendant to "articulate some
legitimate, nondiscriminatory reason for the employee's rejection."
McDonnell Douglas at 792.  If the defendant meets this burden, then
plaintiff must have the opportunity to prove, by a preponderance of
the evidence, that "the legitimate reasons offered by the defendant
were not its true reasons, but were a pretext for discrimination."
Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)
(defendant's burden articulated for Title VII cases).

     The burden shifting scheme set forth in McDonnell Douglas
also applies to claims under the ADEA.  See Barnette v. Chertoff,

453 F.3d 513, 515 (D.C. Cir. 2006); <u>Stella v. Mineta</u>, 284 F.3d 135, 144-146 (D.C. Cir. 2002).  The ultimate burden of proof rests at all times with the plaintiff <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 143 (2000).

### III. <u>Plaintiffs Failed To Properly Exhaust Their Administrative Remedies</u>

The plaintiffs failed to exhaust their administrative remedies by abandoning the administrative process.  They should be precluded, therefore, from pursuing their claims in District Court. <u>See</u> 42 U.S.C. § 2000e-16(c); <u>Bowden v. United States</u>, 106 F.3d 433, 437 (D.C. Cir. 1997).

Under Title VII, a plaintiff must consult with an EEO counselor within 45 days of the alleged adverse personnel action. <u>Siegel v. Kreps</u>, 654 F. 2d 773, 776 (D.C.Cir. 1981).  ("The principal exhaustion requirement is that the complainant must initially seek relief in the agency which has allegedly discriminated against him."). In <u>Brown v. General Services Administration</u>, the Supreme Court determined that Title VII creates an exclusive and preemptive structure for federal employment discrimination cases at both the administrative and judicial level. Because the goal of Title VII is conciliation and internal agency resolution instead of litigation, it is necessary for administrative remedies to be exhausted before judicial relief can be obtained. <u>See</u> <u>Brown</u>, 425 U.S. 820, 829-33 (1976); <u>Siegel</u>, 654 F.2d at 776-77; <u>Anderson v. U.S. Postal Service</u>, 25 F.E.P. 938, 939

(D.D.C.1981). Exhaustion of administrative remedies is more than going through the motions, it requires a through and specific presentation of the grievance and its development until a final decision is reached. Edwards v. Dept. of Army, 708 F.2d 1344, 1346-47 (8th Cir. 1983).

"If the agency does not reach the merits of the complaint because the complainant fails to comply with the administrative procedures the Court should not reach the merits either. Otherwise the complainant might be dilatory at the administrative level, knowing he can get into federal court anyway." Johnson v. Bergland, 614 F.2d 415, 417-18 (5th Cir. 1980). Moreover, a plaintiff who abandons the administrative process midstreams "prevents exhaustion and precludes judicial review of those claims."; Powell v. Reno, 1999 U.S. Dist. Lexis 18134, *6 (D.D.C. 1999), quoting Greenlaw v. Garrett, 59 F.3d 994, 997 (9th Cir. 1995). Plaintiffs embarked on the administrative process when they filed formal complaints and requested a hearing at the EEOC. By withdrawing their request the day after the close of discovery, however, they have "abandoned the administrative process mid-stream" and failed to properly exhaust their administrative remedies as Title VII requires. Id.

After a formal complaint has been filed with the Agency and an investigation has been conducted and a Report of Investigation prepared, there are two alternative ways a complainant may proceed. 29 C.F.R. § 1614.108(b),(f),(g), 1614.110(b). The complainant has

35

30 days to decide how to proceed. 29 C.F.R. § 1614.108(f).  They may request a hearing before an Administrative Judge (AJ) or they may request an immediate decision from the Agency. Id.  In the event a complainant requests a hearing before an AJ, they are entitled to engage in discovery.  Whereas if a complainant requests an immediate decision by the agency, they are not entitled to discovery. Compare 29 C.F.R. § 1614.109(d) and 1614.110(b)(See also Ex. -----; EEOC Acknowledgment and Order).

Plaintiffs made initial contact with the Agency's Office of Civil Rights (OCR) on November 7, 2002 (ROI, Ex. 5, p. 2).  They subsequently filed formal complaints in May, 2003.  In January 2004, plaintiffs elected to proceed to a hearing before an Administrative Judge at the Equal Employment Opportunity Commission (EEOC).  The consolidated cases were assigned to the EEOC San Antonio District Office.  After an extended discovery period, discovery closed on January 11, 2005 (December 17, 2004 EEOC Order Extending Period of Discovery and Setting New Date for Pre-Hearing Conference)(EEOC Order).  After electing to proceed under 29 C.F.R. § 1614.108(g) and fully availing themselves of discovery, including taking extensive depositions not available under 29 C.F.R. § 1614.110(b), plaintiffs withdrew their hearing request on January 12, 2005 - the day after the close of discovery (January 12, 2005 Letter from Stephen Spitz to Admin. Judge Laura Alderman).  Plaintiffs then requested a Final Agency Decision (FAD) from the

36

Agency, a procedure in which the plaintiffs were not entitled to discovery. see 29 C.F.R. § 1614.110(b).

Plaintiffs cited as their reason for abandoning their election to proceed with a hearing as "the depositions and other evidence in this case" made them "strongly believe" that there was sufficient evidence to file in District Court and the "unacceptable method by which hearings are conducted by Administrative Judges in the EEOC San Antonio District Office" (Id., referring to her "draconian" order in the Perez case). It is clear that plaintiffs' law firm had a history with and were familiar with the San Antonio Office and the particular Administrative Judge assigned to the case. Nevertheless, they elected to proceed with the hearing procedure and to engage in discovery, unrestrained by the limits imposed by the Federal Rules of Civil Procedure and the Local Rules.

Plaintiffs' formal complaint was filed on May 13, 2003 (ROI, Ex. 2). They requested a hearing on January 9, 2004 (Ex. ----). They received the Acknowledgment and Order from the EEOC on June 24, 2004 (Ex. ----). The plaintiffs could have gone directly to District Court in November 2004 since a hundred and eighty (180) days had expired or, any time thereafter they could have requested an immediate decision by the Agency when they became aware of the case assignment to the San Antonio Office. 29 C.F.R. § 1614. 110(b). Instead, plaintiffs elected to proceed under the hearing procedures, obtaining discovery to which they would not be entitled

37

under FAD procedure, without the normal constraints of the applicable Federal rules.

Plaintiffs manipulated the administrative process by just "going through the motions" of complying with their election to proceed with a hearing. Edwards, 708 F.2d 1346.1347; see also Greenlaw v. Garrett, 59 F.3d at 997 ("A plaintiff may not cut short the administrative process prior to its final disposition, for upon abandonment a claimant fails to exhaust administrative relief and may not thereafter seek redress from the Courts"). Once plaintiffs made an election for the hearing process and received the benefits of that procedure, they should not be able to abandon the process immediately after receiving the benefits. Here, it is clear that plaintiffs calculatingly manipulated the EEO process. As a result, plaintiffs failed to properly exhaust their administrative remedies.

