## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MOHAMMED ABDELKARIM, et al.** | ) | |
| | ) | |
| **Plaintiffs.** | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **JAMES GLASSMAN,** | ) | **Civil Action No. 05-1783 (EGS)** |
| **Chairman, Broadcasting Board of** | ) | |
| **Governors,** | ) | |
| **Defendant.** | ) | |

_____

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs hereby submit their Opposition to Defendant's <u>Motion for Summary Judgment</u> on the basis that there are genuine issues of material fact in dispute, as well as credibility issues that can only be resolved by a jury.   In support of this <u>Opposition to Motion for Summary Judgment</u> Plaintiffs submit the attached Memorandum of Points and Authorities, Plaintiffs' Statement of Disputed and Undisputed Facts and supporting exhibits.

Respectfully submitted,

_____
S/
Tracy L. Gonos, D.C. Bar No.  479160

_____
S/
Elaine L. Fitch, D.C. Bar No.  471240

Kalijarvi, Chuzi & Newman, PC
1901 L Street, NW, Suite 610
Washington, DC 20036
(202) 331-9260

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MOHAMMED ABDELKARIM, et al.** )<br><br>    **Plaintiffs.** )<br>    **v.** )<br><br>**JAMES GLASSMAN,** )<br>**Chairman, Broadcasting Board of** )<br>**Governors,** )<br>    **Defendant.** ) | **Civil Action No. 05-1783 (EGS)** |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff's filed the instant claim alleging that they were discriminated against based on their national origin and their age, in violation of Title VII of the Civil Rights Act and the Age Discrimination and Employment Act.[1/] As demonstrated below, in support of these claims, Plaintiffs have produced sufficient evidence to demonstrate that there are genuine disputes of material fact and credibility issues that can only be resolved by a jury.

## BACKGROUND

In early 2001, the Broadcasting Board of Governors ("BBG") initiated a project to replace its Voice of America ("VOA") Arabic Service with a new channel called the Middle Eastern Radio Network ("MERN"), which would be a joint BBG/VOA project. (Proposal, Bates No. 002318). MERN eventually became known as Radio SAWA. "Radio SAWA was set up because

---

[1/] Plaintiffs also initially claimed that they were subjected to discrimination on the basis of religion. That claim is hereby withdrawn.

of the overwhelming need that the United States government to reach people in the Middle

East..." Hooper Dep. 186:8-17. At the outset, MERN was allotted 32 positions, and there were

34 employees in the Arabic Service. Feb. 13, 2002, MERN Status Report on Personnel Actions.

In pursuit of this project, VOA posted vacancy announcements M/P-02-42 (GS-13) and M/P-02-

41 (GS-12) advertising multiple positions for International Radio Broadcasters (IRB's) at both

the GS-12 and GS-13 grade levels. ROI, Ex. 27; GS-12 Vacancy Announcement. Because there

were still GS-12 positions available after the initial round of selections and because additional

GS-12 positions became available thereafter, additional GS-12 selections were made. Because

Moufac Harb, the selecting official, concluded that the Plaintiffs were not even minimally

qualified for a GS-12 position in Radio SAWA, they were not considered for any of the

subsequent GS-12 vacancies. See Harb Depo Ex. 15.

I.    **Criteria Governing Selections**

Pursuant to a Memorandum of Understanding ("MOU") between VOA and the Union, as

well as in keeping with federal statute and Agency guidance, selections for these vacancies were

to proceed in a very specific manner with some candidates, such as Plaintiffs, entitled to receive

preference over others. Specifically, VOA "Arabic Branch employees seeking only lateral

reassignment to MERN/SAWA positions do not need to apply under a merit promotion vacancy

announcement." ROI, Ex. 35. Only employees seeking promotion were required to apply under

the Merit Promotion announcement. Id.

VOA management, in conjunction with Jack Welch, the Director of Personnel, discussed

the best approach to staffing MERN. King Dep. Ex. 4 at p. 2. Welch set out the following order

of priority to be utilized in undertaking the selections:

For each position (generally starting with the positions at the highest level and greatest importance), the panel will consider *in order*:

1)  Internal candidates already at grade of position to be filled;
2)  If panel determine[s] no internal applicant meets the requirements, internal employees who didn't apply but who are at the grade of the position to be filled;
3)  If panel determines none of these meet requirements, internal applicants for promotion;
4)  If panel determines none of these meet requirements, external candidates or POV's.

External hires or contracts will be used only if a determination is made that no current staff member meet[s] the requirements for the position involved.*

*Personnel will determine whether candidates for promotion meet basic qualification requirements based on position descriptions and qualification requirements supplied by MERN.

Id. at p. 5. The objectives of this approach were to "[u]se as many Arabic staff members as possible to staff MERN to minimize costs and speed staffing." Welch met with employees of the Arabic Branch about the vacancy announcements at which time Welch assured VOA Arabic Branch staff that current employees would be considered for positions with MERN before outside employees and lower graded employees were considered. Welch Dep. 77:12-78:19. Harb, the selecting official, was present for this meeting, but the selection process to be followed was communicated to him separately, as well. Welch Dep. 16:10-15, 79:2-19. Gandji, a member of the interview panel, also received the Welch's memorandum setting forth the proper order of preference/consideration for the selection of candidates. Gandji Dep. 58:12-21.

Based on this specified order of preference for candidates, the express terms of the process set out by Welch, and Welch's testimony, internal candidates applying for a position with MERN at their same grade level, e.g., Arabic Service GS-12 IRB's applying for MERN GS-12 IRB positions, were to be given preference over other candidates and could only be non-selected in favor of external or lower-graded employees if they did not meet the basic qualifications for

-3-

the position.  Similarly, internal candidates for promotion, e.g., Arabic Service GS-12's applying

for MERN GS-13 IRB positions were second in line only behind internal candidates applying at

their same grade level and could only be non-selected in favor of lower-graded internal

candidates or external candidates if they did not meet the basic qualifications for the position.

The selections were constrained in another way, as well.  Pursuant to the Agency's

interpretation and application of the Hatch-Mundt Act, 22 U.S.C.S. § 1474, which grants hiring

preferences to U.S. citizens over non-citizens, the Agency's ability to hire non-citizens is further

subject to regulation.[2]  Specifically, according to the Agency's personnel regulations,  "A non-

U.S. citizen may be appointed only after reasonable efforts to recruit equally or better qualified

U.S. citizens have been made and have been unsuccessful."  MOA V-A 822.1 (Hooper Dep. Ex.

1).  Furthermore:

> A non-U.S. citizen may be employed or promoted only if no equally or better qualified
> U.S. citizen is available to perform the duties of the position. The determination as to
> whether a non-U.S. citizen is better qualified than a U.S. citizen will be based on criteria
> established by Personnel to evaluate the qualifications of both citizens and non-citizens.

Id.  When asked about the criteria to evaluate the qualifications of citizens vs. non-citizens,

Welch explained that they are evaluated against the "job-related requirements."  Welch Dep.

187:11-22.

> A non-citizen may be selected in the presence of a qualified U.S. citizen if, after full and
> fair consideration of all candidates against the job requirements, the selecting official
> determines that the non-citizen is better qualified than the U.S. citizen and the superior

---

[2] Plaintiffs are aware that IBB/BBG/VOA is currently embroiled in litigation over the proper interpretation and application of the Hatch Mundt Act, which governs the hiring of non-citizens over citizens.  However, Plaintiff's take no position herein on the issues that are the subject of that litigation because they have no bearing on the instant case.  The only issue of relevance here is the Agency's stated policies and practices with respect to the hiring of non-citizens and the import of those policies and practices on the GS-12 and GS-13 IRB selection process.

qualifications of the non-citizen are supported by acceptable written documentation provided by the selecting official.

MOA V-A 822.1.  Welch admitted that, pursuant to the Agency's policy, "we couldn't hire ... from the outside a non-U.S. citizen if there was an equally or better qualified citizen who had applied for the job ... at the same time."  Id.

As Welch explained, based on the established selection criteria, the selecting official should not have considered external candidates or internal candidates for promotion unless no candidate in the groups entitled to priority consideration possessed the qualifications for the position.  Welch Dep. 84:2-85:2.  That is, external hires or contractors would only be used if a determination was made that no current staff member met the requirements for the position.  Welch Dep. 86:20-87:5.  Welch explained the basis for the agreed upon procedures:

> It made sense to look at the people that you already had because we already had them at that grade level, to utilize them if they could do the job at the level that was needed made sense before you went to the additional expense of promoting somebody or bringing somebody in from the outside.  They were also already available as opposed to having to go through a process of identifying and bringing them in.... more would be involved in bringing in people from the outside.

Welch Dep. 87:14-88:6.

## II.    Development of the Vacancy Announcements

James Hooper served as SAWA's staff director.  Hooper Dep. 7:11-8:3.  He was responsible for helping to establish Radio SAWA.  Hooper Dep. 15:8-19. Hooper was hired in December 2001, and Radio SAWA went on the air in February or March 2002.  Id.  Hooper was part of the team that helped bring SAWA on air, hired some of the initial staffers, processed the initial staffing actions, and processed the subsequent hiring of additional staff members and contractors.  Hooper Dep. 15:8-19.  With respect to the selections at issue herein, Hooper helped Harb develop the vacancy announcement, set up the interviews, provided the paperwork to the

interview panelists, and communicated Harb's selection decision to personnel.  Hooper Dep. 63:16-18.

Hooper developed the GS-13 and GS-12 vacancy announcements based on several discussions with Harb about what should be included.  Hooper Dep. 31:3-20, 32:5-33:13, 33:16-34:4; Harb Dep. 67:19-21; Abdelkarim ROI, Ex. 27 (GS-13 Vacancy Announcement).  Hooper specifically asked Harb what knowledge, skills and abilities the candidates must possess in order to be qualified for the position.  Hooper Dep. 39:9-11; 45:20-46:3, 46:16-21, 48:11-12.  Hooper then "distilled" Harb's input into the five KSA's that appear in the vacancy announcements.  Hooper Dep. 39:2-40:6.  After each of their several discussions Hooper would refine the draft announcements and discuss the new version with Harb.  Hooper Dep. 32:5-33:13, 39:2-40:6.  The announcements were not published until Harb was satisfied that they reflected the skills necessary for the positions.  Hooper Dep. 39:2-40:6.

The most important KSA's for the position are indicated by the point value assigned thereto.  Hooper Dep. 41:6-42:21.  Harb had input into the point value assigned to each KSA in the vacancy announcements.  Hooper Dep. 59:11-18.

Harb determined how many vacancies there were under each Vacancy Announcement.  King Dep. 24:20-25:6.

### III.    Necessary Qualifications as Established by the Vacancy Announcements

The vacancy announcements for both the GS-13 and GS-12 positions had somewhat different duties, because the GS-13 positions were supervisory in nature and the selectees would serve as editors.  ROI, Ex. 27; GS-12 Vacancy Announcement.  However, the knowledge, skills and abilities required for both positions were essentially the same.  That is, both positions required, in order of importance: (1) a thorough knowledge of Middle Eastern history and

-6-

culture, awareness of political, economic, and social developments in the region, in general, and in the broadcast target area, in particular; (2) professional knowledge of writing and editing principles and practices for electronic media and skill in applying these to material used in international radio broadcasting; (3) experience with a leading news organization in the region and with a Western news organization was desirable, as well as experience covering major news events; (4) knowledge of management principles and practices; and (5) knowledge and demonstrated ability to use computers and familiarity with internet related software.  ROI, Ex. 27; GS-12 Vacancy Announcement.   Additionally, both positions required specialized experience in broadcasting.  Id.

## IV.    Selection Process

Susan King is the personnelist who assisted in the processing of applications for the vacant positions.  She has worked in various personnel positions since 1990 and has handled a range of personnel issues.  King Dep. 11:1-14:22.  According to Ms. King, there were three certificates of eligibles issued, including a merit/competitive selection certificate for internal candidates for promotion, a Delegated Examining Unit (DEU) certificate for external candidates,[3] and a non-competitive reassignment certificate for candidates seeking lateral reassignment. King Dep. 27:4-8.

For the GS-13 positions, King reviewed the applications that were received through the merit/competitive selection process to determine which candidates met the basic qualifications for the position(s).  King Dep. 26:9-16, 53:16-54:3.  She did not rate or rank the applicants.  King

---

[3]  The delegated examining unit is part of the Agency's personnel office that has authority from OPM to review, rate and rank applications from outside (non-government) candidates.  King Dep. 46:15-19.

Dep. 27:4-21. A rating and ranking panel "of three experts," Jennifer Parmelee, Claude Porsella and Negussie Mengesha, was convened for this purpose. King Dep. 29:11-13, 30:12-14. King asked these individuals to serve on the panel based on their subject matter expertise, experience and their positions as Supervisory IRBs. King Dep. 30:18-31:17, 33:10-12. For "instructions" the panel received a "crediting plan," which broke down the five key job factors/functions and assigned each a point value that, when added together, totaled 30 points. King Dep. 34:13-19, 36. The job factors/functions are derived from the KSA's in the vacancy announcement. King Dep. 37:2-40:18. The panel received the crediting plan, the vacancy announcement, the position description and the applications. King Dep. 34:13-19, 36:9-17.

After candidates were rated and ranked, a merit promotion certificate of eligibles was issued to Mr. Harb. King Dep. 54:7-13. This certificate contained the names of the individuals with the top 10 scores from the rating panel, including plaintiffs, Abdelkarim (ranked 1st), Abdelrahman (ranked 4th), and Elmasry (ranked 8th). King Dep. 78:19-21, 79:7-21, 107:19-108:1; rating sheet. It did not include the name of selectee, Wassila Beldi. Id. However, King retrieved this first certificate from Harb on the instructions of her supervisor, Conboy, because Agency regulations specified that the certificate should list only five eligible candidates. King Dep. 63:10-18, 70:1-71:12, 80:5-15; 108:15-21, 109:22-111:7; Welch Dep. 32:15-18. Consequently, King prepared a second certificate containing the names of only the top five candidates, including Plaintiffs Abdelkarim and Abdelrahman. Id.; rating sheet. Later, however, Welch instructed King to issue yet a third certificate that contained the names of all 17 candidates who applied. King Dep. 73:12-15, 113:18-114:14, 116:5-21, 125:18-21. All in all, three distinct merit promotion certificates were issued for the GS-13 position. King Dep. 121:1-11.

Welch allegedly decided to issue the certificate containing all 17 names "because the scores [of the rating panel] were all equal..." and because there were multiple vacancies. King Dep. 73:12-15, 113:18-114:14, 116:5-21, 125:18-21; Welch Dep. 22:1-9. Interestingly, Welch cannot recall how he learned that a first certificate of 10 people had been issued. Welch Dep. 24:2-21. Nor does he explain why, as Director of Personnel, he was involved in reviewing and/or reissuing certificates of eligibles.

Neither of Welch's explanations for issuing a third certificate containing the names of every candidate withstand scrutiny. First, Welch admits that the 10 point difference between Abdelkarim who was rated first and Aida Akl (selectee) who was rated last, or seventeenth, is a large difference. Welch Dep. 38:22-39:14. Second, he admits that the difference between Abdelkarim's score and fourteenth ranked Wassila Beldi's (selectee) score, while slightly narrower, is still significant. Welch Dep. 39:15-21. King agrees that the scores are not even close to equal. King Dep. 73:21-75:3. Finally, King was never given any explanation for why her supervisor first told her that the certificate containing 10 names was too many, she was to replace the first certificate with a second certificate containing only 5 names, and then she was to replace the second certificate with a third certificate containing all 17 names. King Dep. 116: 22-117:4.

King agreed that this process was highly unusual and has never occurred previously or since in her career. King Dep. 118:17-119:7. She has never issued more than one certificate in a promotion context in a merit selection process. King Dep. 123:6-9. Nor can Welch recall any instances in which three separate certificates were issued even though he has been at VOA for 20 years. Welch Dep. 137:8-138:4. Further, there is nothing in the Agency's personnel or selection policies that contemplates or allows such an action. King Dep. 114:19-115:15.

Having served as a selecting official at VOA for over a decade, Ismail Dahiyat, former Acting Director of the Arabic Service, has a basis for judging whether the issuance of multiple certificates was unusual. Dahiyat Dep. 153:13-21. He can recall no other occasion on which three separate certificates of eligibles were issued for the same vacancy announcement. Dahiyat Dep. 153:22-154:6. He has never heard of any situation where certificates are issued, interviews are commenced, everything is halted while new certificates are issued, candidates previously deemed ineligible are now considered eligible, and then interviews recommence – all of which happened here. Dahiyat Dep. 152:10-19, 154:7-155:6, 159:19-160:1.

Welch's suggestion that a certificate containing the names of every single candidate who applied under the merit promotion process was appropriate because of the multiple vacancies is similarly suspect. As Welch acknowledges, candidates could be chosen from three separate pools/lists - merit promotion certificate, DEU certificate and/or lateral reassignment certificate. Welch Dep. 152:7-153:15. Welch admits there were enough candidates for Mr. Harb to choose from on the original Merit Promotion Certificate of Eligibles, the DEU Certificate and the Reassignment Certificate, without the need to issue a new Merit Promotion Certificate containing the name of every single applicant. Welch Dep. 167:15-168:19. In fact, before the Merit Promotion Certificate was amended for the third time to add the seven lowest ranked individuals, including that of selectee Beldi, Harb already had 19 certified candidates from which to choose. Welch Dep. 173:1-6.

The issuance of multiple merit promotion certificates is also suspect in light of the events that precipitated it. As indicated by a Memo sent to the Arabic Service from Welch, the intervention was spurred by complaints/questions raised by individuals who were notified that they did not make the certificate of eligible candidates:

> In the last several days, we have received a number of questions concerning the
> interviewing and selection procedure for the position of Supervisory International Radio
> Broadcaster (Arabic) GS-1001-13....  A certificate of eligibles containing the names of
> some Agency employees eligible for promotion was issued by the Office of Personnel
> late last week and interviews have been held.... However, because there are multiple
> openings for these positions and all Agency applicants were assigned high ratings by the
> rating panel.... [and] [b]ecause of the closeness of the scores assigned, I have determined
> that it is appropriate to refer all of these applicants for consideration for these
> promotional opportunities.