Plaintiff also failed to exhaust their original administrative remedies on their claims of harassment and reprisal for prior EEO activity (Compl. ¶¶ 32-34). They subsequently sought to amend their administrative complaint to raise a harassment (hostile work environment) claim on October 9, 2003 (ROI, Tab 6). They never raised a retaliation claim at the administrative level. Both the hostile work environment claim and the retaliation claim are untimely since they failed to contact an EEO counsel within 45 days of their departure from SAWA. 29 C.F.R. § 1614.105(a)(1).

38

Plaintiffs no longer worked for SAWA after December 2002. All the allegations that form the basis of their hostile work environment occurred while they worked at SAWA. They did not raise this claim until nine months later. The complaint fails to allege any acts of retaliation occurring after either the November 2002 (informal) or May 2003 (formal) complaints. Indeed, plaintiffs failed to raise this claim administratively at any time or even identify in their District Court complaint those acts they consider retaliation.

To the extent plaintiffs may argue that the defendant waived the 45-day time limit by accepting plaintiffs' harassment claim for processing, they are mistaken. Saltz v. Lehman, 672 F.2d 207, 208 (D.C. Cir. 1982). An agency does not waive the time requirement by accepting and investigating a "tardy" complaint, absent equitable tolling. Id., citing Oaxaca v. Roscoe, 641 F.2d 386 (5th Cir. 1981). Here, the plaintiffs have failed to plead and prove grounds for equitable tolling. See Mondy v. Secretary of the Army, 845 F.2d 1051, 1056 -1057 (D.C. Cir. 1988).

As previously discussed, Title VII requires a federal employee to contact an EEO counselor within 45 days of the alleged discriminatory or retaliatory act. 29 C.F.R. § 1614; Siegel, 654 F.2d at 776. Administrative remedies must be exhausted before plaintiffs can seek redress in Federal Court. Brown, 425 U.S. at 829-833. Since the plaintiffs failed to timely raise a hostile

work environment claim and have never raised a retaliation claim at the administrative stage, they are precluded from doing so now and those claims should be dismissed.

**IV.   Plaintiffs Fail to Present Sufficient Evidence to Sustain Their Burden of Proof under Title VII.**

Plaintiffs claim that they were not selected for the new GS-12 and GS-13 positions at SAWA because of their national origin (Egyptian - Syrian) and their religion (Sunni Muslim).  In order to establish a prima facie case of a discriminatory for failure to promote or hire, plaintiffs must establish: (1) that they belong to a protected group; (2) that they applied and were qualified for a job for which the employer was seeking applicants (i.e. the job sought was vacant); (3) that despite their qualifications, they were rejected; and (4) that the individual(s) were selected to fill the position(s). Cones v. Shalala, 199 F.3d 512, 515-517 (D.C. Cir. 2000); Stella v. Mineta, 284 F.3d 135, 145.

The plaintiffs are members of protected groups.  They are Muslim and their nationality is Egyptian and Syrian (plaintiff Alkhateeb).  They applied for, were qualified for, and were considered for the GS-13 and GS-12 positions at SAWA, with the exception of plaintiff Elmasry, who withdrew her application for the GS-13 position before she was interviewed.[9]  They were not

---

[9] Under the MOU with the Union, plaintiffs were automatically considered for the GS-12 position, even if they did not submit an application.

selected for the available GS-13 or GS-12 positions.  Given the relatively low threshold showing required under <u>McDonnell Douglas</u> and <u>Stella</u>, plaintiffs have satisfied their initial burden of making a <u>prima facie</u> case of national origin and religious discrimination although their <u>prima case</u> is not particularly strong.[10]

The defendant has articulated non-discriminatory reasons for the selection of individuals other than the plaintiffs for both the GS-12 and GS-13 positions.  Without repeating the qualifications of the selectees and the reasons for their selection, discussed <u>supra</u>, the plaintiffs failed to demonstrate that they had a "skill set" or the background for the new positions.  Mr. Harb believed, which was confirmed by Mr. Marsh and Ms. Gandji, that they failed to demonstrate during their interviews and their performance at SAWA that they were suited to the radically new SAWA style, programming and format.  The defendant has met the burden of production. <u>Burdine</u>, 450 U.S. at 254-256 (defendant must not bear the burden of persuasion . . . the defendant's explanation must simply raise an issue of fact).

---

[10] Of the eight individuals selected for the GS-13 positions, there were two Egyptians, one Tunisian, one Moroccan, two Palestinians, one Jordanian and one Lebanese selected.  There were four Muslims, two Christians and two individuals whose religious affiliation is unknown selected.  Of the thirteen individuals selected for the GS-12 positions, there were two Egyptians, three Sudanese, two Moroccans, one Iraqi, one Jordanian and one who was either Jordanian or Palestinian.  There were nine Muslims, one Christian and — unknown.

41

It is incumbent upon plaintiffs to prove by a preponderance of the evidence that defendant's proffered reasons are pretext for invidious discrimination based on their national origin and religion. Burdine, 450 U.S. at 256.  The primary, if not exclusive, thrust of plaintiffs' pretext argument is that their experience and qualifications for both the GS-12 and GS-13 positions demonstrate that they were better qualified for those positions than the selectees (see e.g. ROI, Ex. 6 (Abdelkarim)).

Title VII does not permit a Court to act as a super-personnel department that reexamines an employer's business decision. Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999).  Even if a Court believes that the employer used poor selection procedures, it may not "second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive." Fischbach v. D.C. Dep't. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting Milton v. Weinberger, 696 F.3d 94, 100 (D.C. Cir. 1982)("it is axiomatic that . . . an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other distinctions do not influence the decision").

In some cases, qualifications evidence may be sufficient to show pretext. Ash v. Tyson Foods, Inc. 546 U.S. 454 (2006).  In order to infer pretext, however, plaintiffs must demonstrate sufficient evidence that would permit a reasonable fact-finder to conclude that a reasonable employer would have found plaintiffs to

42

be "significantly" better qualified for the job. Aka v. Washington Hospital Center, 156 F.3d 1284 (D.C. Cir. 1998); Carter v. George Washington University, 387 F.3d 872, 881-882 (D.C. Cir. 2004).  Or plaintiffs may seek to expose other flaws in the explanation such as showing the employer has misstated their qualifications. Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).  However, plaintiffs cannot show pretext merely based on their subjective assessment of their own skills and performance. See e.g. Hammond v. Chao, 383 F.Supp. 2d 47, 57 (D.D.C. 2005); see also Stewart v. Ashcroft, 352 F.3d 422 (D.C. Cir. 2003).  In determining whether the proffered reasons are pretext, the Court does not examine whether the reasons were correct but instead focuses on whether the selecting official honestly believed the reasons advanced. McNally v. Norton, Civil Action No. 02-0140, citing Fischbach, 86 F.3d at 1183; see also Hammond, 383 F.Supp. 2d at 58.  It is not enough to show that the reasons given were not just, or fair or sensible.  Plaintiffs must show that the explanation given to them was a "phony reason." Pignato v. American Trans Air, 14 F.3d 342, 349 (7th Cir. 1994), quoted in Fischbach, 86 F.3d at 1183.