Alkhateeb ROI, Exh. 6, p. A-11 (Memo from Jack Welch, Dir. of Personnel).

Welch claims not to remember who raised questions and/or complaints about the original

certificate of eligibles, but Harb remembers quite well.  First, Harb was aware that some of the

individuals who applied for the GS-13 received notices from personnel that they were not

referred because they were not among the best qualified.  Harb Dep. 237:18-238:3.  At Harb's

suggestion, some of these people complained.  Harb Dep. 238:1-4, 239:1-2.  For example,

Mohammed Cherkaoui (selectee) complained to Harb and questioned his non-selection stating

"I'm the man of the year.'"  Harb Dep. 238:16-22.

Second, there is also evidence that Harb intervened on behalf of Wassila Beldi (selectee).

Harb was overheard asking Beldi "How come your name was not included?" to which Beldi

responded, "I do not know, but I am not going to be quite [sic] about it."  Abdelkarim ROI, Ex.

13, Alkhateeb Aff., p. 3.  Beldi related this conversation to Abdelrahman and indicated that Harb

had told her "not to worry."  Abdelkarim ROI, Ex. 16, Abdelrahman Aff., p. 3; *see also*

Abdelrahman Dep. (Jan. 8, 2007) 62:13-63:4.  Beldi told Mohamed Elshinnawi, who supervised

the Plaintiffs at VOA, that she complained to Harb about not being on the certificate of eligibles

list, and Harb promised her they would reconsider.  Elshinnawi Aff. ¶ 20.  Further, by Harb's

own admission, he went to personnel and asked to see who applied and who made the certificate

of eligibles.  Harb Dep. 387:3-4.

-11-

Moreover, when confronted with the fact that the lowest ranked selectee received a score of 17 out of 30, Welch is unable to justify his assertion in the memo that everyone received high ratings. Welch Dep. 95:3-14.

There was also a DEU certificate of eligibles issued for the GS-13 position which contained candidates' scores and listed candidates in rank order. Alkhateeb ROI, Exh. 32; King Dep. 64:7-22; King Dep. Exh. 2 DEU Certificate of Eligibles.

The Merit Selection process for the GS-12 position was generally the same as that for the GS-13. King Dep. 132:1-133:3. However, because only six candidates applied under the merit promotion process, they were not rated and ranked, they were simply placed on the certificate. King Dep. 138:19-139:3. There was also a reassignment certificate issued containing the names of internal candidates for non-competitive reassignment. King Dep. 135:2-4; Abdelrahman ROI, Exh. 33. There was a third Certificate issued from the DEU for outside candidates. King Dep. 135:5-8. Abdelrahman ROI, Exh. 32, DEU Certificate.

All candidates who eventually appeared on the various certificates of eligibles were referred to the interview panel consisting of Moufac Harb, Sheila Gandji and Will Marsh, and were interviewed.

V.    **The Selections**

With the exception of Elmasry who withdrew her application, all of the plaintiffs applied for the subject GS-13 Supervisory IRB/Shift Editor positions, made the Certificate of Eligibles and were interviewed. Harb Dep. 117-122. None of them were selected. Id. The selectees were Hala Arafa (Egyptian, 40), Wassila Beldi (Tunisian, 46), Mohammed Cherkaoui (Moroccan, 41), George Shammas (Palestinian, 65), Nicola Zaboura (Jordanian, 63), Mohammed Saad (Egyptian,

-12-

54), Daniel Nassif (Lebanese, 44, external hire), Munir Nasser (Palestinian, 65, external hire), Usama Farag (Egyptian, 41), Diaa Bekheet (Egyptian, 41). Abdelkarim ROI, Tab 30; King Dep. Ex. 4; Ex. Xx (SF-52s reflecting dates of birth).

All of the plaintiffs applied for the subject GS-12 IRB positions, made the certificate of eligibles and were interviewed. None of them were selected. Twelve individuals were selected under the posted vacancy announcement - 7 citizens and 5 non-citizens. Bates No. 000556. The selectees were Aida Akl (Jordanian, 44), Gamal Al Adle (Egyptian, 48), Elzubeir El Tayeb (Sudanese, 48), Rachid Jaafar (Moroccan, 44), Maha Rabie (Palestinian, 50), Mohammad Suleibi (Jordanian or Palestinian, 55), Emad Al-Khafaji (Iraqi, 42, previously a contractor/POV), Reem Abaza (Egyptian, 30, non-citizen, promoted from GS-11), Dalia Alaqidi (Iraqi, 33, non-citizen, promoted from GS-11), Elmigdad Gebril (Sudanese, 43, non-citizen), Nassreddine Hssaini (Moroccan, 37, non-citizen, promoted from GS-11), and Zahrat Abuzaid (Sudanese, 45, non-citizen). Abdelkarim ROI, Tabs 31-34.

Only two other Arabic Service staffers applied, but were not selected, for either of the two posted GS-12 or GS-13 positions - both of these individuals were also of Egyptian national origin. Abdelkarim ROI, Tab 36. At least one of them, Ziad Abdelrahman, was highly rated by the DEU rating panel. King Dep. Ex. 2.

After the selection s for the GS-12 vacancies there were still four positions available, but Harb opted not fill them, rather than to fill them by selecting Plaintiffs. Harb Dep. 224:10-13.

### VI.    **Plaintiffs' Background, Experience and Qualifications**

Plaintiff's were not only qualified for both the GS-12 and GS-13 IRB positions, they were exceptionally qualified and vastly better qualified than many of the selectees.

-13-

A)     Mohammed Abdelkarim

Mohammed Abdelkarim is a 48 year old,[4/] U.S. citizen of Egyptian origin.  Abdelkarim ROI Ex. 6, p. 2.  He received a bachelor's degree in languages from Am Shams University and also took courses at the Institute of Radio & TV in Cairo, Egypt. Abdelkarim ROI, Exhibit 6, Tab a.  Prior to working for Defendant, Mr. Abdelkarim was a reporter and announcer with Radio Cairo and the Japanese Broadcasting Corporation. Abdelkarim ROI, Ex. 6, Resume.

He joined VOA as a GS-11 IRB on October 13, 1989.  Abdelkarim ROI Ex. 6, p. 2. In 1992, he was promoted to GS-12.  Abdelkarim ROI Ex. 6, p. 2.  During his career at VOA he received numerous awards for his exceptional performance.  Abdelkarim ROI, Exs. 6 (Tabs G-H) & 41; Marsh Dep. Ex. 6.  For example, in April 2002, during the same general time period as the selections, he received a within grade pay increase "in recognition of sustained high quality performance of official duties."  Abdelkarim ROI Ex. 41; Marsh Dep. Ex. 3; Marsh Dep. 93:3-6; Dahiyat Dep. 106:3-13.  Abdelkarim received two separate cash awards in 2001.  Abdelkarim ROI, Ex. 41.  In addition, he was nominated for and received a highly prestigious VOA Award of Excellence for his program "Mubarak/Copts/Human Rights" in 2001.  Marsh Dep. 93:13-94:8, 97:7-22; Marsh Dep. Ex. 4; Dahiyat Dep 79: 1-7, 77:17-20, 79:11-15, 105:3-18; Dahiyat Dep. Ex. 10.

Moreover, for each of the three years preceding the selections, Abdelkarim received an overall rating of "outstanding" from his supervisors, including William Marsh, and the narrative sections of the appraisals described his abilities in the superlative.  Abdelkarim ROI Ex. 41 (2000-

---

[4/]All the ages indicated herein are those of the individual at the time the disputed selections were made.

2001 Performance Appraisal, 1999-2000 Performance Appraisal, 1998-1999 Performance

Appraisal). Mohamed Ghuneim, former Chief of the Arabic Branch, described Abdelkarim as a

topnotch, able, and dedicated broadcaster who is well versed in American and Arab politics and

familiar with both cultures.  Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.  Abdelkarim is a

"special person with special talents and qualifications."  Abdelkarim ROI, Ex. 24, Ghuneim Aff.,

p. 3.

(B)     <u>Zeinab Abdelrahman</u>

Zeinab Abdelrahman is a 55 year old, United States citizen born in Egypt.  Abdelkarim

ROI, Ex. 16, Abdelrahman Aff., p. 2.  She received a bachelor's degree in economics from Cairo

University and completed a one-year program on German languages in West Germany.

Abdelrahman Dep. (Dec. 23, 2004) 6:7, 8:3.  Prior to working for VOA, Ms. Abdelrahman

worked as a reporter, newscaster, programmer, and announcer with Radio Cairo, Sawat el Arab,

Arab Radio and German radio (Deutsche Welle).  Abdelrahman Dep.  (Dec. 23, 2004) 7:15-10:21.

Ms. Abdelrahman was hired in 1988 by the Arabic Service as a GS-11 IRB and was

promoted to GS-12 in October 1993.  <u>Id</u>.  During her career she received numerous awards and

recognition for her performance and abilities.  For example, in 1999, she received a Superior

Accomplishment Award for outstanding performance as an Arabic Branch broadcaster and in

recognition for her special talent for securing interviews on major developments in the audience

area and the rest of the world.  Abdelrahman ROI, Ex. 6, Tab c.  She worked on the Accent on

Youth program for seven years and won an award for the program.  Abdelrahman Dep. (Dec. 23,

2004) 15:18-16:2.

Moreover, for each of the three years preceding the selections, Abdelrahman received an overall rating of "outstanding" from her supervisors, including William Marsh, and the narrative sections of the appraisals extolled her exceptional abilities. Abdelrahman ROI, Ex. 6, Tab c. Of particular note was her repeated distinction as the most "prolific" interviewer in VOA Arabic Service. Id.

(C)    Hayat Alkhateeb

Plaintiff Hayat Alkhateeb is a 59 year old, United States citizen, of Syrian national origin. Alkhateeb Dep. 6:2-9. Ms. Alkhateeb moved to Syria when she was five years old. Alkhateeb Dep. 5:20-6:3. She received a bachelor's degree in philosophy and sociology from the University of Damascus and later took courses from Texas University, the University of Maryland and Career University in the District of Columbia. Alkhateeb Dep., pp. 7:1-9:5. Prior to working for defendant, she worked as a broadcaster doing news and youth programming for Syrian Radio and TV. Alkhateeb Dep. 12:11-13:14.

Ms. Alkhateeb was hired by the Arabic Service as a GS-11 IRB in 1981, and was promoted to GS-l2 in 1986. Id. She has repeatedly been recognized as an exceptional broadcaster and reporter, winning approximately 22 awards during her tenure at VOA. Alkhateeb Dep. 21:16-21; Alkhateeb ROI, Ex. 6; Marsh Dep. Ex. 12. In particular, one of her programs made it to the finals of the prestigious, VOA-wide Excellence in Programming Awards. Marsh Dep. 167:2-16. Additionally, she was nominated for, selected for and successfully completed a highly selective one year management/leadership program called "Women's Executive Leadership." Alkhateeb Dep. 8:14-20; Marsh Dep. Ex. 11. During that program she spent three months working at CNN on "World Report." Alkhateeb Dep. 8:21-9:5.

Moreover, for each of the three years preceding the selections, she received an overall rating of "outstanding" from her supervisors, including William Marsh. Marsh Dep. 177:13-16; Marsh Dep. Ex. 7, 10; Alkhateeb ROI, Ex. 41, Tab b. The following is a typical description of her performance and capabilities: "Ms. Alkhateeb is an all-around international radio broadcaster, who has proven her skill in virtually every radio broadcasting discipline - including hosting complex integrated airshows, translating house material, originating reports or panel discussions, and producing programs." Marsh Dep. Ex. 7.

            (D)   Amina El-Bishlawy

Amina El-Bishlawy is 55 year old, United States citizen who was born in Egypt. Abdelkarim ROI, Ex. 15, El-Bishlawy Aff., 2. She earned a bachelor's degree in political science and economics and a high diploma (equal to a Masters degree) in radio and television journalism from Cairo University. El-Bishlawy Dep. 6:20-7:3. Prior to working for VOA, El-Bishlawy worked as a broadcaster for Radio Cairo. Id.

Ms. El-Bishlawy was hired in 1986 as a GS-11 IRB for the VOA's Arabic Service, and was promoted to GS-12 in November 1991. Abdelkarim ROI, Ex. 15, El-Bishlawy Aff., pp. 1-2. Like the other plaintiffs, she has received ample awards and recognition for her outstanding work, including a VOA Superior Accomplishment Award. Dahiyat Dep. 84:18-85:1.

Like the other plaintiffs, for each of the three years preceding the selections, she received an overall rating of "outstanding" from her supervisors, including William Marsh. ROI, Ex. 6, Tabs A-B. The narratives of her performance appraisals are similarly glowing, indicating that she is entrusted with editing duties and other responsibilities that other IRBs are not – duties that required "keen news judgment." Id.

      (E)     <u>Faiza Elmasry</u>

Plaintiff Faiza Elmasry is a 46 year old, citizen of the United States born in Egypt and is a Sunni Muslim.  Abdelkarim ROI, Ex. 14, Elmasry Aff., p. 2.  Ms. Elmasry earned a bachelor's degree in economics and politics from Cairo University and a diploma (similar to a master's degree) in political change in Yemen.  Elmasry Dep. (Jan. 9, 2007) 7-8.  Prior to joining VOA, she worked as a broadcaster, announcer, and programmer for Radio Cairo and Radio Japan. Elmasry Dep. (Jan. 9, 2007) 36:13-15.

Ms. Elmasry was hired in 1989 as a GS-11 IRB, for VOA's Arabic Service and was promoted to GS-12 in April 1992.  Abdelkarim ROI, Ex. 14, Elmasry Aff., pp. 1-2.  She too received numerous awards and accolades for her performance and skills as an IRB.  In 1999, Elmasry received both a Quality Step Increase "in recognition of her sustained high quality performance of her official duties" and a Collective Accomplishment Award for superior coverage of the war in Kosovo. Marsh Dep. 211:12-21; Elmasry ROI, Ex. 6, Tab E.  She has also received a prestigious "house" award for excellence in programming.  Elmasry ROI, Ex. 6, Tab E.

For each of the three years preceding the selections, she received an overall rating of "outstanding" from her supervisors, including William Marsh.   Elmasry ROI, Ex. 6, Tabs A-B; Marsh Dep. Ex. 17.  In fact, Ms. Elmasry received outstanding ratings for 10 years at VOA. Elmasry Dep. (Jan. 9, 2007) 36:15-16.  Her performance appraisal narratives also teemed with superlatives.  Elmasry ROI, Ex. 6, Tabs A-B. For example, Marsh extolled: "She is, without question, one of the premier talents in the Arabic Branch."  Marsh Dep. Ex. 17.

     **V.**    **<u>Agency's Asserted Legitimate Reasons for the Non-selections</u>**

Harb's asserted legitimate non-discriminatory reason for not selecting any of the Plaintiffs for either the GS-13 or GS-12 positions was that they were not even minimally qualified to perform the jobs. Harb Dep. 167:14-168:4, 168:18-19 (none of the Plaintiffs were qualified for reassignment); Harb Dep. 148:18-21 (Abdelkarim not at all qualified); Harb Dep. 145:4-6 (Abdelkarim not qualified at all for GS-13 position); Harb Dep. 179:15-16 (Elmasry not qualified); Harb Dep. 181:7-8 (El-bishlawy not qualified); Harb Dep. 181:7-8 (Alkhateeb not qualified). To be clear, Harb did not compare the qualifications of the Plaintiffs with the selectees; he simply concluded that each of the Plaintiffs was not qualified. Harb Dep. 180:1-5. 180:14-17.181:7-8.

However, for the purposes of its Motion for Summary Judgment, Defendant's asserted legitimate non-discriminatory reason is that "the plaintiffs failed to demonstrate that they had a "skill set" or the background for the new positions. Mr. Harb believed, which was confirmed by Mr. Marsh and Ms. Gandji, that they failed to demonstrate during their interviews and their performance at SAWA that they were suited to the radically new SAWA style, programming and format." Defendant's Memorandum of Points and Authorities 40.

## VI.    **Facts Disputing Defendant's Asserted Legitimate Reason for the Selections**

### A.    **Marsh and Gandji Cannot and Do Not Confirm Harb's Assessment That the Plaintiffs Did Not Demonstrate During Their Interviews or Their Prior Experience Working at SAWA that They Did Not Possess the Skill Set for the Positions.**

While a three person panel, consisting of Harb, Marsh and Gandji, interviewed the candidates for the GS-13 and GS-12 positions, Harb alone made the selection decisions. Gandji Dep. 151:17-20. After being pressed over their suggestions that the selection decisions were based on an informed consensus by the interview panel, Marsh and Gandji both eventually

-19-

admitted that they completely deferred to Harb based on his knowledge of the Arabic language and his assertions regarding his observations of these individuals' performance working in the "new" format.   Marsh Dep. 207:1-9, 348:7-349:3.  The panel's discussion of candidates proceeded from Harb's expressed preferences:  "...Moufac Harb said, '...these are the folks that I would like ... to have on the selection.'"  Marsh Dep. 295:1-3; *see also* id. at 220:22-221:16, 221:17-22; Gandji Dep. 36:17-21, 137:10-20; Harb Dep. 133:19-134:3.  Harb has the same recollection, only he further states that he doesn't recall having any discussion with the panel after he presented his list of names.  Harb Dep. 131:10-15.

Marsh further attests that, "the other candidates were deemed better qualified *by Mr. Harb, the selecting official....*  That was *his* judgment."  Marsh Dep. 396:15-397:5 (emphasis added).  Marsh admits he has no personal knowledge as to why given candidates were not selected.  Marsh Dep. 397:6-15 (regarding the reasons for Abdelrahman's non-selection).  Gandji further confirms the falsity of the assertion that the panel jointly made the selections:

> There's one thing that Mr. Harb had that I certainly don't have and that is ... a command of the Arabic language and how to write.... so we could not judge, I could not judge, on the level of writing.  And he had worked with them, and that's where most of the weight came in terms of writing news.... [Harb] knew the skill sets involved."