Plaintiffs evidence concerning their superior qualifications emphasizes their long experience with the Arabic Service, their dedication, outstanding performance and/or their skill in classical Arabic (See e.g. ROI, Ex. 6 p. 8(Abdelkarim)).  However, they failed to demonstrate how their long service, their outstanding

43

performance and skill in classical Arabic was objectively superior
to the selectees for what was admittedly a radical departure from
the radio broadcasting that they had been doing in the Arabic
Service, including format, style and language. (See e.g. Marsh Dep.
Vol. I, pp. 116-117; Harb Dep., Vol. I, pp. 100-103; Vol II, pp.
419-425, 441-442).

A review of the qualification of the GS-13 selectees indicates
that many of the selectees had worked with VOA almost as long as
the plaintiffs, if not longer ((Arafal (1986), Beldi (1986),
Cherkaoui (1989), Zaboura (1971), Shamma (1970)).  Moreover, two of
the selectees were already performing as GS-13s in the Arabic
Service and were laterally transferred to the new positions
(Shammas, age 63, Christian/Palestinian; Zaboura, age 63,
Christian/Jordanian).  The selectees had also demonstrated
dedication and superior performances (GS-13 File, Bates Nos. 00041-
000193).  Mr. Cherkaoui was employee of the year in 2000 (Id.,
Bates Nos. 00062-00063).  All of the selectees had superior news
and news writing backgrounds and were better able to adapt to the
new format.

Plaintiffs complain bitterly that two outside candidates, Mr.
Nassif and Mr. Nasser, were selected for the GS-13 positions
alleging that they lacked "radio" experience.  A review of the
vacancy announcements indicated that more than radio or broadcast
experience was required (ROI, Vol. II, Ex. 27).  There was an

44

extraordinary emphasis on the ability to quickly gather, write and translate news from primary sources. In addition, the programming was designed to appeal to a different audience than the Arabic Service. Mr. Nassif was a recognized expert in the Middle East who had organizational and management skills designed to implement strategic goals. Given his expertise, his judgment in the selection and editing of news for the new target audience would be an asset. Mr. Nasser had over 20 years experience in news writing, reporting, editing and translation. His experience with news the news media and journalism was much broader than the plaintiffs.

Similarly, a review of the qualifications of the GS-12 selectees, and the qualifications of the plaintiffs fail to demonstrate that plaintiffs were "substantially" better qualified for the new discipline and skill set required for SAWA (Bates No. -----(Applications)). Plaintiffs lacked news writing skills from original, multiple sources (Harb Dep. Vol. II, pp. 424-444; 446-450). They lacked the voicing skills required for the "up to the minute quick" newscast (Id. at 448-449). They also lacked the technical abilities to execute live newscasts with music. Id. The voices of most of the selectees were better suited to the news format (Id.; see also Harb Dep. Vol I, pp. 507-514).

Finally, plaintiffs point to an isolated comment by Mr. Harb complaining that "We are not Radio Cairo" and his strong dislike of the pronunciation of particular words, including a hard "G" used in

the Egyptian dialect.  Isolated comments such as these fail to
sustain plaintiffs burden of producing evidence of discriminatory
intent of either national origin discrimination or religious
discrimination.  Threadgill v. Spelling, 377 F.Supp. 2d 158, 164
(D.D.C. 2005); Dunaway v. Int'l Brotherhood of Teamsters, 310 F.3d
758 (D.C. Cir. 2002); Nesbit v. Pepsico, Inc., 994 F.2d 703, 705
(9th Cir. 1993); see generally Price Waterhouse v. Hopkins, 490 U.S.
228, 277 (1999)(O'Connor, J., concurring).   Moreover, these
comments, rather than indicating discriminatory intent, reflect the
new direction of SAWA, which was a policy decision made by
BBG/IBB/VOA unrelated to plaintiffs or Mr. Harb.  The style book
was changed to modify the classic Arabic style, originating with
Radio Cairo broadcasting.  It was changed to a more colloquial
Arabic.  Plaintiffs may disagree with this decision or the
appropriateness of the language or style and format implemented by
Mr. Harb, but this fails to evidence discriminatory intent.

     Plaintiffs have failed to present a scintilla of evidence that
the selections at issue were motivated by religious discrimination
against Muslims, or Sunni Muslims in particular.  Indeed, the
record reflects that not one of the selectees for the GS-13
positions was a Shia Muslim as was Mr. Harb.  A review of the known
religious backgrounds of the SAWA employees as of November 2002
indicate Muslims, and Sunnis Muslims in particular, dominate the
workforce.  At most the non-Sunni workforce at SAWA was changed by

two Christians and one (non-practicing) Shia (Mr. Harb) over the
workforce of the Arabic Service (See Exhibits 1 and 2).  This
evidence is insufficient to raise an inference of religious
discrimination or overcome the legitimate, non-discriminatory
reasons for plaintiffs' non-selection.  Plaintiffs may not rely on
their unsupported opinions, no matter how strongly held, and their
subjective conclusions to create a factual issue for trial. Liberty
Lobby, Inc, 477 U.S. at 248 (1986); Green v. Dalton, 164 F.3d 671
(D.C. 1999).

     The plaintiffs have failed to show " . . . both that the
reason was false, and that discrimination was the real reason" for
their non-selection. Hicks, 509 U.S. at 515 (1993).  Thus, summary
judgment should be entered in favor of the defendant on plaintiffs'
claim of national origin and religious discrimination.

## V.    Plaintiffs Cannot Demonstrate Sufficient Evidence to Sustain Their ADEA Claim.

     To establish a prima facie case of age discrimination under
the ADEA, a plaintiff must show that he/she: (1) belongs to the
statutorily-protected age group (over 40), (2) suffered an adverse
action, and (3) was disadvantaged in favor of a younger person.
May v. Shuttle, Inc., 129 F.3d 165, 172 (D.C. Cir. 1997), cert.
denied, 524 U.S. 927 (1998); Forman v. Small, 271 F.3d 285, 292
(D.C. Cir. 2001).  A "younger person" must be a person
"considerably" younger than the plaintiff. Crockett v. Richardson,
127 F.Supp.2d 40, 46 (D.C. 2001); see also Beeck v. Federal Express

<u>Corp.</u>, 81 F. Supp.2d 48, 53-54 (D.D.C. 2000)("To raise an inference of discrimination by showing that a younger person was favored, a plaintiff must point to a worker with a 'significant' or 'substantial' difference in age"), <u>citing</u> <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 313 (1996).

To be "significantly" or "substantial" the relevant age difference usually must be ten years or more. <u>O'Connor</u>, 517 U.S. 308, 313 (1996); <u>see</u> <u>e.g.</u> <u>Mintzmyer v. Babbit</u>, 1995 WL 25342*14 (D.D.C. Jan. 1995), <u>affirm'd</u> 72 F.3d 920 (D.C. Cir. 1995); <u>Richter v. Hook Super Rx, Inc.</u>, 142 F.3d 1024, 1028-1029 (7th Cir. 1998). An eleven month age difference between the plaintiff and the selectee is insufficient to meet the legal standard of "considerably different" or "substantially different" in age to establish a <u>prima</u> <u>facie</u> case under the ADEA. <u>O'Connor</u>, 517 U.S. at 313. Courts in this Circuit have found that a difference of less than five years between the plaintiff and the favored employee is not sufficiently substantial to raise an inference of age discrimination. <u>Beeck v. Federal Express Corp.</u>, 81 F. Supp.2d at 53-54 (a difference of less than 4 years between the selectee and the plaintiff was not substantial or significant enough to withstand the defendant's motion for summary judgment); <u>see</u> <u>also</u> <u>Clifton v. Federal Nat'l Mortgage Assoc.</u>, 36 F.Supp.2d 20, 26 (D.D.C.1999) (a three year difference did not support <u>prima</u> <u>facie</u> case of age discrimination); <u>Siragy v. Georgetown University</u>, 1999

48

WL 767831, *5-*7 (D.D.C. Aug.20, 1999) (finding that a difference
of only four years weighs against inference of age discrimination).