Gandji Dep. 37:17-38:16; *see also* id. at 39:22-40:2.  Based on this, "[Harb] presented us with a list [and] I could not disagree with him."  Gandji Dep. 136:22-137:7.

For example, with respect to Alkhateeb, Marsh asserts that Harb's justification for her non-selection was as follows:

> [T]he participants in the GS-12 interviews had already been doing the work that they ... would be hired to do at Radio SAWA.  It was something Moufac Harb supervised on a day-to-day basis.  There was a track record.... And I'm saying that she wasn't, according to Moufac Harb's choices, wasn't at the top tier of people he wanted on this, during this selection.

Marsh Dep. 192:9-193:15; *see also* Gandji Dep. 134:3-17 (asserting only Harb knows the reasons Abdelrahman was not selected). Similarly, Marsh admits, "I don't know how [Alkhateeb] performed [while working at Radio SAWA] except that she – the candidates who were selected performed better, according to *Moufac Harb*." Marsh Dep. 200:18-201 (emphasis added). Yet, it is undisputed that Alkhateeb never worked at SAWA prior to the selections; she was not assigned there until after the selections had been made. Alkhateeb Dep. 16:15-17:2, 27:14-17. Marsh claimed to be unaware of this fact. Marsh Dep. 201:2-5.

With respect to those plaintiffs who were temporarily assigned to Radio SAWA prior to the GS-12 selections, Marsh admits that, other than Harb's word, he has no personal knowledge of whether the selectees performed better at MERN/Radio SAWA than the plaintiffs. Marsh Dep. 207:1-9. With respect to Abdelkarim in particular, Marsh was so surprised to learn that he was not one of Harb's top candidates that Marsh directly questioned Harb about it.

> And following the interviews, when we gathered at this meeting, Moufac [Harb] talked about the people he wanted to select, and I did raise. I said, 'Wow. You know. So Gamal Al-Adel is one of them.' And he goes, 'Yeah.' And I asked the question. I said, 'Is he better at this new format than somebody like ... Mohamed Abdelkarim?' And the answer was, 'Gamal is one of the best.'"

Marsh Dep. 150:13-151:16, 310:7-12. Marsh cannot confirm whether Harb was fair in his assessment of the candidates or not. Marsh Dep. 201:14-22. He further attests that he did inform Harb how wonderful the plaintiffs were. Marsh Dep. 232:8-17. Harb, who denies knowing almost anything positive about the plaintiffs' performance, also denies that Marsh ever told him anything about the plaintiffs. Harb Dep. 122:17-123:1, 123:14-16, 124:5-8.

Thus, contrary to the Agency's characterization, the only consensus that seems to have emerged is that the interview panel members should entirely defer to Harb because they did not

speak Arabic and he did and because he asserted that he had information about the candidates'
performance that they did not.

### B.    Interviews

One of the primary justifications proffered by Defendant for not selecting the Plaintiffs is
that the Plaintiffs performed poorly in their interviews.  There is specific evidence to refute this
assertion with respect to each of the Plaintiffs.

With respect to Abdelkarim, Harb does not remember any questions that were asked of
Abdelkarim or any of Abdelkarim's responses.  Harb Dep. 114:2-6, 115:20-22,172:10-12.  After
being pressed about his qualifications, and despite her prior insistence that she could remember no
specifics about the selection or interview process, Gandji suddenly claimed to remember that
Abdelkarim performed poorly on the interview.  Gandji Dep. 66:11-67:20.  However, Abdelkarim
had three interviews, one for a temporary assignment and one for each of the GS-13 and GS-12
positions, and Gandji cannot remember on which of the three interviews he allegedly performed
poorly.  Id.  Further, Gandji's interview notes for the GS-13 position provide no evidence to
support the claim that he had a poor interview, with the possible exception of a note that he was
only "okay" with contacts.  Gandji Dep. 123:22-127:16.  Moreover, her notes specifically indicate
that he had supervisory experience.  Gandji Dep. 127:22-128:5.  Marsh's interview notes further
indicate that Abdelkarim gave a substantive interview and that he discussed his contacts.  Marsh
Dep. 443:11-448:16.  Like Gandji, when pressed about any specific deficiencies in Abdelkarim's
interview, Marsh states, "I don't remember the specifics."  Marsh Dep. 105:2-10.  Marsh has no
recollection of the GS-12 interviews and cannot state whether Abdelkarim performed well or
poorly in that interview.  Marsh Dep. 146:15-147:3.

With respect to Abdelrahman, Harb likewise has no memory of the interview and does not remember what asked her or how she responded.  Harb Dep. 16:16-20; Harb Dep. 118:4-6, 177:19-21.  In addition, not only do Gandji's notes fail to indicate that Abdelrahman interviewed poorly, they actively refute this assertion.  Her notes reflect that Abdelrahman had "experience in reporting; originates news stories; interviews and panel discussions."  Gandji Dep. 130:3-18.  Gandji's notes also indicated that Abdelrahman was "good on details" and that her other answers were "good to excellent."  Gandji Dep. 131:1-132:18.   Abdelrahman also had "great contacts" and gave "great details."  Gandji Dep. 132:16-133:7.  Finally, Gandji noted that Abdelrahman had supervisory experience and experience using DALET. Gandji Dep. 133:8-20.

With respect to El Bishlawy, none of the interview panelists can give any explanation or examples of what was allegedly lacking in her interview.  Harb has no recollection of anything asked or said during the interview.  Harb Dep. 117:18-118:1, 118:3, 181:4.  Nor do Gandji's interview notes contain any information to support the assertion that El Bishlawy performed poorly.[5]  Gandji Dep. 142:9-145:3.

Assertions that Alkhateeb performed poorly in the interview(s) are also contradicted by available evidence.  For example, Gandji stated that Alkhateeb had "no managerial experience," but her interview notes indicate Alkhateeb's answer to the managerial question was "correct" and that Alkhateeb had team leader and/or coordinator experience.  Gandji Dep. 110:18-112:11.  Identical to the other Plaintiffs, Harb does not remember any of the questions or any of Alkhateeb's answers.  Harb Dep. 120:19-121:2, 121:15-17.

---

[5]  Gandji's interview notes do contain one reference to El-Bishlawy having received only one training session on DALET.  Gandji Dep. 142:9-145:3.  However, Harb was solely responsible for decisions about who would be trained (and when) on the DALET system.  Hooper Dep. 220:14-16.

There is also no evidence to support the assertion that Elmasry performed poorly on her GS-12 interview. Once again, Harb does not remember anything about the interview. Harb Dep. 178:18-179:1. When asked why Elmasry was not selected for the GS-12, Gandji initially asserts that it was based on "the interviews and Mr. Harb's assessment of the writing and skills of the other candidates." Gandji Dep. 181:12-19. However, Gandji later admits that she recalls nothing about Elmasry's interview, her application or her past experience as a GS-12 IRB. Gandji Dep. 180:14-181:1.

Finally, according to Marsh, the individual(s) who prepared the interview questions decided that the emphasis would be on news judgment, editing and language skills. Marsh Dep. 395:22-396:14. Marsh states that, in his view, none of the plaintiffs lacked language skills or news judgment. Marsh Dep. 397:18-398:15. Further, as set forth above, Abdelkarim and El Bishlawy had extensive editing experience and skills, which is important given that the GS-13 Supervisor IRB/Shift Editor position involved significant amounts of editing.

## C.    Voicing Skills

Harb also impugned the plaintiffs' voicing skills, stating that SAWA "required a good voice, understandable, not monotone." Harb Dep. 448:17-20. The evidence plainly demonstrates the falsity of his claims. According to Marsh: "When [the Plaintiffs] worked for me, they were premier voices." Marsh Dep. 314:10-316:5; *see also* Elmasry Dep. (Jan. 9, 2007) 38:4-7 (Elmasry voice was always praised.)

Marsh's statements with respect to Abdelkarim are well-documented. In his performance appraisal, Marsh described Abdelkarim as having "one of the best males voices in the Arabic Branch." Abdelkarim ROI, Ex. 6, Tab H, 5-1-98 to 4-30-99 performance appraisal, page 9. And,

Marsh continues to believe Abdelkarim had one of the finest voices in the Arabic Service.  Marsh

Dep. 80:18-81:4.  When asked, "how is it possible that Mohamed Abdelkarim, who you said was

one of the best male voices at the VOA, could not ... possess the news reading/voicing skills

required under Radio SAWA?  Explain that...,"  Marsh responded, "I can't."  Marsh Dep. 313:7-

17.  "It goes without saying that Mr. Abdelkarim has one of the finest voices in the Arabic

Branch."  Marsh Dep. Ex. 2, p. 9 ( 5-1-97 to 4-30-98 Performance Appraisal).  Elshinnawi

concurred, stating Abdelkarim's announcing skills were "unsurpassed".  Abdelkarim ROI Ex. 17,

Elshinnawi Aff., p. 3.

_____**D.    News Reporting and News Writing Skills**

There is ample documentary and testimonial evidence to cast doubt on Harb's statements

that the plaintiffs lacked the news writing and reporting skills for the positions.  Harb Dep.

441:16-22.  As an initial matter, Marsh admits that all of the plaintiffs did news reporting while

under his supervision.  Marsh Dep. 320:20-321:5.  There is also specific evidence with regard to

each plaintiff's exemplary news writing and reporting skills.

Mr. Abdelkarim hosted and coordinated VOA's prime time news hours, which required "a

keen news sense." Marsh Dep. Ex. 2: 5-1-97 to 4-30-98 Performance Appraisal p. 9.  Marsh

praised Abdelkarim's news reporting:

> You have really outdone yourself this week.  Your tireless pursuit of the story really paid
> off for us in a big way.  *No coverage angle was missed* ... by your *on-the-scene coverage* at
> the White House, on the Hill, at the Copts demonstration ... It was really a first-rate effort,
> and I was proud to watch you in action."

Marsh Dep. Ex. 1  - 4 emails from Marsh to Abdelkarim March 31, 2000.  Indeed, Abdelkarim's

newswriting ability was practically "unsurpassed".  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p.

3.  Marsh's interview notes indicate Abdelkarim had experience writing original news based on

wires and other sources (Marsh Dep. 444:15-19).  Marsh's interview notes further indicate

Abdelkarim had originated material and prepared news for a fast paced news show "Towards a

Healthier Life."  Marsh Dep. 448:5-8.  Marsh rejects the notion that Abdelkarim could not write a

news story.  Marsh Dep. 204:4-9.

Abdelrahman likewise had extensive news reporting experience.  Since 1994, she had

worked on a daily basis on an hour-long integrated news program called Around the World.

Abdelrahman Dep. (Jan. 8, 2007) 65:18-23.  She had covered the White House and State

Department doing briefings and analysis while also translating speeches on the air. Abdelrahman

Dep. (Jan. 8, 2007) 66:1-7.  Further, Gandji's interview notes reflect her experience as a news

reporter.  Gandji Dep. 130:3-18.

_____Abdelrahman originated news for the program "Focus," and for her segments did all the

research, interviews, recording and compilation of the show.   Abdelrahman Dep. (Dec. 23, 2004)

18:14-19:4.  She received three awards for this work.  Abdelrahman Dep. (Dec. 23, 2004)

18:8011.  Gandji's interview notes indicate she had experience in originating news stories.

Gandji Dep. 130:3-18.

Alkhateeb won awards for her news reporting, for which Marsh nominated her.  Dahiyat

Dep. 82:20-84:4.  Alkhateeb received a VOA Special Achievement Award for her excellent work

as a "*reporter* on the Middle east peace process and as a host/coordinator for Arabic primetime

news hours."  Dahiyat Dep. Ex. 7 (emphasis added); *see also* Dahiyat Dep. 85:9-10.  With respect

to news writing, she was the writer and editor for the radio news hour and the TV shows Hello

America and Weekly Forum.  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 2

Elmasry had been trained in writing for many different formats.  Elmasry Dep. (Jan. 9,

2007) 38:4-7.  While in Arabic Service she also originated news and wrote briefings for the State

Department and DOD.  Elmasry Dep. (Jan. 9, 2007) 13:1-2.

###### E.    Editing Experience and Skills

_____Several of the plaintiffs also had editing experience and skills which establishes that they

were especially qualified for the GS-13 shift editor positions.  Abdelkarim was described as "an

up and coming news editor and back-half editor."  Marsh Dep. 103:3-14.   In addition, "[h]e is

among the few staffers regularly assigned to be a news editor..."  Abdelkarim ROI, Ex. 6, Tab H.

According to his performance appraisals, he worked at least one day per week as a news editor

during the 1999-2000 and 2000-2001 rating periods. Abdelkarim ROI Ex. 6, Tab H.  He was

considered one of the best news editors in the Arabic Branch. Abdelkarim ROI Ex. 17, Elshinnawi

Aff., p. 3.  Further, Marsh's interview notes reflect a positive discussion regarding Abdelkarim's

editing experience.  Marsh Dep. 448:11-14.

The narratives of El Bishlawy's performance appraisals indicate that she too was entrusted

with editing duties.  ROI, Ex. 6, Tabs A-B; Marsh Dep. 398:16-22.  Similarly, Alkhateeb was an

editor for Radio News hour and the TV shows Hello America and Weekly Forum.  Abdelkarim

ROI, Ex. 13, Alkhateeb Aff., p. 2.

###### F.    Plaintiffs' Technical Skills

With respect to whether the plaintiffs had the necessary technical abilities for the positions,

Marsh believed they were still learning the technical skills.  He also admits, however, that all of

the candidates were still learning the technical skills.  Marsh Dep. 318:14.  Gandji's interview

notes confirm that Abdelrahman had experience with DALET and also that she had supervisory

experience. Gandji Dep. 133:8-20.  Similarly, documentary evidence indicates Abdelkarim had

received praise for his use of actualities in news reports:

> "[It] was a comprehensive, well-conceived wrap-up of the week's events, and was replete
> with sound and actualities.  It was really a first-rate effort, and I was proud to watch you in
> action."

Marsh Dep. Ex. 1  - 4 emails from Marsh to Abdelkarim March 31, 2000.

Further, any deficiencies in plaintiffs' training and abilities with respect to using the new

DALET system are directly attributable to Harb.  Harb was solely responsible for deciding who

would be trained (and when) on the DALET system.  Hooper Dep. 220:14-16.

### G.    Objective Evidence That Plaintiffs Were Not Only Qualified, But That They Were Better Qualified than Many of the Selectees

There is ample additional evidence that not only were the selectees not better qualified

than the plaintiffs, some of them were not qualified at all.  Notably, the Agency declines to

dispute, despite the selecting official's unsupportable statements to the contrary, that Plaintiffs all

possessed the basic qualifications for the positions and were rated higher than many selectees by

objective rating bodies.  This evidence is in stark contrast to the self-serving subjective assertions

of the selecting official, upon which Defendant is forced to rely.

The only objective evaluation of the candidates' experience and qualifications, as

measured against the job requirements specified in the vacancy announcement, reveals not only

that the Plaintiffs were qualified for both the GS-12 and GS-13 positions, but also that they were

rated as more qualified than many of the selectees.  Rating sheets.

King reviewed the applications of all the plaintiffs and determined that, based on their

applications and experience, they were qualified for the GS-13 positions. King Dep. 40:6-41:12;

King Dep. Exh. 1.  Gandji specifically admits that Abdelkarim met the requirements for the GS-

13 position.  Gandji Dep. 62:3-64:10; 65:13-20.  Elshinnawi, a former supervisor, states: "There is no reason why he should not have been a top candidate."  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 3.  A candidate qualified for a GS-13 IRB position is certainly also qualified for a GS-12 IRB position.  King Dep. 198:18-21.

Abdelkarim was given the highest average score of 97 points by the DEU rating and ranking panel for the GS-13 positions.[6/]  King Dep. Ex. 2.  Abdelrahman received the fourth highest score of 94 points. King Dep. Ex. 2.  These two plaintiffs were also ranked first and fourth respectively by the merit promotion rating panel.  King admits that Abdelkarim and Abdelrahman were rated significantly higher by the merit promotion  rating panel than selectee Beldi, who was rated 14th out of 17 candidates, and received only 20 points out of a possible 30. King Dep. 75:4-12; King Dep. Ex. 1.   In fact, all of the Plaintiffs were rated higher than Beldi by the merit promotion rating and ranking panel. King. Dep. Ex. 1.  Similarly, all of the Plaintiffs were rated higher by the merit promotion rating and ranking panel than Usama Farag, who was rated 13th with a score of 20 points.  King Dep. Ex. 1.  It is also noteworthy that the GS-13 merit promotion rating and ranking panel rated every single plaintiff higher than Gamal Al Adle, Maha Rabie and Aida Akl, each of whom were selected for GS-12 positions which required virtually identical KSA's.  Id.  While Elmigdad Gebril was not ranked by the panel, his qualifications and application were scored against the selection criteria, with the result that he received a lower score than all but one of the plaintiffs. King Dep. Ex. 1.

Because it was not necessary to do so, only two of the plaintiffs, Abdelkarim and Abdelrahman, applied under the DEU procedures and were rated by the DEU.  Harb received the

_____

[6/] The DEU rating and ranking panel evaluated candidates on a scale of 1 to 100.  The merit promotion rating and ranking panel evaluated candidates on a scale of 1 to 30.

DEU certificate which included scores so he knew Abdelkarim scored a 97 and Abdelrahman scored a 95; nonetheless he selected Nassif and Arafa who scored only a 92 and a 93 respectively. King Dep. 75:4-12; King Dep. Ex. 2.   In fact, four of the six selectees from the GS-13 DEU Certificate and the Merit Selection Certificate were among the lowest rated candidates.   King Dep. Exs. 1-2.   It is also noteworthy, that both Abdelrahman and Abdelkarim were rated higher by the DEU panel than Elmigdad Gebril, Elzubeir El Tayeb and Rachid Jaafar, all of whom were eventually selected for GS-12 positions.

Despite receiving the DEU Certificate of Eligibles for the GS-13 position listing candidates in rank order with their scores (King Dep. 92:18-93:6), Harb initially testified, under oath, that he was never told about or shown any documents reflecting the scores assigned to candidates by the various rating panels.  Harb Dep. 72:16-19.   Only later does Harb admit he knew about these ratings and the scores assigned by the rating and ranking panel, including the fact that Abdelkarim was the top rated candidate with 97 points. [7/]  Harb Dep. 143:8-14, 144:12-15.