The ages of the GS-13 selectees were 41, 46, 55, 63 and 66.
The ages of the plaintiffs were 46, 48, 54, 55 and 59.  Clearly,
there was not such a significant disparity in the ages that would
permit a strong inference of age discrimination.  <u>Stella</u>, 284 F.3d
at 145-146.  Plaintiffs Abdelkarim (48) and Elmasary (46) are only
seven and five years older than the youngest selectees and fifteen
and twenty years younger than the two oldest selectees.  They
clearly cannot establish a <u>prima</u> <u>facie</u> case under the ADEA.  Again,
given the extraordinarily low threshold for a <u>prima</u> <u>facie</u> case,
plaintiffs Abdelraham (55), Alkhateeb (59) and El-Bishlawy (54) can
arguably establish a <u>prima</u> <u>facie</u> case because they are ten years
older than the two youngest selectees.

Similarly, there were twelve selectees for the GS-12 positions
of which 3 selectees were in their 30s, 8 selectees were in their
40s, and one selectee was 56.  Except for three of the selectees
who were in their 30s, the remaining nine selectees were in the
same 10 year age category of the plaintiffs.  Under <u>Stella</u>,
plaintiffs have established a <u>prima</u> <u>facie</u> case as to the GS-12
selections, but hardly a strong or compelling one.

Regardless, plaintiffs cannot overcome the articulated non-
discriminatory reasons for their non-selection by demonstrating
evidence of pretext or credible evidence that age was a determining

factor in the selections. <u>Krodel v. Young</u>, 748 F.2d 701, 706 (D.C. Cir. 1984).  More specifically, plaintiffs cannot prove that age made a difference in the employer's decision in the sense that "but for" the discriminatory motive, plaintiffs would have been selected (<u>Id</u>., citing <u>Cuddy v. Carmen</u>, 694 F.2d 853, 857-58, n. 23 (D.C. Cir. 1982)).

In an attempt to demonstrate pretext, plaintiffs assert that Mr. Harb made age related comments that evidence his discriminatory intent.  Specifically, they allege that Mr. Harb stated "past experience does not count" when he introduced himself to the Arabic Service (ROI, Ex. 6).  In response to one of the plaintiff's complaint that SAWA should not use a "sexy" delivery style by whispering in order to appeal to the target area, Mr. Harb is alleged to observed that "this is not for you.  It is for persons who are 25 and under."  In a similar vein, when plaintiff Elmasry complained about the problems between her and Ms. Beldi, Mr. Harb allegedly commented that she had been working there since he was in "High School" and "I can't do anything for you" (ROI, Ex. 14, p. 8).

These comments must be assessed in context <u>Threadgill</u>, 158 F.Supp. at 164, citing <u>Dunaway</u>, 310 F.3d 758.  None of the comments are related to the specific employment decisions in question.  Because SAWA was to be a new and radically different approach to broadcasting in the Middle East than previously done by the Arabic

50

Service, a general comment regarding the significance of past experience simply reflects the radical change that SAWA represented. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994)(CEO's general statement that they "need some new, young blood" are considered stray comments).  Similarly, Mr. Harb alleged observation that the use of a "sexy" voice was for the "25 and under" not for plaintiff Alkahateeb is hardly more than emphasizing  SAWA's attempt to capture a younger audience and it was not designed to appeal to the audience targeted by the former Arabic Service.  Finally, Mr. Harp's alleged comment, even if true, in response to the personality conflict between Ms. Elmasary (age 46) and Ms. Beldi (age 48), her new supervisor, reflects nothing more than his view that the dispute between Ms. Elmasary and Ms. Beldi appeared petty.

The plaintiffs have failed to demonstrate any evidence that age was a determining factor in their non-selection. Krodel, 748 F.2d at 706.  Thus, the defendant is entitled to summary judgment on plaintiffs' ADEA claim.

VII. **Plaintiff Cannot Establish a Hostile Work Environment Claim**

Plaintiffs assert that Mr. Harb's dislike of the hard "G" sound of the Egyptian dialect, and comments about Radio Cairo reflect harassment based on their national origin.  Plaintiff also complained that Mr. Harb ignored them, and failed to introduce them to outsiders who came into the news room.  Plaintiff El-Bishlawy

51

asserts that Mr. Harb stared at her Islamic attire, but on the
other hand complains that he ignored her when she entered the room
(Elmary Dep. Vol. I, p. 11; Vol II, p. 47-48).  Ms. El-Bishlawy
also claims that the agency's failure to notify her of her non-
selection in writing constituted "harassment."[11]

Finally, plaintiff El-Bishlawy claimed that she was harassed
by Ms. Beldi. Her complaint against Ms. Beldi arises from an
assignment of a productivity report given to plaintiff El-Bishlawy
and her colleagues by Ms. Beldi.  Plaintiff El-Bishlawy did not
think the assignment was appropriate and she confronted Ms. Beldi
on the subject (El-Bishlawy Vol. I, p. 80-85; Vol. II, p. 60).  Ms.
Beldi got mad and the conflict escalated.  There were three other
such incidents.  Ms. Beldi always apologized, except for the
confrontation over the productivity report. Id.

To establish a hostile work environment claim, the plaintiffs
must demonstrate that: (1) they were subjected to discriminatory
intimidation, ridicule and insult; (2) the actions were based on
their membership in a protected class; (3) they found the actions
to be abusive and hostile; and (4) the actions were sufficiently
severe or pervasive that a reasonable person would find that they
affected a term, condition, or privilege of employment; and (5) the
employer knew or should have known of the harassment in question

---

[11] She was notified of her non-selection by a telephone call
from Mr. Hooper (El-Bishlawy Dep. Vol. I, p. 57-59).

52

but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Baloch v. Norton, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); Gustave - Schmidt v. Chao, 360 F. Supp. 2d 105, 120 (D.D.C. 2004).

In determining whether a hostile work environment exists, the Supreme Court has directed courts to look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), quoting Harris v. Forklift Sys., Inc., 510 U.S. 17,23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Here, the facts do not support such a claim.

The Supreme Court has held that a hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Harris, 510 U.S. at 22 (quotation omitted). In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility

code.'" <u>Faragher</u>, 524 U.S at 788, 118 S. Ct. 2275 (citations omitted). Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'" <u>Id</u>. (citations omitted). "Even a few isolated incidents of offensive conduct do not amount to actionable harassment" <u>Stewart v. Evans</u>, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citing <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753 ( 4th Cir. 1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish Title VII liability"); <u>Baskersville v. Culligan Int'l Co.</u>, 50 F.3d 428, 430 (7th Cir. 1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched the employee and incidents were not sufficiently severe or pervasive")).