Additional evidence demonstrates that the selectees were lacking as compared to the plaintiffs.  Mohammed Cherkaoui (GS-13 selectee) was ranked lower than Abdelkarim and Abdelrahman by the rating panelists.  King Ex. 2.  Harb admits that there were problems with the structure of his writing and his spelling.  Harb Dep. 455:1-2, 458:3-6.  When Abdelkarim started as a news editor, he was editing Cherkaoui's and Beldi's work because they worked with him as translators.  Abdelkarim Dep. (Jan. 8, 2007) 53:24-54:1. Elshinnawi never rated Cherkaoui as

---

[7/] George Shammas, who was already a GS-13, received the same score as Abdelkarim.

outstanding because he has serious shortcomings in voice delivery, translation and news judgment. Elshinnawi Aff. ¶ 19.

In addition to being one of the lowest ranked candidates by the merit promotion rating and ranking panel, Marsh's interview notes reflect that Wassila Beldi (GS-13 selectee) had "very little DALET" experience. Marsh Dep. 420:16-22. Additionally, Beldi repeatedly missed deadlines and failed to provide the news headlines to some newscasters, including the Plaintiffs, before rushing to the studio to read the newscasts. El Bishlawy Dep. 80:2-82:20, Dahiyat confirms that Beldi was a difficult co-worker and supervisor. Dahiyat Dep. 93:19-94:3. When Beldi was selected Dahiyat was surprised and wondered why she would be promoted over other candidates. Dahiyat Dep. 118:18-119:8.

Munir Nasser (GS-13 selectee), an external hire, who should not even have been considered unless the internal candidates were deemed completely unqualified, also had shortcomings. Ms. Parmelee, a member of the rating and ranking panel, noted that he had "no track record in international broadcasting." Harb Dep. 136:8-11; King Dep. Ex. 1. After he begain working at Radio SAWA it was apparent that he had little to no knowledge about using DALET, translating news or writing news. Elmasry Dep. (Jan. 9, 2007) 21:15-17. Moreover, he had never worked in any type of broadcast media. Elmasry Dep. (Jan. 9, 2007) 21:17-18; King Dep. Ex. 1, Porsella Notes. Not surprisingly, then, he was ranked lower than both Abdelrahman and Abdelkarim by the DEU rating panel. King Dep. Ex. 2.

Daniel Nassif (GS-13 selectee) was another external hire who should have been selected only if no internal candidates met the basic qualifications. At the time of his selection he had no experience in radio as expressly noted by two of the ratings panelists. King Ex. 1, Porsella and

Parmelee notes.  Even Harb cannot deny that Nassif lacked this critical experience.  Harb Dep. 153:12-18, 154:5-18. As explained above, Nassif was rated lower than Abdelkarim and Abdelrahman by the DEU rating panel.  However, it is also noteworthy that he would have been rated even lower but for a disparately high score assigned to him by the third rater.   King Dep. 181:19-183:1; King Dep. Ex. 1  (Mengesha 30 points, Parmelee 20 points, and Porsella 17 points).  After his selection it became apparent that he had little knowledge of DALET, had trouble writing news, and had no experience as a broadcaster.  Elmasry Dep. (Jan. 9, 2007) 21:15-18; Abdelkarim Dep. (Jan. 8, 2007) 57:23-24; Abdelkarim ROI Ex. 6 (Rebuttal Aff. p. 2).  He was ranked significantly lower than both Abdelrahman and Abdelkarim by the DEU rating panel, receiving the lowest score they assigned to any of the candidates.  King Dep. Ex. 2.

As even Harb acknowledges the GS-13 vacancy announcement requires that the shift editor be capable of serving as a broadcaster.  Harb Dep. 68:18-69:4; see also Abdelkarim Dep. (Jan. 8, 2007) 41:14-15; Abdelkarim ROI, Ex. 27 p. 3 ("Incumbent will serve as an announcer when required.").   Neither Nasser or Nassif were capable of this because they had no prior experience, a shortcoming which was expressly acknowledged by the rating and ranking panel and which Harb was unable to refute.  Harb Dep. 136:8-14, 153:12-18, 154:5-18; King Ex. 2.

George Shammas's (GS-13 selectee) selection is also suspect.  Remarkably, Gandji's interview notes reflect that Shammas was "not familiar with MERN format." Gandji Dep. 146:19-147:22.  She also indicated that he failed to list stories in response to an interview question requiring him to do so.  Id.  Finally, Shammas did not know how to use DALET.  Abdelkarim ROI Ex. 6 (Rebuttal Aff. p. 2); Abdelkarim Dep. (Jan. 8, 2007) 42:9-12.  In short, he have a very poor interview.

Zahrat Abuzaid (GS-12 selectee), a non-citizen, could only legally be selected according to VOA's policy applying the Hatch-Mundt Act, if she is better qualified than the plaintiffs.  At the time of her selection Harb was not aware that she was hired at VOA as a producer, not an IRB.  Harb Dep. 418:3-6.  She had been an IRB only since May 2001.  Abuzaid failed to even address the KSA's for the position when she applied and, therefore, received a letter from personnel indicating that she was not qualified.  King Dep. Ex. 5. She also received lower performance ratings than all of the plaintiffs.  Marsh Dep. 358:20-359:2; Marsh Dep. Ex. 23.

Elmigdad Gebril (GS-12 selectee), who was a non-citizen, could only selected if he was superior to the plaintiffs and had only a high school education.  Harb Dep. Ex. 4, Gebril's application for GS-13.  Harb Dep. 350:12-351:4.  There is no indication of whether he ever studied journalism or broadcasting.  Id.; Harb Dep. 351:16-18.  He was also one of the lowest rated candidates by the DEU rating panel from which he received the lowest score they assigned to any candidate.  King Dep. Ex. 2.

Nasreddine Hssaini, a non-citizen, was ranked dead last on the GS-12 DEU certificate.  Abdelkarim ROI, Tab 31.  Additionally, he received lower ratings on his prior performance evaluations than all of the plaintiffs.  Marsh Dep. Ex. 22.

Given the emphasis assertedly placed on interviews, Rachid Jaafar's selection is also questionable.  Gandji recalls he was more interested in sports than news and this dominated his interview. Gandji Dep. 199:14-22.

Reem Abaza, who was a GS-11 and should not have been promoted unless none of the plaintiffs met the minimum qualifications for the GS-12 position, had serious shortcomings in

voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19.  She had only been an IRB since July 2000.  Abdelkarim ROI Ex. 22, Abaza Aff., 2.

In addition to being rated second to last, with only 18 out of 30 possible points, by the merit promotion panel (King Dep. Ex. 1), Maha Rabie had performance issues.  Elshinnawi never rated her as outstanding because she had serious shortcomings in voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19. Marsh rated her lower on her performance evaluations that all of the plaintiffs and admits that her overall performance was less successful than the plaintiffs.  Marsh Dep. Ex. 19; Marsh Dep. 293:3-8, 335:5-336:8, 338:19-339:3.

Numerous individuals who are familiar both with the relative qualifications of the plaintiffs and the selectees, as well as the differences in format between the Arabic Service and Radio SAWA, concluded that the plaintiffs were better qualified than many of the selectees.  It is noteworthy that, unlike the management officials testifying to the contrary, none of these individuals has any personal stake in the outcome of this case. For example, a previous supervisor, Mohammed Siddiqi, was amazed to learn Abdelkarim was not selected because based on his experience with the selectees they were less qualified in terms of experience and quality of work.  Abdelkarim ROI, Ex. 18, Siddiqi Aff., p. 3. As a former rating officer, Elshinnawi vouched that far less qualified staffers were selected because they were not Egyptians.  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 4.  Diaa Bekheet believes the plaintiffs were subjected to discrimination because the selectees included many with no proven experience as well as non-citizens.  Abdelkarim ROI, Ex. 19, Bekheet Aff., p. 4.  After meeting two of the selectees, Mohammed Ghunheim concluded they were extremely inferior to Abdelkarim.  Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.

-34-

Dahiyat served as Acting Director of the Arabic Branch from the time Marsh left until Harb arrived. Dahiyat Dep. 11:18-13:1. He supervised all of the plaintiffs and most of the selectees. Dahiyat Dep. 50:13-55:1. He testified that he was surprised to learn the plaintiffs were not selected for either a GS-13 or GS-12 position with Radio SAWA: "Because I knew them in the Arabic Service and I knew they were excellent employees." Dahiyat Dep. 163:22-164:5. He further states that "the plaintiffs in my opinion have length of experience, breadth of experience that's more than the others." Dahiyat Dep. 123:19-124:1. He specifically takes issue with Harb's statements regarding the non-citizens selected for the GS-12 positions, wherein Harb claims that the non-citizens were selected because they were "superior" to the plaintiffs: "In my experience supervising and working with those individuals, I do not agree with that statement." Dahiyat Dep. 179:8-180: 12-14. Dahiyat would have selected any of the plaintiffs over GS-12 selectees Dalia Alaqidi and/or Reem Abaza. Dahiyat Dep. 119:15-120:21, 121:14-122:3. Based on the qualifications and duties set forth in the GS-12 job announcement, Dahiyat would have selected Abdelkarim, Elmasry and Alkhateeb over GS-12 selectees Rabie (Dahiyat Dep. 130:16-131:5), Abuzaid (Dahiyat Dep. 130:3-15), Akl (Dahiyat Dep. 131:6-17), Elzubeir Eltayeb (Dahiyat Dep. 131:18-132:13), and Suleibi (Dahiyat Dep. 132:14-133:3).

There is other evidence of the plaintiffs' superior qualifications, as well. Outstanding performance appraisals for many consecutive years is strong evidence of a person's qualifications for a position at that same grade level with the same job title. Dahiyat Dep. 161:17-21. Welch further explained that candidates are required to attach performance appraisals to their applications because "it is one indicator that we suggest that supervisors, selecting officials, take into consideration in making that judgment." Welch Dep. 244:9-13. Performance awards should also be taken into account in the hiring/promotions process. Dahiyat Dep. 161:22-162:3. As set

forth above, Plaintiffs' all received outstanding performance ratings for at least the three rating periods preceding the selections, as well as numerous performance awards, thereby providing objective evidence that, not only were they qualified for both the GS-13 and GS-12 positions, but also that they were more qualified than many of the selectees.

Harb's own actions undermine his claims that the plaintiffs did not even possess the basic qualifications to perform the duties of the position. After their non-selections, the plaintiffs were required to train some of the new IRB's, who lacked broadcasting skills and did not know how to write a news report and/or how to translate. Abdelkarim Dep. (Jan. 8, 2007) 16:2-8; Abdelkarim ROI, Ex. 15, El-Bishlawy Aff., 5; Abdelkarim ROI, Ex. 14, Elmasry Aff., p. 5; Abdelrahman Dep. (Dec. 23, 2004) 66:6-9. Even one of the selectees, Diaa Bekheet, confirms that the plaintiffs had to train newcomers. Abdelkarim ROI, Ex. 19, Bekheet Aff., p. 4. Abdelrahman understandably expressed confusion at why she would be asked to train new IRB's for Radio SAWA after Harb professes to have concluded that she did not possess the minimum qualifications for the job. Abdelrahman Dep. (Dec. 23, 2004) 66:6-9.

Additionally, even after declining to select any of the plaintiffs for a GS-12 position, even though there were still four unfilled positions after the first GS-12s were selected and the Plaintiffs rejected, Harb also continued to utilize Plaintiffs' services as IRBs despite his claims that they simply were not qualified for the job. Abdelkarim ROI Ex. 6, p. 8. For example, Abdelkarim continued performing full job duties from March 2002 until he was reassigned out of Radio SAWA in December 2002. Abdelkarim ROI Ex. 6, p. 8. SAWA relied heavily on him for writing, translating and voicing the news. Abdelkarim ROI Ex. 6, p. 8. Harb sent him to cover congressional events and used his reports in newscasts. Abdelkarim ROI Ex. 6, p. 8. Despite

being deemed "unqualified," Abdelrahman was required to continue preparing the news,

broadcasting the news, calling correspondents, getting the actuality and reports, and preparing and

broadcasting the headlines for Radio SAWA.   Abdelrahman Dep. (Dec. 23, 2004) 22:6-23:4.

Finally, shortly after the plaintiffs departure from Radio SAWA, serious problems arose.

In February 2003, Hooper memorialized some of the ongoing problems:

> We are deeply concerned about *continuing* problems with grammar and spelling errors in
> the scripts for newscasts which are read over the radio and provided to the Internet staff for
> up-link.

Hooper Dep. Ex. 2 Feb. 14, 2002.  The SAWA editors at the time this memo went out were those

who were selected under the GS-13 vacancy announcement at issue in this case.  Hooper Dep.

139:2-17.  Dahiyat listened to Radio SAWA "quite often" and heard some grammatical mistakes.

Dahiyat Dep. 165:15-19, 166:20-167:6.[8/]

The poor grammar and English language skills of Harb's chosen broadcasters has even

attracted critical news coverage:

> One broadcaster, for instance, reportedly had trouble pronouncing the phrase "chicken
> breeders" in the "classical Arabic" used to address audiences that speak different dialects -
> - and so it came out sounding like "vaginas." That red-faced moment was hardly the
> network's only error. Early on, Radio Sawa announcers referred to "Colin Bowell," and
> two panels of Arabic specialists convened by the State Department inspector general's
> office concluded that mistakes on the network were "humiliating for Arabic speakers."

Art Levine, *The American Prospect*, http://www.prospect.org/cs/articles?articleId=10595, Nov. 7,

2005.

### G.     Statements/Actions Indicating Bias

---

[8/] Dahiyat attests that all five plaintiffs had excellent grammar skills.  Dahiyat Dep.
167:11-16.

Numerous statements and actions demonstrate not only Harb's bias against older employees and Egyptians, but also unwarranted favoritism towards Lebanese candidates and journalistic styles.  First, Harb complained openly and bitterly that the Arabic Service was "dominated" by Egyptian broadcasters. A Lebanese journalist, Hesham Elhem of Al-Arabiya TV, related that in or around April 2002 Harb stated that he would "clean the Arabic Branch of the Egyptians."  Elshinnawi Aff. ¶ 16.  Harb stated, within Alkhateeb's hearing, that there were too many Egyptians in the Arabic Service and they needed to be reduced.  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 5.  Elshinnawi offered to help out with Radio SAWA by serving as a GS-12 Washington correspondent for SAWA when it had no correspondents; Harb rejected the idea without interviewing him and hired a Lebanese journalist instead.  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 4.

When Harb started at VOA he was the only individual there of Lebanese origin.  Harb Dep. 464:7-10.  After the selections at issue and the rash of hiring that followed closely after, Harb had added 9 individuals of Lebanese origin, including Nassif who was quickly promoted not once, but twice since his original selection as a GS-13 IRB.  Harb Dep. Ex. 15.  Despite the indisputable facts, Harb denies that many of the people in SAWA are now Lebanese.  Harb Dep. 464:11-14.

Immediately after taking over VOA Arabic Service and then Radio SAWA, Harb also undertook efforts on numerous fronts that demonstrated his preference for the use Lebanese dialects, phrasing, colloquialisms, pronunciation, etc.  For instance, Harb began expunging VOA's radio broadcaster style book of Egyptian phrases and pronunciation styles, and replacing them with Lebanese phrasing and pronunciation instead.  Elmasry Dep. (Jan. 9, 2007) 15:11-13;

Abdelrahman Dep. (Jan. 8, 2007) 29:2.  Harb went further and "put down" the Egyptian dialect.

Elmasry Dep. (Jan. 9, 2007) 12:2-3.  He indicated disdain by dismissively declaring:  "this is not

Radio Cairo."  Elmasry Dep. (Jan. 9, 2007) 15:24. On almost a daily basis, he ridiculed Egyptian

culture and icons.  Elmasry Dep. (Jan. 9, 2007) 16:18-23.

In the Arabic world, there are two different ways to pronounce the letter "G" - with some

regions using a hard "G" and others using a soft "G" that sounds more like a "D."  Harb insisted

that all broadcasters use the pronunciation preferred in Lebanon, even though that was not the

pronunciation used by most Arabic speakers.  Abdelkarim Dep. (Jan. 8, 2007) 65:10-68:19;

Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.  Harb also chastised one of the selectees, Hala

Arafa, for using the word "Istekhbarat" instead of "Mukhabarat," which is a word used in the

Lebanese media.  Abdelkarim ROI Ex. 6, p. 6.  Arafa even asked Harb why he was trying to

"Lebanize" the station.  Abdelkarim ROI Ex. 6, p. 6.  This problem is so apparent to  Arabic

speakers that it has generated public discussion and news coverage:

> Independent observers say that [Harb's] networks have been marred by an unprofessional,
> freewheeling approach to hiring and firing, shoddy journalism, and distorted news
> priorities that usually downplay tough coverage of Arab regimes and even terrorist
> organizations -- while often overemphasizing news from Lebanon, which happens to be
> Harb's homeland.

Art Levine, *The American Prospect*, http://www.prospect.org/cs/articles?articleId=10595, Nov. 7,

2005.

Another example of Harb's bias is reflected in Harb's changes to promotional spots.  In the

Arabic Service, promotional spots were done in classical Arabic.  Under Harb, however, the

promotional spots were done by individuals with Lebanese accents using Lebanese slang.

Abdelkarim Dep. (Jan. 8, 2007) 64:18-19; Abdelkarim ROI, Ex. 14, Elmasry Aff., p. 6.;

-39-

Abdelkarim ROI Ex. 24, Ghuneim Aff., p. 3.  When asked by the EEO investigator why promos were being done in a local Lebanese dialect, Harb denied it stating, under oath, that all promotional spots were done in classical Arabic.  Abdelkarim ROI Ex. 7, Harb Aff., p. 7. During his deposition, however, Harb changed his testimony, and admitted that some people doing promos have Lebanese accents.  Harb Dep. 496:20-22.