The plaintiffs' hostile work environment claim lacks merit because the allegations, even if true, do not rise to the level of an objectively hostile work environment since they were not pervasive or severe.  Although the comments and actions were perceived by plaintiffs as insulting or offensive, the standard for a hostile work environment claim requires more than a disregard of the "general civility code". A supervisor not speaking to subordinates when they enter a room may be considered rude, but

that does not constitute a hostile work environment.  Moreover, plaintiffs have completely failed to proffer any objective evidence that Mr. Harb's comments were based on their national origin, religion, or age.  Stewart, 275 F.2d at 1134-1135.

The alleged statements regarding Radio Sawa's emphasis on those under 25 or the insisting on the use of the soft "G" rather than the hard "G" is hardly harassment.  The target audience was age 18-30 and the style book had been changed as a matter of policy.  Plaintiffs' disdain for the new, informal and collegial style of SAWA is evident.  However, plaintiffs' super-sensitivity to these changes fails to support their claim of harassment.  The plaintiffs have described nothing more than the normal "trials and tribulations" of a workplace undergoing radical change.

Finally, plaintiff El-Bishlawy's references to the confrontations between her and her new supervisor Wassila Beldi do not state a hostile work environment claim.  See Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting.")).  A fair reading of the genesis of their disputes reflects nothing more than a personality clash in an office setting.  There is nothing to suggest that the dispute was based on age, nationality or religion.

Plaintiffs have failed to demonstrate sufficient evidence that

the actions about which they claim were because of their age, nationality or religion, or that they were sufficiently severe or pervasive to alter the term or conditions of their employment. Thus, the defendant is entitled to summary judgment on plaintiffs' hostile work environment claim.

**CONCLUSION**

For the forgoing reasons, the defendant is entitled to summary judgment and accordingly, the complaint should be dismissed with prejudice.

Respectfully submitted,

___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

___/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMED ABEDELKARIM, <u>et al</u>.,  )
                                   )
            Plaintiffs,            )
    v.                             )    Civil. Action No. 05-01783  (EGS)
                                   )
                                   )
JAMES K. GLASSMAN,                 )
Chairman, Broadcasting Board       )
    Of Governors,                  )
                                   )
            Defendant.             )
_____)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

The defendant, in accordance with Local Rule 7(h), submits the following Statement of Material Facts as to Which There Is No Genuine Issue:

### Plaintiffs

1.    Plaintiff Mohamed Abdelkarim (age 48) is a United States citizen who was born in Egypt (Compl. ¶ 3).[1]  He is a practicing Sunni Muslim. <u>Id</u>.  Mr. Abdelkarim was hired in 1989 by the Voice of America's Arabic Service as a GS-11, IRB, and was promoted to GS-12 in April 1992. <u>Id</u>.  He is presently a Television Production Specialist, GS-12 with the Voice of America (VOA). <u>Id</u>.

2.    Plaintiff Zeinab Abdelrahman (age 55) is a United States citizen who was born in Egypt (<u>Id</u>. ¶ 4).  She is a practicing Sunni Muslim. <u>Id</u>.  Ms. Abdelrahman was hired in 1988 by the Arabic

---

[1] The ages identified throughout this memorandum are the ages of the individuals at the time of selections at issue.

Service as a GS-11, IRB, and was promoted to GS-12 in October 1993. <u>Id</u>. Since December 2002, she has held the position of Radio Broadcast Technician in Broadcasting Operations of the Voice of America. <u>Id</u>.

3. Plaintiff Hayat Alkhateeb (age 59) is a United States citizen who was born in historic Palestine (<u>Id</u>. ¶ 5). She is Sunni Muslim (ROI, Ex. 13). Ms. Alkhateeb later moved to Syria when she was five years old and she is a practicing Sunni Muslim (<u>Id</u>.; Alkhateeb Dep., pp. 5-6). Ms. Alkhateeb was hired by the Arabic Service as a GS-11, IRB, in 1981, and was promoted to GS-12 in 1986. <u>Id</u>. She retired from the employ of the United States Government in March of 2004. <u>Id</u>.

4. Plaintiff Amina El-Bishlawy (age 55) is a United States citizen who was born in Egypt (<u>Id</u>. ¶ 6). She is a practicing Sunni Muslim (<u>Id</u>.; El-Bishlawy Dep., p. 6). Ms. El-Bishlawy was hired in 1986 as a GS-11, IRB for the VOA's Arabic Service, and was promoted to GS-12 in November 1991. <u>Id</u>. On December 29, 2002, she was selected for a GS-13, Foreign Language Information Specialist position in the International Information Programs Office at the Department of State. <u>Id</u>.

5. Plaintiff Faiza Elmasry (age 46) is a citizen of the United States who also was born in Egypt (<u>Id</u>. ¶ 7). She is a practicing Sunni Muslim (<u>Id</u>.; Elmasry Dep., pp.6-7). Ms. Elmasry was hired in 1989 as a GS-11, IRB, for VOA's Arabic Service and was

promoted to GS-12 in April 1992. Id.

**Radio SAWA**

6.    Prior to 2001, VOA broadcasting to the Middle East was ineffective.  Studies and a fact-finding mission in 2001 confirmed that Arabic Service broadcasts were having little impact, reaching only about two percent of the population. (Proposal for Middle East Radio Network (Proposal) Bates No. 002317).

7.    In early 2001, the Broadcasting Board of Governors (BBG) initiated a project to replace the VOA Arabic Service with a new channel called the Middle Eastern Radio Network ("MERN"), a joint BBG/IBB/VOA project (Proposal, Bates No. 002318).  MERN eventually became known as Radio SAWA.[2]

8.    The establishment of Radio SAWA was more than simply a reorganization, it was the creation of a radically new and different approach to programming to the Middle East (King Dep., p. 199; Proposal, Bates No. 002317; Marsh Dep. Vol. I, pp. 116-117).[3] The delivery systems and sites would change and medium-wave or FM signals would be used through arguments with various regional and local affiliates to broadcast throughout the Middle East. (Bates No. 002320, Dahiyat Dep., pp. 21, 57-58).

---

[2] SAWA will be used interchangeably to refer to both MERN and SAWA.

[3] The International Broadcasting Board (IBB) encompasses VOA, Office of Cuba Broadcasting, and the offices of Administration and Engineering.  It reports directly to the BBG.

9.    Sawa's new target audience was between the ages of eighteen (18) and thirty (30) (Proposal, Bates No. 002319; Abdelkarim Dep. p. 87; Harb Dep. Vol I, pp. 12-13; vol III, pp. 606-607, 671-672).  Sixty percent (60%) of the audience in the Middle East is under age 25 (Id., Bates No. 002319).  SAWA's goal was to broadcast 24 hours a day, seven days a week (Id., Bates No. 002319).  Four hours per day, broadcasts tailored to local areas would be presented "by friendly on-air people who spoke the colloquial Arabic," not classical Arabic (Id., Bates No. 002321).

10.    SAWA hoped to "connect on a more personal level" (Id., Bates No. 002318).  The news segments would be carried at 15 minutes and 45 minutes after the hour (Id., Bates No. 002322).  The programming would also include individual features of five minutes or less on various subjects (e.g., computers, women's issues, health, etc.) (Id., Bates No. 002322).  Music would be broadcast for most of the hour to attract the younger audience (Id., Bates No. 002322).