In addition to the hiring decisions Harb made in association with the vacancies at issue herein, he also made numerous additional personnel decision regarding IRB positions after refusing to select the plaintiffs.  These related personnel decisions further demonstrate Harb's pro-Lebanese/anti-Egyptian and anti-Syrian biases.  For example, Thabit Sawan (Lebanese) was selected for GS-12 position, but subsequently given a 120-day temporary promotion to GS-13, that Harb anticipated would become permanent.  Abdelkarim ROI Ex. 34; Harb Dep. 224:3-5, 480:10; 481:10-11.  Harb acknowledges that a requirement for a GS-13 position is a college degree (Harb Dep. 231:2-4), but denied that Sawan lacked such a degree (Harb Dep. 346:17-20). After being confronted with Sawan's application, however, Harb admitted that Sawan's highest level of education was high school.  Harb Dep. 347:20-348:7.  Like Daniel Nassif,[9] Sawan was promoted through the ranks very, very quickly despite the fact that it usually takes years for IRBs with PhDs or Masters degrees to qualify for grades 12 or 13 and very few ever reach grades 14 or 15.  Abdelkarim ROI Ex. 23, Hopkins Aff., p. 4.

Harb also hired nine Lebanese IRBs.  Harb Depo Ex. 15.  Saada Abdullah had been working for Lebanese TV as an assignment editor when she was hired as a GS-12 IRB.  Harb

---

[9] After just one short year, Harb promoted Nassif to GS-14 managing editor, and then gave him a temporary promotion to GS-15.   Harb Dep. 230:13-19.

Dep. 486:10-17; Harb Depo Ex. 15.  Harb hired Katia Wakim who was of Lebanese origin and had been working for TV in London as a contractor.  Harb Dep. 486:18-22.  Wakim was allegedly hired because Harb had been told to expand news coverage and to do so he needed more people. Harb Dep. 487:1-7.  He hired Antoine Issa from a radio station in Lebanon.  Harb Dep. 488:1-4, 480:10, 16-19.  Anna Abd al-Massih was hired from Lebanon as a contractor.  Harb Dep. 488:11-17.  Greta Ghacibeh and Khattar Torbey were both hired as contractors.  Harb Dep. 480:10; 481:13-18, 480:10, 481:1-5.

During the same time frame that Harb was hiring all these Lebanese broadcasters, he  was also removing or discontinuing the services of numerous Egyptian staffers other than the plaintiffs.  Harb Dep. 616:11-12.   These include Badia Rifaai, who left after being told her pace of reading was not suitable for SAWA.  Harb Dep. 614:18-19, 616:17-20.  Additionally, Harb discontinued the services of Kamal and Mona Bekheet, both Egyptian, during this period.  Harb Dep. 614:20-615:1, 617:6-10. Harb fired Abdullah Hamed Omar, Egyptian, a POV and finalist on a VOA waiting list for hiring, and replaced him with a Lebanese individual.  Elshinnawi Aff. ¶ 29.

At the conclusion of Harb's hiring spree for SAWA, he had hired 58 employees:  nine were Lebanese but only six were Egyptian.  Harb Depo Ex. 15.  Of those not selected for any position, all but one were Egyptian.  Thus, with his original selection decisions, in which he declined to select seven Arabic Service staffers, six of whom were Egyptian and one of whom was Syrian, for any position with Radio SAWA, and during the months that ensued when he systematically removed Egyptian staffers and replaced them with many Lebanese staffers, Harb completely changed the demographics of his workforce.

This is not surprising given Harb's comments about changing the demographics of the workforce. Mr. Harb said that he was having problems because he could not get rid of many of the "old people that came from the Voice of America." Fandy Aff. ¶ 10. Mr. Harb's goal was to hire people who were "with it" and specifically "younger" people who do not have the "hangups of older people." Fandy Aff. ¶ 11. In April 2002, Mr. Harb also commented that "[w]e need young blood. We are for the younger generation." Freij Aff. ¶ 8.

### I.     Differences in Format Between VOA Arabic Service and Radio SAWA

Defendant argues that SAWA was "radically different" from the Arabic Service because it was fast paced; required broadcasters to take news directly from a wire service and write original, brief news stories based thereon; required an IRB to learn new technical skills involving the DALET system to include actualities in news stories; and required the broadcasters to use colloquial Arabic, not classical Arabic. Defendant's Memorandum of Points and Authorities 8-9. By comparison, Defendant minimizes the experience and duties of Arabic Service IRB's suggesting that they merely translated already prepared news stories, did long, block programs, and used Classical Arabic. Defendant's Memorandum of Points and Authorities 9-10.

By Defendant's own admission, SAWA primarily played music, had only two brief newscasts per hour, one of which was only 90 seconds long, and had only occasional short features. Defendant's Memorandum of Points and Authorities 8-9; Hooper Dep. 238:4-9. As a result of the infrequent, short newscasts SAWA was much easier, despite any increase in pace. Elmasry Dep. (Jan. 9, 2007) 9:16-21; Abdelrahman Dep. (Jan. 8, 2007) 19:17-20:6.

After initial denials, VOA management officials also admit that VOA Arabic Service had similarities to Radio SAWA. For example, Hooper acknowledged that there was breaking news at

VOA Arabic that the IRB's, including Plaintiffs, covered.  Hooper Dep. 241:3-9.   Additionally,

VOA Arabic received news from correspondents in the field, something that SAWA also does.

Hooper Dep. 242:13-15.  Arabic Service news was not, as the Defendant has claimed, pure

translation.  Arabic Service newscasters also often incorporated other news or interviews.

Abdelkarim Dep. (Jan. 8, 2007) 77:3-12, 20-25.  And, as set forth above, each of the plaintiffs had

experience originating, as opposed to merely translating, programming, and they all had ample

newsreporting and broadcasting experience.

With respect to the Defendant's statement that SAWA was much "faster-paced" than the

Arabic Service, this may also be an exaggeration.   SAWA staffers indicate that the pace is

frenetic or fast only when there is a breaking news event and that otherwise it could be "leisurely".

Abdelkarim ROI Ex. 21, Abuzaid Aff., p. 3; Abdelkarim ROI Ex. 22, Abaza Aff., 3.

Furthermore, the admission that Radio SAWA's newscasts are no longer than 10 minutes per hour

undercuts Defendant's assertion that it was so fast-paced that the plaintiffs could not adapt.

Surely if, as explained above, they were outstanding at preparing both daily and weekly shows of

over an hour long, in addition to the performance of their other duties, they could adapt to

preparing a 10 minute newscast once per hour.  Moreover, there is specific evidence to refute the

suggestion that at least two of the plaintiffs were incapable of working in a fast paced

environment.  Elmasry's style and shows at VOA Arabic Service were always fast-paced.

Elmasry Dep. (Jan. 9, 2007) 38:1-4.  Similarly, Marsh's interview notes indicate that Abdelkarim

had originated material and prepared news for a fast paced news show "Towards a Healthier

Life."  Marsh Dep. 448:5-8.

### J.    Failure to Follow Designated Order of Consideration for Candidates

Marsh recalls no attempts to make a determination whether or not the non-U.S. citizens who were selected for the GS-12 positions were better qualified than the Plaintiffs, who were US citizens, seeking reassignment to those same positions. Marsh Dep. 412:8-14. Gandji cannot or will not answer whether there was any determination made that no current staff member met the requirements for the position, before Harb selected external candidates and/or contractors. Gandji Dep. 58:12-64:10.

Harb initially claims that he always gave priority to citizens when they were qualified for the job, but in this instance because Plaintiffs were not qualified, he chose non-citizens. Harb Dep. 257:15-19. Yet, Harb also admits that he did not compare the qualifications of the non-citizen selectees with the plaintiffs' until *after* the selections had been made. Harb Dep. 259:3-10.

## **ARGUMENT**

### I.    **Summary Judgment Standard**

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Furthermore, the D.C. Circuit has directed that trial courts should apply 'an added measure of "rigor" to motions for summary judgment in employment discrimination cases.'..." Lucero-Nelson v. Washington Metro. Area Transit Auth., 1 F. Supp. 2d 1, 3 (D.D.C. 1998); see also Moore v. Ashcroft, 401 F.Supp.2d 1, 21 (D.D.C. 2005). It is well settled that the court must view the evidence in the light most favorable to the non-moving party. Borgo v. Goldin, 204 F.3d 251, 254 (D.C. Cir. 2000). Plaintiffs, as the party opposing summary judgment, must "have the advantage of the court's reading the record in the light most favorable to [them], will have [their] allegations taken as true, and will receive the benefit of the doubt when [their] assertions conflict with those

of the movant." 1OA C. Wright and A. Miller, Federal Practice and Procedure § 2716 at nn. 4-6 (footnotes omitted).

## II.     Legal Standards Governing Claims Under Title VII and ADEA

Discrimination claims under Title VII and the ADEA are analyzed according to a three part, burden-shifting framework.   Plaintiffs have the initial burden of presenting evidence sufficient to raise an inference of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Plaintiffs can raise such an inference by demonstrating the following:  (1) they belong to a protected group; (2) they applied and were qualified for a job for which the employer was seeking applicants; (3) despite their qualifications, they were rejected; and (4) other individual(s) were selected to fill the position(s).  McDonnell Douglas, 411 U.S. at 802;  Cones v. Shalala, 199 F.3d 512, 515-517 (D.C. Cir. 2000).  This burden is not an onerous one.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

After Plaintiffs have articulated a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802-03.

If the employer articulates such a reason, the burden shifts back to Plaintiffs to prove that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.   In St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993), the Supreme Court clarified that, to sustain a finding of discrimination, the plaintiff is not required to prove anything beyond a showing that the employer's asserted reasons

-45-

for its action lacked credibility.[10/]    "According to <u>Hicks</u>, a plaintiff need only establish a prima facie case and introduce evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the factfinder ... may infer discrimination."  <u>Barbour v. Merrill</u>, 48 F.3d 1270, 1277 (D.C. Cir. 1995).

The same burden shifting framework set forth in <u>McDonnell Douglas</u> applies to claims under the ADEA.  <u>Barnette v. Chertoff</u>, 453 F.3d 513, 515 (D.C. Cir. 2006); <u>Stella v. Mineta</u>, 284 F.3d 135, 144-146 (D.C. Cir. 2002).

In this case, Defendant admits that the plaintiffs established a prima facie case of discrimination under both Title VII (based on National Origin) and the ADEA, except for Abdelkarim under the ADEA.  Defendant has asserted the same legitimate non-discriminatory reasons for the disputed non-selections in response to both Plaintiffs' Title VII claims and their ADEA claims.  Thus, in order to survive summary judgment on their claims under both statutes, plaintiffs need only point to evidence sufficient to raise questions about the credibility of Defendants' proffered legitimate reasons for the non-selections.

III.    **Plaintiffs Have Produced Sufficient Evidence to Demonstrate the Existence of Genuine Issues of Material Fact Regarding Whether They Were Discriminated Against in Violation of Title VII.**

Defendant concedes that Plaintiffs have established a prima facie case of discrimination based on their national origin (Egyptian, Syrian).  Defendant's Memorandum of

---

[10/] This directly contradicts Defendant's suggestion that Plaintiffs cannot survive summary judgment unless they prove both that Defendants' asserted legitimate non-discriminatory reason is false *and* that discrimination was the real reason.  See Defendant's Memorandum of Points and Authorities 46.

Points and Authorities 40. That is, Defendant admits that the Plaintiffs were members of a

protected group, they applied for and were qualified for both the GS-13 and GS-12 vacancies, but

they were not selected for either position. Id. at 39-40.[11/]  Therefore, the only issue in dispute is

whether they have produced sufficient evidence to support an inference that Harb's proffered

legitimate reasons for the selections at issue are a pretext for unlawful discrimination.

### A.    Defendant's Questionable Asserted Legitimate Non-Discriminatory Reason for the Plaintiffs' Non-selections

Defendant asserts essentially the same reason for Harb's refusal to select Plaintiffs for

either the GS-13 or GS-12 positions. That is, that the plaintiffs failed to demonstrate that they had

the skill set or the background for the new positions and that Harb and the interview panelists

believed that they failed to demonstrate during their interviews and during their  performance at

Radio SAWA that they were suited to SAWA's "new" style, programming and format.

Defendant's Memorandum and Points of Authorities 40. As a general matter, this assertion is

highly suspect because it is a gloss on what Harb, the selecting official, actually states regarding

Plaintiffs' qualifications or lack thereof. Harb's actual asserted reason for Plaintiffs' non-

---

[11/]  While Defendant concedes that Plaintiffs established a prima facie case of national origin discrimination (and later that all but one also established a prima facie case of age discrimination), it also makes the curious statement that they have not established a "particularly strong" prima facie case. Defendant's Memorandum of Points and Authorities 40, 48. Defendant points to no authority in support of the proposition that the court can or should consider the "strength" of the prima facie case in deciding whether Plaintiffs have presented sufficient evidence to survive summary judgment. Neither does Defendant explain how the supposed strength of the prima facie case is to be evaluated by the Court. The Court should ignore Defendant's irrelevant assertion and evaluate Plaintiffs' claims according to established precedent, i.e. by determining whether Defendant has asserted a legitimate non-discriminatory reason for its actions and whether Plaintiffs have sufficient evidence to support an inference that this asserted reason is false and/or a pretext for unlawful discrimination. This is the only permissible means of determining whether Plaintiffs have met their burden for surviving summary judgment. Burdine, 450 U.S. at 253.

selections is much more extreme and much less defensible than what the Defendant chooses to articulate (and attempt to defend) for purposes of summary judgment.

Specifically, Harb adamantly and repeatedly insists that the plaintiffs did not even possess the most basic qualifications for either of the positions (Harb Dep. 167:14-168:4, 168:18-19, 181:7-8), including for a lateral reassignment to a GS-12 IRB position that each of them held for many years and for which they were, by Defendant's own admission, deemed qualified and for which they were highly rated by the ranking and rating panels who evaluated their applications and experience.  More importantly, Defendant's admission that the Plaintiffs were qualified for the positions eviscerates Harb's justification for not selecting them.  This admission alone not only destroys Harb's credibility, but also irrevocably leads to the conclusion that this Motion must be denied.

Defendant undoubtedly makes this concession, despite Harb's outlandish justification, because it knows that any other position is indefensible in light of the voluminous evidence contradicting Harb, including:  (1)  the statements of officials King, Gandji, Marsh, Elshinnawi, Dahiyat and even some of the selectees that Plaintiffs did possess the minimum qualifications; (2) the Plaintiffs' longstanding history of truly superlative performance; and (3) the ratings of the merit promotion and DEU rating panels that ranked Abdelkarim first, Abdelrahman fourth, and all of the plaintiffs higher than several of the selectees for both the GS-13 and GS-12 positions. These inconsistencies alone cast doubt on Defendant's asserted reason for the non-selections and highlight the importance of requiring Defendant to defend against the reasons actually articulated by the selecting official, not some watered down version that it finds more palatable.

     **B.**    **Plaintiffs Have Produced Substantial Evidence to Demonstrate That Harb's Asserted Reason for Their Non-selections Is Pretextual**

Defendant asserts that the only evidence proffered by Plaintiffs to dispute Harb's justifications is evidence that they were better qualified than many of the selectees. Defendant's Memorandum of Points and Authorities 41. As demonstrated by the points set forth below, each of which undermines Defendant's asserted rationale for the non-selections, this statement is false.

> **(1)     Defendant's False Attempt to Portray the Selections as a Consensus Reached by the Interview Panel Based on Both the Interviews and Their Knowledge of Plaintiffs' Performance While Working at Radio SAWA's Pilot Project Undermines the Asserted Rationale for the Selection Decisions**

As set forth in great detail above, contrary to Defendant's assertions, the interview panel did not reach a consensus about the selectees based on their interview performance and their prior performance at the SAWA pilot project. *See supra* pp. 19-22. Instead, both Marsh and Gandji admit that Harb began the deliberations by presenting a list of the candidates that he wanted to select and that they deferred to him because they did not speak Arabic and because he claimed that the selectees were superior based on his personal observations of their work during the SAWA pilot project. Id. at pp. 19-20. Both Marsh and Gandji admit that the selection decisions were Harb's alone. Id. at pp. 19-20.

Harb's credibility with respect to his asserted observations of Plaintiffs' performance during the SAWA pilot project is particularly suspect as demonstrated by the fact that Alkhateeb never performed any work for Radio SAWA prior to the GS-13 selections. Alkhateeb Dep. 16:15-17:2, 27:14-17. Therefore, Harb could not possibly have determined that she was unable to perform in the Radio SAWA format. Casting further doubt on Harb's decisions, and the assertion that the panel concurred with him and his asserted bases therefor, is the fact that Marsh specifically informed Harb how "wonderful" the Plaintiffs were and even inquired whether

Abdelkarim was not more qualified than Harb's preferred selectees.  Marsh Dep. 150:13-151:16,

232:8-17, 310:7-12.  Harb, of course, denies that Marsh made such statements or that anyone

suggested Plaintiffs might be better qualified than the selectees.  Harb Dep. 122:17-123:1, 123:14-

16, 124:5-8.

(2)    **Irregularities in the Selection Process Cast Doubt on the Credibility of Defendant's Justifications for Plaintiffs' Non-selections**

Suspicious irregularities in the selection process cast doubt on Defendant's assertion that

the selections were made in a fair and unbiased manner.  As explained in detail above, three

separate merit promotion certificates were issued in connection with the GS-13 vacancy

announcements.  *See supra* pp. 7-9.  Neither the first certificate containing only the top 10

candidates' names, nor the second certificate containing only the top five candidates' names,

included selectee Beldi.  Id.  The Agency attempts to explain the rescission of the first two

certificates, and issuance of a third certificate containing the names of all 17 candidates, including

Beldi, by claiming the action was justified by the closeness of the candidates' scores and the fact

that there were multiple vacancies.  Id. at pp. 8-10.