11.    There was also a significant change in how news would be obtained by the SAWA staff and how it would be presented.  SAWA would obtain the news directly from three wire services, (AP, Reuters, AFPC (Agence France Presse)) as it happened rather than translating the news stories provided by the VOA English language Central Newsroom (Gandji Dep. Vol. II, p. 194; Marsh Dep. Vol. I, pp. 100-103, 116-117).

12.  SAWA employees would be writing, for the first time, the news directly from the raw wire service copy, which would provide for a much quicker turn around time for on-air delivery (Id.; Gandji Dep. Vol. I, p. 69; Marsh Dep., pp. 116-117).

13.  The VOA Arabic Service, on the other hand, primarily produced block programming in a long format.  It used the classical Arabic language traditionally used in the Middle East by state and government broadcasts (Proposal, Bates No. 002318).

14.  The Arabic Service translated into classical Arabic and adapted already prepared news stories from the VOA English language Central Newsroom (Gandji Dep. Vol. II, pp. 169-171; Marsh Dep. Vol. I, pp. 116-117).

15.  Since the intent of SAWA was to use more informal and colloquial Arabic, many standard expressions in the VOA stylebook were changed to reflect SAWA's different style and format (Abdelkarim Dep., p. 47).

16.  Once the plan for SAWA was approved by Congress, the Agency took the initial steps to implement it.  In April 2001, Mr. Gary Thatcher, Associate Director for Program Support, was assigned as Director and Ms. Sheila Gandji (age 48, American, no religious affiliation), Executive Producer and Program Manager for the European Division of VOA, was assigned as Project Manager to create the infrastructure for SAWA (Gandji Vol. I, pp. 10, 23; ROI, Ex. 1, pp. 8-14).

17.  On December 10, 2001, Mr. James Hooper (age 56; American, Protestant) was hired as the Staff Director for the project (Hooper Dep., p. 8).

18.  On February 2, 2002, Mr. Mouafac Harb (age 37) was hired as the Director of Network News for SAWA (Harb Vol. I, p. 34).  Mr. Harb was formerly the Washington Bureau chief for the <u>Al Hayat</u> newspaper and headed a radio/TV station in Lebanon.  He also served as a part-time editor for Newsweek's Arabic edition (ROI, Ex. 7; Harb Dep. Vol I, pp. 31-38).  He is Lebanese and a non-practicing Shia Muslim (<u>Id</u>., pp. 4-5).

19.  SAWA drew its initial staff from the VOA Arabic Service (ROI Ex. 35; Harb Dep. Vol., pp. 90-98).  After interviewing employees, a core group of Arabic Service employees were initially assigned the task of providing support for Radio SAWA broadcasts while the Arabic Service was still functioning (Harb Vol. I, pp. 83-84, 101-103).  This core group allowed Radio SAWA to meet its target date to begin broadcasting by early 2002, making its first broadcast on March 22, 2002 (Harb Vol. I, p. 23).  The Arabic Service discontinued broadcasting in April 2002 (Harb Dep. Vol I, pp. 26-28; Dahiyat Dep., pp. 12-13, 46-47).

**Overall Plan for the Selection Process**

20.  Senior management of the International Broadcasting Bureau determined the number of full-time employees that SAWA would be authorized for the initial staffing (Gandji Dep. Vol. II, p.

85).  Before any vacancy announcements were released, Senior Agency officials met with the VOA Arabic Service to discuss the process for filling the new positions with SAWA (Welch Dep. Vol. I, p. 98).

21.  In addition, management contacted the Union, AFGE Local 1812, to discuss the transition to and staffing of SAWA.  The agency entered into an agreement with the Union designed to place as many current Arabic Service employees with SAWA as possible to avoid a reduction in force (RIF) of Arabic Service employees.  For those not selected for SAWA, positions would be found elsewhere within the agency (ROI, Exhibit 35).

22.  The Union accepted this proposal and an agreement with the Union was memorialized in a Memorandum of Understanding ("MOU") on February 15, 2002 (Gandji Dep. Vol. II, pp. 204-206; ROI, Ex. 35).  This agreement was limited to the initial staffing phase of SAWA (ROI, Ex. 35).

23.  Under the MOU, a current Arabic Service employee did not have to submit an application for a position at his/her current grade level for this initial staffing of SAWA.  Current Arabic Service employees who sought a promotion to the next grade level would have to submit an application and compete under the normal merit promotion procedures.  Id.

24.  The new SAWA positions were opened to all qualified candidates including all government and non-government employees (outside candidates) and U.S. citizens and non-citizens.

25.  The vacancy announcements for the GS-13, Supervisory International Radio Broadcaster (Arabic) positions, and for the GS-12, International Radio Broadcaster (Arabic) positions, opened on February 21, 2002 and closed on March 13, 2002 (Harb Dep. Vol. II, p. 565; Welch Dep. Vol. I, pp. 14-15; ROI, Ex. 27).  The functional title of the GS-13 position was Shift Editor and the GS-12 position had a functional title of Newswriter.

26.  A three-person panel was used to interview the candidates for the new GS-13 and GS-12 positions.  The panel was comprised of Ms. Sheila Gandji, Mr. William Marsh, and Mr. Mouafac Harb (Gandji Dep. Vol. II, p. 154; King Dep., p. 130).[4]  The final selections were made by Mr. Harb. <u>Id</u>.   The interview panel asked the same questions of each candidate (<u>Id</u>. at 93).

**<u>GS-13 Selection Process</u>**

27.  Ms. King determined that there were thirty-nine applicants for the GS-13 positions, of which seventeen met the minimum qualifications of the position (King Dep., p. 40).

28.  Since there were more than ten qualified candidates, Ms. King convened a rating and ranking panel consistent with section 460 of the Agency's Manual of Operations and Administration ("MOA") (King Dep., p. 30).  A rating and ranking panel is used for merit promotions to assist with the selection of applicants for inclusion

---

[4] Mr. Marsh was Senior Advisor to the Director of VOA and formerly the Chief of the Arabic Service (Marsh Dep. Vol. I, April 8, 2004, p. 8, 15, and 16).

8

on a certificate of eligible candidates (King Dep., p. 70). Ms. King averaged the ratings given by the panelists for each candidate and issued a merit promotion certificate with ten names (King Dep., pp. 78-79).

29. After issuing this certificate, Ms. King was advised by her new supervisor, Mr. Michael Conboy, that because the merit promotion certificate should have had only five names on it, she should retrieve it (Id.; King Dep., pp. 78, 80). Ms. King retrieved the certificate and the interviews were suspended (King Dep., pp. 71-73).

30. After the certificate containing ten names had been withdrawn, but before a certificate containing five names was re-issued, Mr. Welch, Director of Personnel, became aware of the situation (Welch Dep. Vol. I, p. 22; King Dep, pp. 70-71).

31. Although there was a ten-point difference between the candidate ranked number 1 for the GS-13 position and the candidate ranked number 17 (the number of qualified candidates), Mr. Welch believed that the difference between each candidate's individual score was not significant enough to prevent all seventeen applicants from being certified (Welch Dep. Vol. I, p. 42, Vol. II, pp. 156-157; King Dep., p. 73).