This explanation does not withstand scrutiny.  As King and Welch admit, Agency policy

specifies that the certificate of eligibles should have included only the top five candidates.  King

Dep. 63:10-18, 70:1-71:12, 80:5-15, 108:15-21, 109:22-111:7; Welch Dep. 32:15-18.  When

questioned about the fact that there is a 10 point difference (on a 30 point scale) between

Abdelkarim, who is ranked first, and Akl, who is ranked seventeenth, Welch admits that this is a

"significant" difference.  Welch Dep. 38:22-39:14.  He also admits there is a significant difference

between the scores of Abdelkarim and Beldi, who was ranked fourteenth.  Id. at 39:15-21.  King

-50-

flatly admits that the scores are not close.  King Dep. 116:22-117:4.  Welch casts further doubt on

the justification for issuing a certificate containing all of the candidates when he admits that Harb

could choose candidates from three different certificates - including the DEU certificate and the

reassignment certificate.  Welch Dep. 152:7-153:15.  Thus, even before the issuance of the third

certificate containing the names of all 17 candidates under the merit promotion process, Harb

already had 19 certified candidates from which to choose.  Welch Dep. 173:1-6.  Welch cannot

explain why 19 candidates was insufficient.  Id.

Defendant's explanation for the issuance of the third merit promotion certificate is even

more suspect when one considers the evidence that selectee Beldi complained to Harb that she

had not made the certificate and that he reassured her that the decision would be reconsidered.

See supra pp. 10-11; Elshinnawi Aff. ¶ 20.  Harb partially corroborates this by admitting that he

went to personnel and asked who had made the certificate of eligibles.  Harb Dep. 387:3-4.

All agency officials questioned about this matter agree that the issuance of three separate

merit promotion certificates is highly unusual, and they can recall no other instances in which it

had occurred.  King. Dep. 118:17-11:9, 123:6-9; Welch Dep. 137:8-138:4; Dahiyat Dep. 152:10-

19, 153:22-154:6, 154:7-155:6, 159:19-160:1. Additionally, there is nothing in the Agency

personnel or selection processes that contemplates or allows such an action.  King Dep. 114:19-

115:15.

> **(3)     With Respect to Qualifications, Plaintiffs' Only Burden is To Demonstrate that they Possessed the Basic Qualifications for the Positions and/or That They Were Equally as Qualified as the Non-Citizen Selectees - Plaintiffs Present Ample Evidence to Sustain this Burden**

Defendant acknowledges that the level of Plaintiffs' qualifications for the subject

vacancies may demonstrate Harb's asserted reasons for their non-selections are pretextual. Defendant's Points and Authorities 41.  Defendant incorrectly states, however, that in order to demonstrate pretext, Plaintiffs must establish that a reasonable employer would have found them to be "significantly" better qualified for the job.  Id.  (relying on Aka v. Washington Hospital Center, 156 F.3d 1284 (D.C. Cir. 1998) and Carter v. George Washington University, 387 F.3d 872, 881-82 (D.C. Cir. 2004)).  Neither Aka nor Carter are applicable to the instant case because both of those cases involved employment decisions in which the employer's decision criteria was based on a straight calculation of which individual was the most qualified for the position in question. See generally Aka, 156 F.3d 1284; Carter, 387 F.3d 872.

It is undisputed that the instant selections were not to be made based on a straight qualifications calculation.  Instead, as explained in detail above, pursuant to a Memorandum of Understanding with the Union, (Abdelkarim ROI, Ex. 35), selection criteria established by the Chief of Personnel and communicated to the applicants and the selecting official, (King Dep. Ex. 4; Welch Dep. 16:10-15, 77:12-78:19, 79:2-19), and the Agency's application of the Hatch-Mundt Act granting preferences to citizen applicants (Hooper Dep. Ex. 1, MOA V-A 822.1; Welch Dep. 187:11-22), certain employees, including Plaintiffs, were entitled to preference in the selection process.  More specifically, pursuant to the MOU and the selection criteria established by Welch, internal candidates for promotion to the GS-13 position, such as Plaintiffs, were entitled to selection over external candidates as long as they met the basic qualifications for the position. Further, the selection criteria also specified that "[p]ersonnel will determine whether candidates for promotion meet the basic requirements based on position descriptions and qualifications requirements supplied by MERN."  King Dep. Ex. 4, p. 2.  Thus, the question of whether an internal candidate met the basic qualifications was for personnel to decide, not Harb.   Personnel

clearly reached this conclusion when it placed the Plaintiffs on the merit promotion certificate.

Harb simply chose to ignore the established selection priorities requiring him to select internal

candidates who were deemed qualified before even considering external candidates. Additionally,

internal candidates for lateral reassignment to the GS-12 positions, such as Plaintiffs, were

expressly entitled to selection over internal candidates for promotion, i.e., GS-11's, GG-11's

and/or POV's. Further, pursuant to VOA's interpretation and application of the Hatch-Mundt

Act, non-citizens could be hired over citizens only if the non-citizen's qualifications were

demonstrably superior to those of the citizen applicants. They were not.

### (A)    GS-13 Selections

Based on these criteria, which were established by the Agency for specific reasons, (Welch

Dep. 87:14-88:6; King Dep. Ex. 4, p. 2), Plaintiffs need only demonstrate that they met the

minimum qualifications for the GS-13 position to demonstrate that they were entitled to selection

over external candidates Nasser and Nassif. As conceded by Defendant, and as attested to by

every Agency official other than Harb, Plaintiffs have met this burden. Defendant's Points and

Authorities 39; *see also, supra* pp. 29, 35.

Moreover, Plaintiffs exceed this burden by demonstrating that a reasonable employer

would conclude that they were significantly better qualified than Nasser and Nassif, as well as

several of the other selectees including Beldi, Cherkaoui and Shammas. Beldi was rated and

ranked lower than every single plaintiff by the merit promotion rating and ranking panel. King

Dep. Ex.1. In fact, Beldi was ranked 14th out of 17 candidates and received only 20 points out of a

possible 30. Id. Cherkaoui, Nasser and Nassif were all ranked lower than Abdelkarim and

Abdelrahman by the DEU rating and ranking panel.[12]  King Dep. Ex. 2. Furthermore, as set out in

detail above, Plaintiffs have produced ample evidence from Agency officials and others that these

individuals lacked important skills identified in the KSAs and were otherwise inferior to

Plaintiffs.  *See supra* pp. 29-32.

External selectees Nasser and Nassif had particularly obvious shortcomings.  *See supra* pp.

31-32.  As Defendant declines to dispute, both individuals had no experience whatsoever in radio

broadcasting, and Harb admits that not all of the GS-13s had experience as announcers.  Harb

Dep. 225:16-19.  While every asserted shortcoming of Plaintiffs is gone over with a fine tooth

comb by Defendant, it brushes off Nasser's and Nassif's lack of an essential skill by asserting

"more than radio or broadcast experience was required."  Defendant Memorandum of Points and

Authorities pp. 43-44. However, Harb himself acknowledges that the GS-13 position required

selectees to "serve as an announcer when required."  Harb Dep. 68:18-69:4; *see also* Abdelkarim

ROI, Ex. 27, p. 3.  In addition, Nasser had no experience with translating and writing news

(Elmasry Dep. (Jan. 9, 2007) 21:15-18), and Nassif had no experience in radio (Harb Dep.

153:12-18; Elmasry Dep. (Jan. 9, 2007) 21:17-18).

In light of Defendants' assertions that performance in the interviews was a key factor in

the selections, Shammas's selection is also suspect.  Gandji's interview notes indicate that during

the interview he demonstrated that he was unfamiliar with the Radio SAWA format and that he

failed to answer questions properly.  Gandji Dep. 146:19-147:22.  It is hard to imagine how Harb

could assert that Shammas was superior in the "new" Radio SAWA format given that the

---

[12]  Because, as internal candidates, Plaintiffs were not required to apply under the DEU
procedures for external candidates, only Abdelkarim and Abdelrahman did so.  Therefore, the
other Plaintiffs were not rated or ranked by the DEU panel, only by the merit promotion panel.

evidence indicates he was unfamiliar with it.  Further, the fact that Shammas was apparently selected despite a poor interview severely undercuts Harb's assertion that Plaintiffs' allegedly poor interviews justified their non-selections.

### (B)    GS-12 Selections

Plaintiffs need only demonstrate that they met the minimum qualifications for their own positions, the GS-12 IRB position, to demonstrate that they were entitled to selection over promoted candidates Al-Khafaji, Alaqidi, and Hssaini.  Only Harb disputes this; all other Agency officials unanimously agree that the Plaintiffs were qualified not only for the GS-12 positions, but also for the higher level GS-13 positions.  Defendant's Points and Authorities 39; *see also, supra* pp. 29, 35. Plaintiffs' evidence is sufficiently compelling to also establish that they were more qualified than Hssaini and Alaqidi, who are discussed directly below.

Plaintiffs need only demonstrate that a reasonable employer would find them equally qualified for the GS-12 positions as compared to non-citizen selectees Alaqidi, Gebril, Hssaini and Abuzaid.  Pursuant to Agency policy set forth at MOA V-A 822.1, "The determination as to whether a non-U.S. citizen is better qualified than a U.S. citizen will be based on criteria established by Personnel to evaluate the qualifications of both citizens and non-citizens."  Hooper Dep. Ex. 1.  The only criteria established by personnel to rate the qualifications of the candidates is the KSA's and related crediting plan, which were used by an independent rating and ranking panel convened by personnel to score and evaluate the applications of all the candidates.  As explained in detail above, according to these criteria and the independent rating and ranking panel's evaluations, Gebril was not only rated lower than Plaintiffs, he received the lowest score assigned to any of the candidates.  King Dep. Ex. 2.  Hssaini was the lowest ranked candidate on

the DEU Certificate of Eligibles for the GS-12, also receiving the lowest score assigned to any candidates.  Abdelkarim ROI, Ex. 32.

As set forth in detail above, there is ample additional evidence that Alaqidi, Gebril, Hssaini and Abuzaid were not even equally as qualified as the Plaintiffs, much less better qualified.  This is established by prior performance appraisals, experience and the testimony of VOA officials.  *See supra* pp. 29-30, 32-35.  Dahiyat, who supervised all of the non-citizen selectees and the Plaintiffs expressly disputes Harb's statement that the non-citizens were "superior" to the Plaintiffs.  Dahiyat Dep. 179:8-180:12-14.  He also testifies that he would have selected any of the Plaintiffs over Alaqidi and that he would have selected Abdelkarim, Elmasry and Alkhateeb over Abuzaid.  Id. at 119:15-120:21, 121:14-122:3, 130:3-15.

There is also evidence to demonstrate that Plaintiffs were significantly more qualified than GS-12 selectees Akl, El Tayeb, Jaafer, Suleibi and Rabie, none of whom were members of Plaintiffs' protected groups.  Both Abdelrahman and Abdelkarim were rated higher than either El Tayeb or Jaafar by the GS-13 DEU rating and ranking panel.  King Dep. Ex. 2.  Every single one of the Plaintiffs was ranked higher than Rabie and Akl by the GS-13 merit promotion rating and ranking panel.  King Dep. Ex. 1.  Both of these panels were evaluating the candidates based on virtually identical criteria to that for the GS-13 vacancies since the KSA's in both the GS-13 and GS-12 vacancy announcements were almost identical.

In addition to being rated second to last by the GS-13 merit promotion panel, Maha Rabie fell short of Plaintiffs in other ways as well.  King Dep. Ex. 1.  Her past performance appraisals were lower than Plaintiffs because of serious shortcomings in voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19.  Marsh also repeatedly gave Rabie lower performance ratings

than he gave Plaintiffs and admitted that, overall, she was less successful than Plaintiffs.  Marsh

Dep. Ex. 19; Marsh Dep. 293:3-8, 335:5-336:8, 338:19-339:3.  Importantly, voice delivery and

news judgment were two of the qualities that Harb claims disqualified Plaintiffs from

consideration.

In light of the asserted importance of interviews, Jaafer's selection is also suspect because

during his interview he indicated he was more interested in sports than news and this interest

"dominated" his interview.  Gandji Dep. 199:14-22.

Finally, because Harb admits that he left vacant four GS-12 positions rather than selecting

Plaintiffs **(**Harb Dep. 224:10-13**),** Plaintiffs can rebut his asserted reasons for failing to select them

simply by demonstrating that they were qualified for these vacant positions.   The qualification of

Plaintiffs for both the GS-13 and GS-12 positions has been roundly conceded by Defendant.

> **(4)     While They Are Not Required to Produce Such Evidence to
> Survive Summary Judgment in this Case, Plaintiffs' Evidence
> Demonstrates That They Were Significantly More Qualified
> Than Many of the Disputed Selectees, Further Demonstrating
> That Defendant's Asserted Justifications Are Pretextual**

Plaintiffs' extensive qualifications and truly superlative performance are described above

in great detail.  *See supra* pp. 14-19.  This is additional evidence that Plaintiffs were more

qualified than many of the selectees.  As discussed throughout, that the Plaintiffs were rated more

highly than many of the selectees is compelling evidence because the rating and ranking panelists

evaluated Plaintiffs' and the selectees' qualifications against the qualifications specified in the

vacancy announcement. Any suggestion by Defendant that the vacancy announcement did not

include all of the necessary knowledge, skills and abilities for the positions must be rejected

because Harb was intimately involved not only in the development of both vacancy announcements, but also in determining the KSAs and their relative importance. *See supra* pp. 5-6. Additionally, Plaintiffs' outstanding performance appraisals for at least each of the three years prior to the selections is strong evidence of their qualifications and should be evaluated accordingly. Dahiyat Dep. 161:17-21; Welch Dep. 244:9-13. Their many performance awards are also entitled to substantial weight. Dahiyat Dep. 161:22-162:3. By contrast, the Agency does not aver that any of the disputed selectees received similarly outstanding performance appraisals and/or performance awards.

Also compelling is evidence that numerous individuals familiar with the relative qualifications of the candidates, as well as the alleged format differences between the Arabic Service and Radio SAWA, attest that Plaintiffs were better qualified than many of the selectees. *See supra* pp. 34-35. These individuals include Elshinnawi, a former supervisor, Bekheet, a selectee, Dahiyat, former Acting Director of the Arabic Service, and also Siddiqi and Ghunheim. Id. Importantly, none of these individuals has any vested interest in the outcome of this case, unlike the management officials who have testified to the contrary.

As a related matter, serious problems arose at SAWA after Harb's selections. As set forth above, under the watch of the GS-13's chosen by Harb, there were ongoing spelling and grammatical problems related to broadcasts and internet scripts. Hooper Dep. Ex. 2; Hooper Dep. 139:2-17. The problems were so serious and even embarrassing that they attracted critical news coverage. Art Levine, *The American Prospect*, *supra*. These types of problems, none of which occurred in the Arabic Service, demonstrate that Harb's selectees were not better qualified than Plaintiffs, all of whom had excellent grammar skills. See Dahiyat Dep. 167:11-16.

**(5)    Plaintiffs Have Submitted Sufficient Evidence to Demonstrate Disputed Issues of Fact and Credibility Regarding Harb's Asserted Legitimate Non-Discriminatory Reason For The Non-Selections**

In addition to claiming that the Plaintiffs lacked the basic qualifications for the subject positions, Harb later extolled a litany of deficiencies allegedly exhibited by the Plaintiffs that justified their non-selections. These include that they performed poorly on the interview, had poor voicing skills, and lacked news reporting and/or news writing skills, editing experience, and/or the necessary technical skills. As set forth above in painstaking detail, Plaintiffs have produced evidence that specifically refutes virtually every one of these allegations with respect to each of the Plaintiffs. *See supra* pp. 22-28. This evidence is too substantial to repeat again, but some examples are useful to illustrate Harb's (and other's) lack of credibility with respect to the various assertions.

Example 1:    Harb's claims that Abdelkarim and the others lacked the voicing skills for the positions (Harb Dep. 448:17-20) are contradicted and/or flatly denied by management. Marsh was mystified by Harb's assertion and stated that when the plaintiffs worked for him they were "premier voices." Marsh Dep. 313:7-17, 314:10-316:5. Similarly, Elshinnawi stated that Abdelkarim's voice, in particular, was "unsurpassed." Abdelkarim ROI, Ex. 17, Elshinnawi Aff. p. 3.

Example 2: Harb's claim that Plaintiffs lacked news reporting skills (Harb Dep. 441:16-22) is similarly contradicted. Marsh admits that all of the Plaintiffs did news reporting under his supervision. Marsh Dep. 320:20-321:5. The Plaintiffs' evidence demonstrates that not only did they have extensive news reporting experience, several of them had won awards for their news reporting. *See supra* pp. 25-26.

Example 3: The blatant falsity of Harb's and the other interview panelists' claims that all of the Plaintiffs performed poorly on the interview are proven by Gandji's and Marsh's own interview notes. *See supra* pp. 22-23. More specifically, Gandji's notes make it crystal clear that Abdelrahman gave an excellent interview. The notes indicate she had experience in originating news, that her answers were "good to excellent," and that she had "great contacts," gave "great details," had supervisory experience, and had experience using DALET. Gandji Dep. 130:3-133:20.

The evidence contained in these few examples, combined with the other specific evidence presented by Plaintiffs to refute Defendant's asserted legitimate reason for the non-selections, is more than sufficient to allow a trier of fact to infer that Harb's stated rationale is false and that the real reason was discrimination.

In addition to claiming that the plaintiffs were not sufficiently qualified for the subject positions, Defendant also claims that they had various performance and, perhaps even, conduct issues. Any assertions regarding the abilities of the plaintiffs to perform the duties of the subject positions have already been refuted herein. The Defendant's other assertions, such as a false claim about a plaintiff giving news to another news outlet and the display of a political message in another Plaintiff's work space are irrelevant and do not warrant a response. Harb has never suggested that any of these alleged issues played any role in his selection decisions. Furthermore, these allegations are attributable only to Harb - the Agency has identified no one else with first hand knowledge of any of them. Moreover, as Harb admits, he did not document any of these alleged performance issues, casting further doubt on his veracity. Harb Dep. 358:11-14. Additionally, in light of the plaintiffs' previous performance reviews and the glowing

testimony about their skills and abilities, Harb's self-serving claims to the contrary simply are not believable.