32. Given the number of vacancies to be filled and the close relative scores, Mr. Welch recommended to management that the appropriate approach was to issue another certificate that included

9

all qualified candidates that applied for the position (Welch Dep. Vol. I, pp. 22, 42; King Dep., pp. 70-71, 73).  Senior management accepted Mr. Welch's recommendation (Harb Dep. Vol. III, p. 624).

33.  Ms. King issued a new merit promotion certificate with all seventeen names (Welch Dep. Vol. I, pp. 59-60; Bates Nos. 000007-000008).  The names appeared in alphabetical order in accordance with the procedures contained in the MOA merit promotion guidelines (Welch Dep. Vol. I, pp. 61-62; King Dep. 56; Welch Dep. Vol. II, p. 139).

34.  Ms. King also issued a reassignment (non-competitive) certificate with one name (Bates No. 000010).

35.  On March 30, 2002, the Delegated Examining Unit (DEU), which rates the outside candidates and those already employed by the agency that chose to apply under this procedure, issued a certificate of eligibles (Welch Dep. Vol. I, pp. 52-53; Bates No. 000006).  This certificate of eligible candidates contained both U.S. citizens and non-U.S. citizens who were found to be qualified for consideration. Id.

36.  DEU certificates are issued in rank and score order (Id.; King Dep., p. 64; Welch Dep. Vol. I, p. 139).  Under the DEU procedures, the selecting official must then follow the "rule of three," which means that at each step of the process, the selected individual must be one of the three highest ranked applicants still available  (King Dep., p. 64; Welch Dep. Vol. II, p. 139).

37.  As noted in the vacancy announcement, applicants could apply under either procedure if they were eligible. Consequently, applicants for the positions appear on multiple certificates (Bates Nos. 000007-000008; 000010; 000006).

38.  The interview panel conducted interviews of all qualified candidates for the GS-13 position certified by the Office of Personnel (ROI Ex. 8; Gandji Dep. pp. 28, 35-36, 154).  The interviews were held between approximately April 1, 2002 and April 11, 2002 (Marsh, Gandji Interview Notes; Bates Nos. 002224-002304). All candidates were asked the same list of questions initially prepared by Mr. Hooper and given the same opportunity to respond (ROI, Ex. 8; Gandji Dep. Vol. I, p. 35).

**GS-13 Selections**

39.  Plaintiffs Abdelkarim, Alkhateeb, El-Bishlawy, and Abdelrahman applied for the GS-13 Shift Editor positions (Harb Vol. I, pp. 117-122). Plaintiff Elmasry applied and then withdrew her name from consideration for this position (Harb Vol. I, p. 117). The remaining four plaintiffs were among the candidates interviewed.

40.  Although Mr. Harb was the only selecting official, after the interviews the panel discussed the candidates' interview responses, and their relative qualifications for the new positions(Harb Dep. Vol I, pp. 124-130; Gandji Dep. Vol. I, pp. 35-37; Marsh Dep. Vol. I, pp. 221-222).

11

41.  Mr. Harb believed that Mohamed Abdelkarim, Zeinab
Abdelrahman, Hayat Alkhateeb, and Amina El-Bishlawy failed to
demonstrate during the transition period and the interview that
they possessed the news judgment and reporting skills necessary for
the GS-13, shift editor position under the new format and the
radical change in programming (Harb Dep. Vol. I, pp. 113-130; Vol.
II, pp. 419-425, 441-444).  "In addition, they did not demonstrate
that they possessed the necessary information on or sources for the
target area" (Gandji Vol. II, pp. 234-236).  As shift editors, the
selectees would have to perform as team leaders (Marsh Dep., pp.
116-117; Ex. 15).  They did not demonstrate that they had the
political savvy or the management skills necessary for the task.

42.  The selectees for the GS-13 shift editor positions were
as follows:

Hala Arafa (age 41)is Muslim of Egyptian national origin.  She
was employed by the Arabic Service since 1986 and had been a GS-12,
IRB, news editor since 1993 (Bates Nos. 0000413-000042; 000045; see
also 00047).

Wassila Beldi (age 46) is Muslim of Tunisian national origin.
She was employed by the Arabic Service since 1986 and was a GS-12,
IRB who hosted a weekly panel discussion (Bates Nos. 000079,
000081). She had prior experience accessing the wire services (Id.
¶ 3). She served as a news editor and a backhalf editor for VOA
(Id. ¶ 4).  Ms. Beldi had a strong news background and performed

12

well during the interview.

Mohammed Cherkaoui (age 41) is a Muslim of Moroccan national origin (Bates No. 00062).  He had been employed by the Arabic Service since 1989 as an IRB.  Mr. Cherkaoui was the coordinator and host of prime-time news hours, receiving many awards for excellence in programming and was Employee of the Year in 2000 (Bates Nos. 00062-00063).  He conducted an average of 370 interviews a year with politicians, opposition leaders, scholars, and ordinary citizens in English, Arabic, or French (Bates No. 00065).

George Shammas (age 66) is a Christian of Palestinian national origin who was a GS-13, supervisory IRB (Arabic)(Newswriter) with VOA since September 2000 (Bates No. 000168).  He is a graduate of the University of Kentucky, College of Communication (Bates No. 000170).  He served as Senior Editor for the Arabic Service and has had significant supervisory and management responsibilities (Bates No. 000171). He was laterally reassigned to the position.

Nicola Zaboura (age 63) is a Christian of Jordanian national origin (000095) and an employee with the Arabic Service since 1971 who was a GS-13, Supervisory IRB since 1997 (Bates No. 000099).  Prior to his employment with VOA, he was the Political Commentator for Radio Amman and then became chief of the Special Program Section for Radio Amman (Bates No. 000100).  He served as a team leader and was one of the most reliable news and backhalf editors

13

in the Arabic Service (Bates No. 000121).

Mohammed Saad (age 55) is a Muslim of Egyptian nationality who was a GS-12, IRB employed by the Arabic Service since 1997 (Bates No. 000148). He served as shift editor (backhalf) and news editor in the Arabic Service. Id.

Daniel Nassif (age 44) is a Christian of Lebanese national origin (Bates Nos. 000140-000142).[5] He is a recognized authority on the Middle East, testifying on the subject before Congress on multiple occasions and working with the Department of Defense and the Department of State (Bates No. 000142). Previously, he worked with Al-Hayat newspaper as an editorial contributor, the Charles Malik foundation as Research Director and Global Core Strategies as a Business Development Manager for the public sector (Bates No. 000139).

Munir Nasser (age 65) is a Christian of Palestinian national origin. He has over 20 years' experience in news writing, reporting, editing, and translation in Arabic and English (Bates No. 000128). Mr. Nasser was editor and translator for Newsweek (Arabic Edition) and trained Arab journalists for the International Center for Journalists. Previously, he had served as Managing Editor for Asharq Al-Awsat (Washington Bureau) and was a Washington

---

[5] Several witnesses speculated that Mr. Nassif was Christian (See e.g., ROI, Ex. 7). Similarly, Mr. Nasser's religion is unknown but many witnesses opined he was Christian. The Agency does not maintain records of employees religious preferences (see also ROI, Ex. 38).

correspondent providing stories and news analysis for newspapers and magazines in Kuwait, Jordan, Qatar, East Jerusalem, Saudi Arabia, Detroit, and London (Bates No. 000129).  He also had significant management experience (Bates No. 000131).