Finally, Harb's assertions that Plaintiffs lacked the necessary skills to perform at Radio SAWA, or that they were less skilled than the selectees, is undermined by the events that ensued after the selections.  As previously discussed, after Plaintiffs were non-selected, they were required to continue working at Radio SAWA performing the exact duties for which Harb assertedly deemed them unqualified.  *See supra* pp. 35-36.  Specifically, Harb relied heavily on Abdelkarim for writing, translating and voicing news.  Abdelkarim ROI, Ex. 6, p. 8.  Harb even sent Abdelkarim to cover Congressional events and used his reports in newscasts.  Id.

Even more telling is the fact that the Plaintiffs were not only allowed, but required, to train many of the newcomers hired by Harb to serve as IRB's. *See supra* pp. 35-36.  This is not only confirmed by each of the Plaintiffs, but also by one of the selectees, Diaa Bekheet.  Id.; Abdelkarim ROI, Ex. 19, Bekheet Aff., p. 4.  It defies logic to suggest that Plaintiffs were not even minimally qualified to perform the duties of the position, but that they were sufficiently qualified to train others in those same duties.  This fact alone suggests that Harb's asserted rationale for his decisions is a fabrication.

> **(6)    Defendant's Assertion That Radio SAWA Was "Radically" Different Than The Arabic Service, Thereby Rendering Plaintiff's Prior Experience, Performance Ratings and Performance Awards Meaningless, Does Not Withstand Scrutiny**

As an initial matter, the evidence already discussed herein demonstrates that Plaintiffs had the necessary skills and abilities to perform the functions of a Radio SAWA IRB.   King determined as much when she deemed Plaintiffs qualified based on the requirements of the vacancy announcement that was prepared by Hooper and Harb.  The merit promotion rating and

ranking panel further confirmed this when it evaluated Plaintiffs against the job criteria in the

vacancy announcement and ranked Abdelkarim and Abdelrahman first and fourth and ranked all

of the Plaintiffs higher than selectee Beldi.  Defendant's assertion that there is a meaningful

difference in format between SAWA and the Arabic Service is also belied by the fact that the

Plaintiffs specifically rebutted virtually every assertion by Harb that they were lacking any

particular skill or ability necessary to be an IRB at SAWA.

More specifically, however, to the extent there was a difference between SAWA and the

Arabic Service, the evidence suggests that SAWA's format was actually less demanding.  *See*

*supra* pp. 42-44.  For example, Radio SAWA was primarily music with only 10 minutes of news

and 90 seconds of news headlines per hour.  Defendant's Memorandum of Points and Authorities

8-9; Hooper Dep. 238:4-9.  This can hardly be considered more demanding than creating,

producing, writing, and hosting daily and weekly shows that were often over an hour long, which

is what Plaintiffs were required to do at VOA Arabic Service.

Additionally, close scrutiny reveals that the Arabic Service and SAWA were not as

different as Defendant claims.  For example, management officials admit that Arabic Service

staffers dealt with breaking news, just as SAWA staffers did, and that Arabic Service staffers

received news from correspondents in the field, just as Radio SAWA staffers did.  Hooper Dep.

241:3-242:15.  Contrary to Defendant's claims, Arabic Service IRB's did originate news, in

addition to translating news.  Abdelkarim Dep. (Jan. 8, 2007) 77:3-12, 20-25.  Finally, selectees

for Radio SAWA suggest that Defendant's assertion that the pace at SAWA was much faster is an

exaggeration.  Abdelkarim ROI, Ex. 21, Abuzaid Aff., p. 3 & Ex. 22, Abaza Aff., p. 3.  To the

extent this is not an exaggeration, Plaintiffs presented evidence to demonstrate that they were

capable of and even excelled at a fast-paced format.  Elmasry Dep. (Jan. 9, 2007) 38:1-4; Marsh

Dep. 448:5-8.

Of course, Defendant has to argue that the jobs at Radio SAWA were "radically"

different than the jobs at the Arabic Service because it is the only way it can justify Harb's

statements that the Plaintiffs did not meet the minimum qualifications for lateral reassignment to

an IRB position at the same grade level they had held for years and at which they had been

repeatedly rated as outstanding performers. Harb justified selecting candidates with lower ratings

by asserting that they were being judged for a different task than they had previously performed at

the Arabic Service. Harb Dep. 604:21-605:3. However, when asked whether the job

announcement reflects those purported differences between the Arabic Service and SAWA, Marsh

admits it does not. Marsh Dep. 278:13-16. Nonetheless, it was part of the consideration. Marsh

Dep. 278:19-22. Marsh cannot explain why, if these alleged different skill sets were required for

the job, they were not included in the job announcement. Marsh Dep. 279:6-14. This is

particularly suspect in light of the fact that Harb developed and approved the job announcements,

including the KSA's.   Indeed, VOA personnel official King actually admits that, while Radio

SAWA was a new network, with a new name, the jobs to be filled were still just positions for

Arabic language radio broadcasters with the same job titles, and performing the same type of work

the plaintiffs had been performing previously. King Dep. 199:8-200:7.

> **(7)**    **There is Substantial Evidence that Harb's Selection Decisions Were
> Motivated By Impermissible Bias Based on the National Origin of the
> Candidates**

In <u>McDonnell Douglas</u>, the Court stated that:

Other evidence that may be relevant to any showing of pretext includes facts as to ... the

> [employer's] general policy and practice with respect to minority employment.  On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether [the selecting official's actions] in this case conformed to a general pattern of discrimination against [protected groups].

411 U.S. at 805.  Therefore, it is permissible for the fact finder to consider evidence that Harb's hiring practices radically changed the demographics of the radio broadcasters and to rely on that evidence to support a finding of discriminatory intent.

As set forth in detail above, under Harb's leadership, the demographics of the Arabic Service/Radio SAWA changed dramatically.  *See supra* pp. 40-41.  This started when Harb used the subject GS-12 and GS-13 vacancy announcements as a means of eliminating six Egyptian IRB's (including four of the Plaintiffs) and the only Syrian IRB.  As previously demonstrated he also hired external candidate Daniel Nassif (Lebanese) during the GS-13 selection process.  Not satisfied with this, Harb continued to remake the work force during his tenure, removing Egyptians and bringing in more and more Lebanese IRB's irrespective of their qualifications.  *See supra* pp. 40-42.  At the last known count, Harb had rid the staff of all but six Egyptians, while increasing the number of Lebanese staffers from zero to nine!  Harb Dep. Ex. 15.  Incredibly, despite this fact, Harb denies that many of the people in SAWA are Lebanese.  Harb Dep. 464:11-14.

There is also direct evidence of Harb's bias against Egyptians.  Harb stated that he would "clean the Arabic Branch of Egyptians" and that there were too many Egyptians in the Arabic Service.  Elshinnawi Aff. ¶ 16; Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 5. This evidence alone is sufficient to establish national origin discrimination against Egyptians.

After taking over VOA Arabic Service, Harb demonstrated his biases in other ways, as

-64-

well.  For example, as explained in detail above, Harb radically revised the VOA style book to give preference to Lebanese dialects, phrasing, colloquialisms, pronunciations, etc.  *See supra* pp. 38-40.  Similarly, under Harb's direction the promotional spots were done in colloquial Lebanese. Id.  VOA Arabic Service was broadcast in classical Arabic, which is the same, and understood, throughout the target region.  Abdelkarim Dep. (Jan. 8, 2007) 64:11-17.  Most, if not all, local and international broadcasting media in the target area, including Al Jazeera, use modern classical Arabic. Abdelkarim ROI Ex. 24, Ghuneim Aff., p. 2; Abdelkarim Dep. (Jan. 8, 2007) 66:13-15. This enables all Arabs to communicate despite differences between local languages and dialects. Abdelkarim ROI Ex. 24, Ghuneim Aff., pp. 3-4.

While Defendant asserts that SAWA preferred colloquial Arabic to classical Arabic, this does not explain why Lebanese colloquialism's would be preferred over those of other countries in the region and/or why Harb would insist on a Lebanese pronunciation of words as opposed to a pronunciation more familiar to the majority of the region.   Defendant's suggestion that this difference is explained by SAWA's preference for colloquial dialect, does not explain a trend towards emphasizing a single local dialect (the dialect of the News Director himself) over, for example, Moroccan colloquialisms, Gulf area colloquialisms, or Egyptian colloquialisms. Abdelkarim Dep. (Jan. 8, 2007) 67:21-25.  Given SAWA's stated purpose of reaching more people in the Middle East, any suggestion that SAWA was designed to reflect primarily Lebanese dialects, pronunciation and colloquialisms strains credulity. The obviousness of Harb's "Lebanization" of Radio SAWA is further demonstrated by the fact that it drew public discussion and news coverage.  Art Levine, *The American Prospect, supra.*

This evidence, taken together with Harb's derisive remarks about Radio Cairo, his

denigration of the Egyptian dialect, and his daily ridicule of Egyptian culture and icons (Elmasry Dep. (Jan. 9, 2007) 12:2-3, 15:11-13, 16:18-23) is significant evidence of his bias against Egyptian sounding broadcasters, regardless of whether they are using classical or colloquial Arabic, and in favor of Lebanese sounding broadcasters.

The evidence of bias presented herein, standing alone, raises sufficient questions about Harb's fairness in the selection process to support an inference that his asserted justifications are a pretext for discrimination. For this and all of the other reasons set forth herein, Plaintiffs have produced more than sufficient to evidence demonstrate the existence of disputed facts with respect to their claims that they were not selected for either the GS-12 or GS-13 IRB positions because of their national origin. This issue can only be decided by a jury.

## IV. Plaintiffs Have Produced Sufficient Evidence to Demonstrate the Existence of Genuine Issues of Material Fact Regarding Whether They Were Discriminated Against in Violation of the ADEA

As set forth above, the McDonnell Douglas/Burdine framework is also used to evaluate ADEA claims that are based upon circumstantial evidence of discrimination. See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (noting widespread use of the McDonnell Douglas framework in ADEA cases and assuming its applicability). Under that framework, to set forth a prima facie case of age discrimination for failure to promote, a plaintiff must show that: "(1) she is at least forty years of age, (2) that she is qualified for the position in question, (3) that she was not promoted, and (4) that she was disadvantaged in favor of a younger person." Reese v. Potter, 2005 U.S. Dist. LEXIS 36125 (J. Sullivan), citing Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001).

### A. GS-13 Selections

With respect to the GS-13 position, Defendant has conceded that Plaintiffs Abdelrahman, Alkhateeb, and El-Bishlawy have established prima facie cases of age discrimination. Mot. at 49.[13] Thus, the only remaining issue is whether Plaintiff Abdelkarim (48) has established the fourth prong of a prima facie case of age discrimination. Defendant argues that the age difference between Abdelkarim and the selectees is insubstantial, and therefore, that Abdelkarim's age discrimination claim must be dismissed. Mot. at 49. Defendant's argument fails for two reasons.

First, the premise underlying Defendant's argument is faulty because all of the selectees, in particular the youngest selectees, are not included in the analysis. Instead, Defendant identifies only five of the older selectees. In sharp contrast to the story presented by Defendant, the evidence reflects that there were ten individuals selected for GS-13 positions, and most of them were younger than Abdelkarim:

| | |
|---|---|
| Hala Arafa | 40 |
| Diaa Bekheet | 41 |
| Mohammed Cherkaoui | 41 |
| Usama Farag | 41 |
| Daniel Nassif | 44 |
| Wassila Beldi | 46 |
| Mohammad Saad | 54 |

---

[13] Defendant conceded that Abdelrahman, Alkhateeb, and El-Bishlawy "can arguably establish a prima facie case." Mot. at 49. This concession is wise given that the four youngest selectees are 13-14 years younger than Ms. El-Bishlawy (54), 14-15 years younger than Ms. Abdelrahman (55), and 18-19 years younger than Ms. Alkhateeb (59).

| | |
|---|---|
| Nicola Zaboura | 63[14] |
| Munir Nasser | 65 |
| George Shammas | 65[15] |

Mar. 26, 2002 email from Welch to Thatcher re: MERNS Gs-13s; April 16, 2002 memo from

Harb to Welch re: GS-13 selections; Harb Dep. 81:11-12, 158:1, 162:1-5; King Ex. 2

   As can be seen, four of the selectees are 7-8 years younger than Mr. Abdelkarim.

Accordingly, under Reese, Abdelkarim has established a prima facie case of age discrimination.

   Second, Defendant's assertion that there must be a 10 year age difference between the

Plaintiffs and the selectees is incorrect.  To support this argument, Defendant relies upon

Mintzmyer v. Babbit, 1995 WL 25342*14 (D.D.C. Jan. 1995), affirm'd 72 F.3d 920 (D.C. Cir.

1995).  Contrary to Defendant's assertion, in Mintzmyer, the court determined that the plaintiff

had not met the fourth element of her prima facie case because the selectee was only three years

younger than the plaintiff.  Id. at 41.  The decision does not speak to any minimum age differential

required to establish a prima facie case.  Thus, Mintzmyer is inapposite here, and Defendant's

argument must be rejected.  See also Reese, 2005 U.S. Dist. LEXIS 36125. *17 (plaintiff

established a prima facie case where selectee was seven years younger than plaintiff).

   Although Defendant cites numerous cases that have established a 10 year rule, many  other

courts do not adhere to such rigid strictures.  Tarshis v. Riese Org., 211 F.3d 30, 38 (2d Cir. 2000)

(replacement of 67-year old with 59-year old sufficient); Fisher v. Vassar Coll., 66 F.3d 379, 1995

---

[14] Zaboura was already a GS-13 at the time Harb selected him.  Harb Dep. 246:8-10.

[15] Shammas was already a GS-13 at the time Harb selected him.  Harb Dep. 246:8-10.

WL 527804, at *29 (2d Cir.) (table) (48-year old and 44-year old professors were substantially

younger than 53-year old), republished as amended, 70 F.3d 1420, 1450-51 (2d Cir. 1995) (same);

Hollander v. Am. Cyanamid Co., 172 F.3d 192, 199 & n.3 (2d Cir. 1999) (transfer of duties from

58-year old to two other employees, one 11 years and one 8 months younger, sufficient);

Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (discharge of

plaintiff while retaining employees 8 and 16 years younger sufficient); Douglas v. Anderson, 656

F.2d 528, 533 (9th Cir. 1981) (replacement by person 5 years younger sufficient); Estate of

McGough v. Lockheed Martin, 12 Fed. Appx. 464, 2001 WL 275007, at *3 & n.2 (9th Cir. 2001)

(table) (implying that replacement of 48-year old by 41-year old sufficient); Damon v. Fleming

Supermarkets, 196 F.3d 1354, 1359-60 (11th Cir. 1999) (replacement of 42-year old by 37-year old

sufficient); Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997) (replacement of

42-year old with 39-year old sufficient); Carter v. City of Miami, 870 F.2d 578, 583 (11th Cir.

1989) (replacement of 49-year old with 46-year old sufficient).

Accordingly, Abdelkarim has established a prima facie case of age discrimination with

respect to the GS-13 position.

**B.    GS-12 Selections**

With respect to the GS-12 positions, Defendant concedes that all five Plaintiffs have

established a prima facie case of age discrimination.  Mot. at 49.  Defendant's sole argument for

dismissal, then, is that Plaintiffs cannot demonstrate that Defendant's asserted legitimate reason

for its actions is a pretext for discrimination or that age was a determining factor in the selections.

Mot. at 49-50.  Harb's asserted legitimate reasons for the non-selections have been amply rebutted

above.  Additionally, once again, Defendant failed to identify all of the relevant comparators.  In

its Motion, Defendant listed only 12 of the GS-12 selectees.  However, there were many more than 12 individuals selected by Harb for GS-12 positions.  These additional selections, while not a part of the selections that occurred under the announcements at issue herein, nonetheless shed light on Harb's biases. By failing to consider these other individuals in the analysis, Defendant's argument ignores the vast shift in the age differential for GS-12 international radio broadcasters for the Arabic Service versus those employed by Radio SAWA under Harb's direction.

A more inclusive list includes the following individuals all of whom were selected by Harb for GS-12 IRB positions at Radio SAWA:

| | |
|---|---|
| Biesan Abu Kwaik | 23 |
| Amir Makram Bibawy Salib | 25 |
| Adil Cherkaoui | 28 |
| Dana Zreigat | 30 |
| Reem Abaza | 30 |
| Dalia Alaqidi | 33 |
| Lamia Bourogaa | 35 |
| Wadeea Mansoor | 35 |
| Greta Ghacibeh | 36 |
| Nasreddine Hssaini | 37 |
| Munit Mawari | 38 |
| Tamara Shukri | late 20s, early 30s (39) |

| | |
|---|---|
| Emad Al-Khafaji | 42 |
| Elmigdad Gebril | 43 |
| Rachid Jaafar | 44 |
| Aida Akl | 44 |
| Zahrat  Abuzaid | 45 |
| Gamal Aladle | 48 |
| Joseph Saade | 48 |
| Elzubeir El-Tayeb | 48 |
| Maha Rabie | 50 |
| Mohamed Suleibi | 55 |
| Samir Nader | 57 |

Abdelkarim ROI Ex. 5, 30, 31, 32.  As the evidence reflects, the pattern has been toward hiring younger candidates for the GS-12 positions.  Taking into consideration these selectees, the average age of the IRBs was 39.70.

Mr. Harb's goal of a more youthful radio station apparently applied not only to the audience but to the SAWA employees, as well.  In this regard, Harb's attitude toward the older Plaintiffs is highlighted by several public comments in which he linked the success of SAWA with hiring younger people.  Notably, the individuals who were witness to these admissions by Harb have no personal stake in this matter.

Mamoun Fandy, a Senior Fellow of Arab Politics at the James A. Baker III Institute for

Public Policy at Rice University in Houston, Texas and President of Fandy Associates, a Washington think tank focusing on America and the Arab and Muslim world, has spoken with Mr. Harb on several occasions about Radio SAWA and the transition from Voice of America. Mr. Harb told Mr. Fandy that he was having problems because he could not get rid of many of the "old people that came from the Voice of America." Fandy Aff. ¶ 10. When Mr. Fandy mentioned to Mr. Harb the fact that Mr. Harb terminated several persons of Egyptian national origin and instead hired several Lebanese persons, Mr. Harb responded that the people he hired were the kind of people who were "with it" and since they were "younger" people, they do not have the "hangups of older people." Fandy Aff. ¶ 11.