**GS-12 Selections**

43.  A total of forty applications were received ((Applicant listing vacancy M/P-02-41), Bates Nos. 000570-000572; King Dep., pp. 132, 197).

44.  Twenty-seven candidates were qualified for consideration under the competitive DEU procedures ((DEU tabulation sheets) Bates Nos. 000575-000546). Under the DEU procedure, a rating and ranking panel was convened and ranked the candidates.

45.  On April 5, 2002, a DEU certificate was issued which contained the names of five U.S. citizens and six non-citizens applicants.  The sixth non-citizen was included due to a tie score (Bates No. 000557).[6]

46.  A non-competitive reassignment certificate of six candidates eligible for reassignment was submitted on December 14, 2002.  The plaintiffs, other than Ms. El-Bishlawy, do not appear on this certificate because they did not apply for nor were they required to for this position under the MOU with the Union (ROI, Ex. 35).

―――――――――――――

[6] The GS-11's who applied for promotion under the GS-12 vacancy announcement were referred to the DEU because they were non-citizens. (King Dep. at 146)

15

47.  All GS-12s in the Arabic Service were invited to be interviewed and were considered for the initial staffing of GS-12 positions with SAWA (ROI, Ex. 35; King Dep., p. 166).[7]

48.  There were twelve candidates selected, all of whom were VOA employees or purchase order vendor/independent contractors (POVs)(Harb Dep., Vol. I, pp. 220-224).

49.  The skills needed for the GS-12, IRB newswriter positions included using multiple news sources to produce an original story in Arabic, correct lead, language, and an accurate translation of quotes from English to Arabic (Harb Dep., Vol. II, p. 442).

50.  The selectees needed the ability to deliver and execute a live newscast, starting music with DALET at the appropriate time, starting actualities on time, and editing actualities (Id. at 449).[8]  The SAWA positions required a different skill set than required for the IRBs in Arabic Service (Gandji Dep. Vol. II, pp. 193-194; Marsh Dep. Vol, I, pp. 116-117).

51.  Mr. Harb made the selections based on the applicants' answers to interview questions, as well his own personal observations of the applicants during the start-up of SAWA ((Justification for Selection of Non-citizens for SAWA, IRBs), Bates Nos. 000561-000562).

---

[7] There were also GS-12s who applied for reassignment from the Arabic Service even though they did not have to do so.

[8] A radio actuality is a group of sound bites sent out to radio stations to be used in news reports.

52.  Mr. Harb selected the five non-citizens rather than the plaintiffs because he had observed their performance in the news room for four months very closely and they had a proven track record (Id. at 000561).

53.  All five selectees demonstrated the ability to write news stories directly from multiple sources that were "brief, factual and up-to-the minute." Id.  Their pronunciation on air was "correct, vigorous, energetic and punchy," consistent with the new SAWA style.  Their selection of news for the pan Arab and Iraqi news stream was the most reliable and objective. Id.  They had excellent knowledge of and skill in dealing with Arabic Language "idiomatic expressions."  One selectee was the best among the staff in the Iraqi dialect (Bates No. 000562).  And finally, they fully mastered the complex DALET software and sustained the ability to arrive in studio on time for the twice hourly news casts. Id.

54.  The voices of Elzubeir El-Tayeb, Aida Akl, Maha Rabie, and Zahrat Abuzaid were better suited for SAWA than the plaintiffs' voices because the selectees' voices fit the new SAWA format and they had a better delivery (Harb Dep. Vol. III, p. 663).

55.  The seven U.S. citizens selected for the GS-12 positions were as follows (Bates No. 000556):

Aida Akl (age 44) was an employee of the Arabic Service who is a Christian of Jordanian nationality.  She had been a GS-12, IRB, since 1986 (Abdelkarim Dep., p. 71).

17

Gamal Al Adle (age 49) was an employee of the Arabic Service who is a Muslim of Egyptian nationality. (Abdelkarim Dep., p. 74). He had been a GS-12, IRB since 1985.  He has a BA from Al Azhar University in Cairo, Egypt (Bates Nos 001038-001061).

Elzubeir El-Tayeb (age 48) was an employee of the Arabic Service who is a Muslim of Sudanese nationality (Abdelkarim Dep., P. 72).  He had been a GS-12 IRB since 1985 (Bates No. 000641).  He attended Cairo University and obtained an associate degree in Mass Media and Broadcasting (Bates No. 00044).

Rachid Jaafar (age 44) was an employee of the Arabic Service who is a Muslim of Moroccan nationality (Abdelkarim Dep., p. 70). He has been a GS-12, IRB since 1984 (Bates Nos. 00075, 000076).

Maha Rabie (age 43) was an employee of the Arabic Service who is a Muslim of Palestinian nationality.  She had been a GS-12, IRB since 1988 (Bates Nos. 000680-000681).

Mohammad Suelibi (age 56) was an employee of the Arabic Service who is Muslim of Jordanian nationality  (Abdelkarim Dep., p. 75) He had been a GS-12, IRB since 1988 (Bates Nos. 000707-000708).

Emad Al-Khafaji (age 42)was employed as a purchase order vendor (POV) with the Arabic Service who is a Muslim of Iraqi nationality (Harp Dep. Vol I, pp. 191-193 (Applications for GS-12)).

56.  The five non-citizen selectees for the GS-12 positions

18

were as follows:

Reem Abaza (age 30) was an employee of the Arabic Service who is a Muslim of Egyptian national origin (Abdelkarim Dep., p. 68). He had been a GS-11, IRB since 2000 (see also Harb Dep. Vol. II, pp. 363-366) and was a graduate of Cairo University in Broadcasting (Bates No. 000625-000632).

Dalia Alaqidi (age 34) was an employee of the Arabic Service who is a Muslim of Iraqi nationality (Abdelkarim Dep., p. 72). She had been a GS-11 IRB since 1998 (Bates Nos. 000636-000639; Id.). She has a BA from the Institute of Fine Arts, Baghdad.

Elmigdad Gebril (age 43) was an employee of the Arabic Service, who is a Muslim of Sudanese national origin. He was a GS-12, IRB with the Arabic Service (Bates No. 002275; Harb Dep., Vol. I, p. 92).

Nassreddine Hssaini (age 38) was an employee of the Arabic Service, who is a Muslim of Moroccan nationality. He has a BA in Journalism (Bates No. 00068). He was a GS-11, IRB since 1999 (Id.; Harb Vol. I, p. 204)

Zahrat Abuzaid (age 45) was an employee of the Arabic Service who is a Muslim of Sudanese nationality. He has a BA in languages from Khartoum University and an MA in African History from Howard University (Bates No. 001063). He had been a GS-12 IRB since 1993. Id.

57. In comparison to the selectees for the GS-12 positions,

19

plaintiffs lacked the reporting and news writing skills from multiple sources to produce an original story in Arabic that was competitive, accurate and well presented (Harb. Dep. Vol. II, pp. 441-444).  They did not have the news reading and voicing skills or the technical abilities for the news SAWA format (Harb. Dep. Vol. II, pp. 446-450).

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

20