In addition, Fawzi Freij, a consultant and senior editor of the International Information Programs Office of the Department of State, overheard Mr. Harb say in April 2002, at the same time the GS-13 and initial GS-12 selections were being made, that: "We need young blood. We are for the younger generation." Freij Aff. ¶ 8. Contrary to Defendant's assertion that Harb's ageist comments are not related to the decision not to hire and/or promote the Plaintiffs, it is plain that these comments are directly related to his employment decisions. As such, they are not stray comments, and they cannot, in this context viewing the evidence in the light most favorable to Plaintiffs, be ignored.

In a similar case, Nembhard v. Memorial Sloan Kettering Cancer Ctr., 1996 U.S. App. LEXIS 30738 (2d Cir. 1996), aff'd Nembhard v. Memorial Sloan Kettering Cancer Ctr., 104 F.3d 353 (2d Cir. 1996), the Second Circuit upheld a jury verdict finding age discrimination in a termination case. The court's decision was based on the plaintiff's replacement by an individual one year her junior and the deciding official's ageist comments. The comments were as follows:

"(1) in September, 1991, Pope cancelled Nembhard's application for computer training, explaining that younger staff would be trained; (2) in July, August, and September 1992, Pope made reference to an 'old, black fly' she was trying to get rid of; (3) in August, 1992, Pope told Nembhard that only older people tended to accumulate sick time; (4) In July, 1992, after Nembhard informed Pope of her willingness to train on a computer, Pope told her that the younger staff would train on computers." Id. at *4. The court concluded that "[t]he evidence of pretext, and age-related statements used to support Nembhard's prima facie case, together with the harsh treatment of a veteran employee with a near-unblemished employment record, supports the conclusion that discrimination was the motivation behind her termination." Id. at *13-14.

Here, too, there were several grievous comments made by the selecting official that are clearly related to the Plaintiffs' non-selections. Plaintiffs have also shown that they are vastly better qualified than many of the selectees and that Harb's assertion for why he did not select any of the Plaintiffs, namely that they were not even minimally qualified for the positions, is simply not believable. In conjunction with the substantial disparity in ages between the Plaintiffs and many of the selectees and the downward spiral in the average age of the IRBs, the evidence of pretext is overwhelming. When viewing all of the evidence in the light most favorable to Plaintiffs, it is axiomatic that this evidence must be presented to a jury. Accordingly, Defendant's Motion on Plaintiffs' claims under the ADEA must be denied.

## V.     Plaintiffs Exhausted Their Administrative Remedies

Defendant's argument that Plaintiffs' claims should be dismissed in their entirety for failure to exhaust administrative remedies is wholly without merit. See Def.'s Mot. for Summ. J.

at 35.  Defendant's contention -- that a complainant who timely elects a hearing before an EEOC

administrative judge may not thereafter withdraw the hearing request and proceed to federal court

-- was carefully considered and rejected by Judge Friedman in Brown v. Tomlinson, 462 F. Supp.

2d 16 (D.D.C. 2006)[16]/.  Defendant's argument here should likewise be rejected because it is

contrary to law.

        In Brown, the plaintiff, like the Plaintiffs herein, had requested an EEOC hearing and

participated in the discovery process, but subsequently withdrew the hearing request and filed

suit in federal court.  Relying on the D.C. Circuit's opinion in Rann v. Chao, 346 F.3d 192 (D.C.

Cir. 2003), the court initially held, as Defendant herein wishes this Court to hold, that the

plaintiff did not exhaust his administrative remedies because he abandoned the administrative

process altogether by declaring his intention to file suit in federal court.  Brown v. Tomlinson,

462 F. Supp. 2d 16, 18 (D.D.C. 2006).

        However, Judge Friedman reconsidered and reversed this decision.  Upon review of the

plaintiff's Motion to Alter and Vacate Judgment, Judge Friedman concluded that he had erred in

applying Rann, to an administrative hearing elected by plaintiff when 180 days had elapsed since

plaintiff initially filed his administrative complaint.  Brown, 462 F. Supp. 2d 16.

_____

        [16]/ The Brown Court also considered plaintiff's alleged failure to cooperate during the
discovery process, an issue not present in the case at bar.  Brown, 462 F. Supp. 2d at 20-21.  In
Rann, the EEOC administrative judge had dismissed plaintiff's complaint for failure to
cooperate.  Id. at 20.  In Brown, in contrast, although the plaintiff had failed to initiate discovery
in a timely manner, he procured an enlargement from the administrative judge within which to
propound his discovery.  Id.  On the date his discovery was due, he withdrew his hearing request
and informed the judge of his intent to file suit.  Id. at 20-21.

In so doing, Judge Friedman noted that a complainant is deemed to have exhausted his administrative remedies and thus has the right to file suit in district court if any one of the following conditions is met:

> (a) Within 90 days of receipt of the final action on an individual or class complaint if no appeal has been filed;
>
> (b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final action has not been taken;
>
> (c) Within 90 days of receipt of the Commission's final decision on an appeal; or
>
> (d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

Brown, 462 F. Supp. 2d at 19-20, citing 29 C.F.R. § 1614.407; see also 42 U.S.C. § 2000e-16(c). Judge Friedman also observed that in Saksenasingh v. Sec'y of Educ., 126 F.3d 347, 350-51 (D.C. Cir. 1997), the D.C. Circuit held that a complainant may file suit in this Court pursuant to 29 C.F.R. § 1614.407 when the second of these conditions is met -- the passage of 180 days from when the complaint was filed without final action by the agency -- even if there are other administrative remedies available. Brown, 462 F. Supp. 2d at 20.   He concluded that since more than 180 days had elapsed before plaintiff withdrew from the administrative proceeding, the plaintiff clearly met the condition set forth in 29 C.F.R. § 1614.407(b) for filing suit in district court.  Id., citing Wilson v. Peña, 79 F.3d 154, 166 (D.C. Cir. 1996) ("once a complainant files a complaint or appeal and cooperates with the agency or EEOC for 180 days, he is not required to take any further action to exhaust his administrative remedies.").

In this regard, one factual distinction between Brown and the case at bar gives even

-75-

greater strength to Plaintiffs' position that they clearly exhausted administrative remedies.  In

Brown, plaintiff withdrew his hearing request and informed the administrative judge of his intent

to file suit.  In the instant case, in contrast, Plaintiffs withdrew their hearing request, requested a

Final Agency Decision ("FAD"), received the FAD, and filed suit within 90 days of

receipt of the FAD.  Def.'s Mot. for Summ. J. at 36; Complaint ¶ V.  The plain language of Title

VII authorizes a plaintiff to file suit in federal court "within 90 days of receipt of notice of final

action taken by a department, agency or unit..." 42 U.S.C. §2000e-16(c)).  Accordingly, it is

indisputable that the Plaintiffs have exhausted their administrative remedies.

Finally, Defendant makes the novel and meritless argument that Plaintiffs "manipulated"

the administrative process by obtaining the "benefit" of discovery thus implying that because of

this ill-gained benefit, Plaintiffs' case should be dismissed.  Def.'s Mot. for Summ. J. at 38.

Defendant's argument is premised on the fact that Plaintiffs could properly have requested a

hearing, have the case docketed by a hearing unit of the EEOC, and then filed suit before

initiating discovery.  Id. at 37.  Incredibly, therefore, Defendant's position is not that a

complainant, having requested a hearing, must remain in the administrative process through to a

hearing. Rather, it is complainant's participation in discovery  – a process in which both parties

benefit by the receipt of information –  that Defendant asserts commits complainant to pursuing

the hearing process to completion.

To the contrary, nothing in the law, regulations, or EEOC guidance imposes this

requirement. Indeed, the EEOC routinely issues decisions on the merits of cases in which the

complainant requested a hearing, engaged in discovery, and then withdrew the hearing request.[17]/

If Defendant's theory were correct, the EEOC would not have jurisdiction to do this because

once the complainant withdrew his hearing request, he would have failed to exhaust his

administrative remedies, and the case would be dismissed without any decision on the merits.

Defendant's insupportable theory is further undermined by the EEOC's own guidance,

which makes clear that a complainant may voluntarily withdraw his request for a hearing at any

point.  Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO

MD-110), 7-1 (Nov. 9, 1999) ("Generally, an Administrative Judge will conduct a hearing on the

merits of a complaint unless . . . the hearing request is voluntarily withdrawn."). Furthermore, the

EEOC views the hearing process as an extension of the investigative process. Id. ( "the hearing

process is intended to be an extension of the investigative process, designed to ensure that the

parties have a fair and reasonable opportunity to explain and supplement the record and, in

appropriate instances, to examine and cross-examine witnesses"); see also 29 C.F.R. §

_____

[17]/See e.g. Shu v. Postmaster General, Appeal No. 012007, 2007 EEOPUB LEXIS 3745
(Sept. 10, 2007); Hughes v. Dep't of Commerce, Appeal No. 0120072947, 2007 EEOPUB
LEXIS 3666, (Aug. 28,2007); Coopwood v. Dep't of Transportation, Appeal No.
0120054544, 2007 EEOPUB LEXIS 2829 (July 10, 2007);  Henry  v. Social Security
Administration, Appeal No. 0120054321, 2006 EEOPUB LEXIS 6559 (Nov. 15, 2006);
Kammermeyer v. U.S. Postal Service, Appeal No. 01A61330, 2006 EEOPUB LEXIS 4614 (July
12, 2006); Brown v. U.S. Postal Service, Appeal No. 01A45134, 2006 EEOPUB LEXIS 2385
(June 1, 2006); Ambrosio v. Dep't of the Treasury, Appeal No. 01A44300, 2006 EEOPUB
LEXIS 1650 (April 19, 2006); Clement v. Dep't of the Interior, Appeal No. 01A41546, 2005
EEOPUB LEXIS 3212 (June 30, 2005); Gomez v. Dep't of Labor, Appeal No. 01A44778, 2004
EEOPUB LEXIS 6815, (Dec. 8, 2004); DeChesser v. Dep't of Veterans Affairs, Appeal No.
01995657, 2002 EEOPUB LEXIS 2019 (April 4, 2002).

1614.109(e). As noted, the Plaintiffs did not obtain benefits in discovery that were denied to the Defendants. In fact, Defendant actually had two bites of the apple by being permitted to depose all five of the Plaintiffs twice: once in the administrative process and then again in the federal process. Thus, there was no benefit that inured only to Plaintiffs, and there is no legitimate basis for dismissing Plaintiffs' claims merely because there were two rounds of discovery.

Accordingly, it is beyond question that Plaintiffs exhausted administrative remedies.

**V.     Because Defendant Did Not Move for Summary Judgment on Plaintiffs' Claim of Disparate Treatment in Pay, Overtime, Assignments, Scheduling, and Other Treatment, this Claim must Proceed to Trial Irrespective of the Outcome of Defendant's Motion.**

Defendant's Motion does not address all of the claims raised by Plaintiff in this case.

Consequently, the claims not addressed in Defendant's Motion must proceed to trial, even if Defendant's Motion for Summary Judgment is granted. Specifically, Defendant has not moved for summary judgment on Plaintiffs' claim that they were discriminated against in the terms and conditions of their employment including, but not limited to, pay, overtime, assignments, scheduling, and other treatment because of their age, religion, and national origin in violation of Title VII and/or the ADEA. See Complaint ¶¶ 29, 34.

The standards governing summary judgment are well-established and are set forth above in more detail. However, of paramount importance here is that the moving party, here the Defendant, bears the burden of establishing the absence of any material facts before summary judgment can be granted. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). It is axiomatic that summary judgment shall only be rendered if the pleadings, depositions, written discovery, and affidavits submitted by the moving party show that there is no genuine issue as to any material

-78-

fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c)).

Here, nothing was submitted by the moving party.

In its Motion, Defendant does not advance facts or arguments, much less submit

supporting documentation, that demonstrate the absence of genuine issues of material fact related

to the issue of Plaintiffs' claim for discrimination in pay, overtime, assignments, scheduling, and

other treatment. Accordingly, because Defendant has not met its burden and has not moved for

summary judgment on this claim, the claim must proceed to trial.

Furthermore, it cannot be said that Defendant was unaware of Plaintiffs' claim in this

regard as it was squarely raised in the Complaint and was the subject of discovery. On August 17,

2006, Plaintiffs served Interrogatories and Document Requests specifically related to these

issues.[18]   In those requests, Plaintiffs sought information on how, why, and how much overtime

was awarded. Def's Responses to Plt's First Set of Interrogatories and First Requests for

Production of Documents (hereinafter "Def's First Disc. Responses"), Interrogatory no. 7, p. 7 and

Document Request no. 1, p. 25. In response, Defendant asserted a slew of objections, and further

refused to answer on the basis that the information pertained solely to damages and was, therefore,

premature because discovery of damages had been bifurcated. Id. at 7-8, 25. In addition to

seeking documents relevant to overtime issues, Plaintiffs also sought documents relevant to pay

disparities. Id. at 27 (document request no. 4). Defendant interposed the same standard

objections as well as the objection of prematurity. Id. at 28. Finally, when asked by Defendant in

its discovery requests to identify each violation of Title VII and the ADEA, Plaintiff Abdelkarim

explained that Defendant treated persons of Lebanese national origin differently and better than

---

[18]   One example is reflected in Interrogatory 11, which asked about the assignments meted
out to Plaintiffs after their non-selections. Id. at p. 17.

plaintiffs and other persons not of Lebanese national origin in the terms and conditions of employment, including, but not limited to, pay, overtime, assignments, scheduling, and other treatment. Plaintiff Mohamed Abdelkarim's Responses to Defendant's First Set of Interrogatories, p. 14.

Dissatisfied with Defendant's discovery response on this issue, on December 22, 2006, Plaintiffs notified Defendant of the various deficiencies in Defendant's responses to Plaintiffs' request for documents. Dec. 22, 2006 letter from S. Spitz to D. Sullivan. In that letter, Plaintiffs challenged Defendant's failure to answer document request numbers 1 and 4 pertaining to pay and overtime issues and explained that the document requests did not pertain to damages, as asserted by Defendant: "Plaintiffs instead claim that, while they were working for Radio SAWA, they were paid less than others not of their national origin, age and/or religion. In the Complaint, plaintiffs make clear that an issue of **liability** in this matter was the discriminatory pay." Id. at p. 3 (Int. 4) (emphasis in original).

Defendant responded on March 7, 2007, this time asserting that the Plaintiffs had failed to exhaust their administrative remedies on their "discrimination or harassment claims" pertaining to pay, overtime, assignments, scheduling, and other treatment. Mar. 7, 2007 letter from D. Sullivan to S. Spitz at pp. 1-2. Despite this new objection, Defendant agreed to turn over payroll documents. Id.

Given these exchanges, there is no dispute that Defendant was aware of Plaintiffs' claim of disparate treatment in pay, overtime, assignments, scheduling, and other treatment. Defendant did not move for summary judgment on this claim. Likewise, Defendant did not argue that Plaintiff had failed to exhaust administrative remedies with respect to this claim for discrimination.

Because Defendant has failed to meet its burden of establishing the absence of any disputed material facts, this claim is ripe for trial.

Defendant may attempt to remedy this deficiency in its Motion by raising this claim in its reply brief. Any such attempt is entirely inappropriate and must be rejected. It is well established that arguments raised for the first time in a reply brief are waived. PDK Labs. Inc. v. DEA, 438 F.3d 1184, 1196 (D.C. Cir. 2006) (holding that an argument raised only in the opening brief's fact section and in the reply brief is not properly raised); Bd. of Regents of the Univ. of Wash. v. EPA, 86 F.3d 1214, 1221 (D.C. Cir. 1996).

Furthermore, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). Thus, to the extent Defendant attempts to argue in its reply brief that it was addressing the disparate treatment in pay, overtime, assignments, scheduling, and other treatment, through its argument that Plaintiffs' hostile work environment claim must be dismissed for failure to exhaust administrative remedies, Defendant's argument should be rejected. There is no reference to pay, overtime, assignments, scheduling, and other treatment anywhere in Defendant's argument on exhaustion of administrative remedies, and Plaintiff clearly explained to Defendant in discovery that pay, overtime, assignments, scheduling, and other treatment involved a disparate treatment claim, not a hostile work environment. Thus, Defendant cannot be permitted through its reply brief to attempt to extrapolate its argument on hostile work environment to an argument addressing Plaintiffs' claim of discriminatory treatment with respect to pay, overtime, assignments, scheduling, and other treatment. It is the Defendant's burden here, not Plaintiffs' nor the Courts.

Accordingly, because Defendant has not moved for summary judgment on Plaintiffs' claim of discrimination in pay, overtime, assignments, scheduling, and other treatment, this claim must proceed to trial.

**VI.     Hostile Work Environment and Reprisal Claims**

Plaintiffs herein withdraw their separate claims of hostile work environment and retaliation discrimination.  Discovery revealed that the incidents and acts underlying Plaintiffs' hostile work environment and retaliation claims are more properly construed as either (1) claims for damages suffered as a result of Plaintiffs' non-selection(s) and/or (2) as evidence supporting their claims that their non-selections were discriminatory. Therefore, while Plaintiffs do intend to present evidence obtained in discovery related to these issues to demonstrate bias and/or the extent of their damages, they are not maintaining an independent hostile work environment or reprisal cause of action.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

_____S/_____
Tracy L. Gonos, D.C. Bar No.  479160

_____S/_____
Elaine L. Fitch, D.C. Bar No.  471240

-82-

Kalijarvi, Chuzi & Newman, PC

1901 L Street, NW, Suite 610

Washington, DC 20036
(202) 331-9260

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MOHAMMED ABDELKARIM, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | |
| **JAMES GLASSMAN,** | ) | **Civil Action No. 05-1783 (EGS)** |
| **Chairman, Broadcasting Board of** | ) | |
| **Governors,** | ) | |
| **Defendant.** | ) | |

_____)

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Based upon the Defendant's Motion for Summary Judgment, Complainant's Opposition thereto, and the entire record in this matter, it is hereby ordered that the Agency's Motion for Summary Judgment is **DENIED**.

Date: _____

_____
Emmett G. Sullivan