# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **MOHAMMED ABDELKARIM, et al.** ) | |
| ) | |
| **Plaintiffs.** ) | |
| **v.** ) | |
| ) | |
| ) | |
| **JAMES GLASSMAN,** ) | **Civil Action No. 05-1783 (EGS)** |
| **Chairman, Broadcasting Board of** ) | |
| **Governors,** ) | |
| **Defendant.** ) | |
| _____ ) | |

### PLAINTIFFS' STATEMENT OF
### DISPUTED AND UNDISPUTED MATERIAL FACTS

_____Plaintiffs, in accordance with Local Rule 7(h), submit the following Statement of

Disputed and Undisputed Material Facts.  Unless specifically indicated herein, all facts are

disputed.

### The Inception of MERN/Radio SAWA

1.      In early 2001, the Broadcasting Board of Governors ("BBG") initiated a project to replace

its Voice of America ("VOA") Arabic Service with a new channel called the Middle

Eastern Radio Network ("MERN"), which would be a joint BBG/VOA project.

(Proposal, Bates No. 002318). MERN eventually became known as Radio SAWA.

**Undisputed Fact.**

2.      "Radio SAWA was set up because of the overwhelming need that the United States

government to reach people in the Middle East..."  Hooper Dep.  186:8-17.  **Undisputed**

**Fact.**

3.      At the outset, MERN was allotted 32 positions, and there were 34 employees in the

Arabic Service.  Feb. 13, 2002, MERN Status Report on Personnel Actions.  **Undisputed**

**Fact.**

4.      In pursuit of this project, VOA posted vacancy announcements M/P-02-42 (GS-13) and

M/P-02-41 (GS-12) advertising multiple positions for International Radio Broadcasters

(IRB's) at both the GS-12 and GS-13 grade levels.  ROI, Ex. 27; GS-12 Vacancy

Announcement.  **Undisputed Fact.**

5.      After the selection s for the GS-12 vacancies, there were still four positions available, but

Harb opted not fill them, rather than to fill them by selecting Plaintiffs.  Harb Dep.

224:10-13.  Because there were still GS-12 positions available after the initial round of

selections and because additional GS-12 positions became available thereafter, additional

GS-12 selections were made.  Harb Dep.182:7-11, 224:10-13; Harb Dep. Ex. 15.

**Undisputed Fact.**

6.      Because Moufac Harb, the selecting official, concluded that the Plaintiffs were not even

minimally qualified for a GS-12 position in Radio SAWA, they were not considered for

any of the subsequent GS-12 vacancies.  See Harb Depo Ex. 15.

**Criteria Governing Selections**

7.      Pursuant to a Memorandum of Understanding ("MOU") between VOA and the Union, as

well as in keeping with federal statute and Agency guidance, selections for these

vacancies were to proceed in a very specific manner with some candidates, such as

Plaintiffs, entitled to receive preference over others.  Specifically, VOA "Arabic Branch

employees seeking only lateral reassignment to MERN/SAWA positions do not need to

apply under a merit promotion vacancy announcement." ROI, Ex. 35. Only employees

seeking promotion were required to apply under the Merit Promotion announcement. Id.

**Undisputed Fact.**

8.    VOA management, in conjunction with Jack Welch, the Director of Personnel, discussed

the best approach to staffing MERN. King Dep. Ex. 4 at p. 2. Welch set out the

following order of priority to be utilized in undertaking the selections: For each position

(generally starting with the positions at the highest level and greatest importance), the

panel will consider *in order*:

1)    Internal candidates already at grade of position to be filled;
2)    If panel determine[s] no internal applicant meets the requirements, internal
      employees who didn't apply but who are at the grade of the position to be filled;
3)    If panel determines none of these meet requirements, internal applicants for
      promotion;
4)    If panel determines none of these meet requirements, external candidates or
      POV's.

External hires or contracts will be used only if a determination is made that no current
staff member meet[s] the requirements for the position involved.*

*Personnel will determine whether candidates for promotion meet basic qualification
requirements based on position descriptions and qualification requirements supplied by
MERN.

Id. at p. 5. **Undisputed Fact.**

9.    The objectives of this approach were to "[u]se as many Arabic staff members as possible

to staff MERN to minimize costs and speed staffing." Id. **Undisputed Fact.**

10.   Welch met with employees of the Arabic Branch about the vacancy announcements at

which time Welch assured VOA Arabic Branch staff that current employees would be

considered for positions with MERN before outside employees and lower graded

employees were considered. Welch Dep. 77:12-78:19. Harb, the selecting official, was present for this meeting, but the selection process to be followed was communicated to him separately, as well. Welch Dep. 16:10-15, 79:2-19. **Undisputed Fact.**

11.  Gandji, a member of the interview panel, also received the Welch's memorandum setting forth the proper order of preference/consideration for the selection of candidates. Gandji Dep. 58:12-21. **Undisputed Fact.**

12.  Based on this specified order of preference for candidates, the express terms of the process set out by Welch, and Welch's testimony, internal candidates applying for a position with MERN at their same grade level, e.g., Arabic Service GS-12 IRB's applying for MERN GS-12 IRB positions, were to be given preference over other candidates and could only be non-selected in favor of external or lower-graded employees if they did not meet the basic qualifications for the position. Similarly, internal candidates for promotion, e.g., Arabic Service GS-12's applying for MERN GS-13 IRB positions were second in line only behind internal candidates applying at their same grade level and could only be non-selected in favor of lower-graded internal candidates or external candidates if they did not meet the basic qualifications for the position.

**Undisputed Fact.**

13.  The selections were constrained in another way, as well. Pursuant to the Agency's interpretation and application of the Hatch-Mundt Act, 22 U.S.C.S. § 1474, which grants hiring preferences to U.S. citizens over non-citizens, the Agency's ability to hire non-

citizens is further subject to regulation.[1/]  Specifically, according to the Agency's

personnel regulations,  "A non-U.S. citizen may be appointed only after reasonable

efforts to recruit equally or better qualified U.S. citizens have been made and have been

unsuccessful."  MOA V-A 822.1 (Hooper Dep. Ex. 1).  Furthermore:

> A non-U.S. citizen may be employed or promoted only if no equally or better qualified
> U.S. citizen is available to perform the duties of the position. The determination as to
> whether a non-U.S. citizen is better qualified than a U.S. citizen will be based on criteria
> established by Personnel to evaluate the qualifications of both citizens and non-citizens.

Id.  **Undisputed Fact.**

14.    When asked about the criteria to evaluate the qualifications of citizens vs. non-citizens,

Welch explained that they are evaluated against the "job-related requirements."  Welch

Dep. 187:11-22.  **Undisputed Fact.**

15.    A non-citizen may be selected in the presence of a qualified U.S. citizen if, after full and

fair consideration of all candidates against the job requirements, the selecting official

determines that the non-citizen is better qualified than the U.S. citizen and the superior

qualifications of the non-citizen are supported by acceptable written documentation

provided by the selecting official.  MOA V-A 822.1.  **Undisputed Fact.**

---

[1/] Plaintiffs are aware that IBB/BBG/VOA is currently embroiled in litigation over the
proper interpretation and application of the Hatch Mundt Act, which governs the hiring of non-
citizens over citizens.  However, Plaintiff's take no position herein on the issues that are the
subject of that litigation because they have no bearing on the instant case.  The only issue of
relevance here is the Agency's stated policies and practices with respect to the hiring of non-
citizens and the import of those policies and practices on the GS-12 and GS-13 IRB selection
process.

16.    Welch admits that, pursuant to the Agency's policy, "we couldn't hire ... from the outside

a non-U.S. citizen if there was an equally or better qualified citizen who had applied for

the job ... at the same time." Id. **Undisputed Fact.**

17.    As Welch explained, based on the established selection criteria, the selecting official

should not have considered external candidates or internal candidates for promotion

unless no candidate in the groups entitled to priority consideration possessed the

qualifications for the position.  Welch Dep. 84:2-85:2.  That is, external hires or

contractors would only be used if a determination was made that no current staff member

met the requirements for the position.  Welch Dep. 86:20-87:5.  **Undisputed Fact.**

18.    The basis for the agreed upon procedures are as follows:

It made sense to look at the people that you already had because we already had them at
that grade level, to utilize them if they could do the job at the level that was needed made
sense before you went to the additional expense of promoting somebody or bringing
somebody in from the outside.  They were also already available as opposed to having to
go through a process of identifying and bringing them in.... more would be involved in
bringing in people from the outside.

Welch Dep. 87:14-88:6.  **Undisputed Fact.**

**Development of the Vacancy Announcements**

19.    James Hooper served as SAWA's staff director.  Hooper Dep. 7:11-8:3.  He was

responsible for helping to establish Radio SAWA.  Hooper Dep. 15:8-19. Hooper was

hired in December 2001, and Radio SAWA went on the air in February or March 2002.

Id.  Hooper was part of the team that helped bring SAWA on air, hired some of the initial

staffers, processed the initial staffing actions, and processed the subsequent hiring of

additional staff members and contractors.  Hooper Dep. 15:8-19. **Undisputed Fact.**

20.  With respect to the selections at issue herein, Hooper helped Harb develop the vacancy announcement, set up the interviews, provided the paperwork to the interview panelists, and communicated Harb's selection decision to personnel.  Hooper Dep. 63:16-18.

   **Undisputed Fact.**

21.  Hooper developed the GS-13 and GS-12 vacancy announcements based on several discussions with Harb about what should be included.  Hooper Dep. 31:3-20, 32:5-33:13, 33:16-34:4; Harb Dep. 67:19-21; Abdelkarim ROI, Ex. 27 (GS-13 Vacancy Announcement).  Hooper specifically asked Harb what knowledge, skills and abilities the candidates must possess in order to be qualified for the position.  Hooper Dep. 39:9-11; 45:20-46:3, 46:16-21, 48:11-12.  Hooper then "distilled" Harb's input into the five KSA's that appear in the vacancy announcements.  Hooper Dep. 39:2-40:6.  After each of their several discussions Hooper would refine the draft announcements and discuss the new version with Harb.  Hooper Dep. 32:5-33:13, 39:2-40:6.  The announcements were not published until Harb was satisfied that they reflected the skills necessary for the positions.  Hooper Dep. 39:2-40:6. **Undisputed Fact.**

22.  The most important KSA's for the position are indicated by the point value assigned thereto.  Hooper Dep. 41:6-42:21.  Harb had input into the point value assigned to each KSA in the vacancy announcements.  Hooper Dep. 59:11-18.  **Undisputed Fact.**

23.  Harb determined how many vacancies there were under each Vacancy Announcement.  King Dep. 24:20-25:6.  **Undisputed Fact.**

   **<u>Necessary Qualifications as Established by the Vacancy Announcements</u>**

24.    The vacancy announcements for both the GS-13 and GS-12 positions had somewhat

different duties, because the GS-13 positions were supervisory in nature and the selectees

would serve as editors.  ROI, Ex. 27; GS-12 Vacancy Announcement.  However, the

knowledge, skills and abilities required for both positions were essentially the same.

That is, both positions required, in order of importance: (1) a thorough knowledge of

Middle Eastern history and culture, awareness of political, economic, and social

developments in the region, in general, and in the broadcast target area, in particular; (2)

professional knowledge of writing and editing principles and practices for electronic

media and skill in applying these to material used in international radio broadcasting; (3)

experience with a leading news organization in the region and with a Western news

organization was desirable, as well as experience covering major news events; (4)

knowledge of management principles and practices; and (5) knowledge and demonstrated

ability to use computers and familiarity with internet related software.  ROI, Ex. 27; GS-

12 Vacancy Announcement.   Additionally, both positions required specialized

experience in broadcasting.  Id.  **Undisputed Fact.**

**Selection Process**

25.    Susan King is the personnelist who assisted in the processing of applications for the

vacant positions.  She has worked in various personnel positions since 1990 and has

handled a range of personnel issues.  King Dep. 11:1-14:22.  **Undisputed Fact.**

26.    There were three certificates of eligibles issued, including a merit/competitive selection

certificate for internal candidates for promotion, a Delegated Examining Unit (DEU)

certificate for external candidates,[2/] and a non-competitive reassignment certificate for candidates seeking lateral reassignment. King Dep. 27:4-8. **Undisputed Fact.**

27.     For the GS-13 positions, King reviewed the applications that were received through the merit/competitive selection process to determine which candidates met the basic qualifications for the position(s). King Dep. 26:9-16, 53:16-54:3. **Undisputed Fact.**

28.     She did not rate or rank the applicants. King Dep. 27:4-21. A rating and ranking panel "of three experts," Jennifer Parmelee, Claude Porsella and Negussie Mengesha, was convened for this purpose. King Dep. 29:11-13, 30:12-14. King asked these individuals to serve on the panel based on their subject matter expertise, experience and their positions as Supervisory IRBs. King Dep. 30:18-31:17, 33:10-12. For "instructions" the panel received a "crediting plan," which broke down the five key job factors/functions and assigned each a point value that, when added together, totaled 30 points. King Dep. 34:13-19, 36. The job factors/functions are derived from the KSA's in the vacancy announcement. King Dep. 37:2-40:18. The panel received the crediting plan, the vacancy announcement, the position description and the applications. King Dep. 34:13-19, 36:9-17. **Undisputed Fact.**

29.     After candidates were rated and ranked, a merit promotion certificate of eligibles was issued to Mr. Harb. King Dep. 54:7-13. This certificate contained, in alphabetical order, the names of the individuals with the top 10 scores from the rating panel, including plaintiffs Abdelkarim (ranked 1st), Abdelrahman (ranked 4th), and Elmasry (ranked 8th).

_____

[2/] The delegated examining unit is part of the Agency's personnel office that has authority from OPM to review, rate and rank applications from outside (non-government) candidates. King Dep. 46:15-19.

King Dep. 78:19-21, 79:7-21, 107:19-108:1; rating sheet.  It did not include the name of selectee, Wassila Beldi.  Id.  **Undisputed Fact.**

30.     However, King retrieved this first certificate from Harb on the instructions of her supervisor, Conboy, because Agency regulations specified that the certificate should list only five eligible candidates.  King Dep.  63:10-18, 70:1-71:12, 80:5-15; 108:15-21, 109:22-111:7; Welch Dep. 32:15-18.  Consequently, King prepared a second certificate containing the names of only the top five candidates, including Plaintiffs Abdelkarim and Abdelrahman.  Id.; rating sheet.  **Undisputed Fact.**

31.     Later, however, Welch instructed King to issue yet a third certificate that contained the names of all 17 candidates who applied.  King Dep. 73:12-15, 113:18-114:14, 116:5-21, 125:18-21.  All in all, three distinct merit promotion certificates were issued for the GS-13 position.  King Dep. 121:1-11.  **Undisputed Fact.**

32.     Welch allegedly decided to issue the certificate containing all 17 names "because the scores [of the rating panel] were all equal..." and because there were multiple vacancies.  King Dep.  73:12-15, 113:18-114:14, 116:5-21, 125:18-21; Welch Dep. 22:1-9.

33.     Welch cannot recall how he learned that a first certificate of 10 people had been issued.  Welch Dep. 24:2-21.  Nor does he explain why, as Director of Personnel, he was involved in reviewing and/or reissuing certificates of eligibles.

34.     The 10 point difference between Abdelkarim who was rated first and Aida Akl (selectee) who was rated last, or seventeenth, is a large difference.  Welch Dep. 38:22-39:14.   The difference between Abdelkarim's score and fourteenth ranked Wassila Beldi's (selectee) score, while slightly narrower, is still significant. Welch Dep. 39:15-21.

35.    The scores are not even close to equal.  King Dep. 73:21-75:3.

36.    King was never given any explanation for why her supervisor first told her that the certificate containing 10 names was too many, that she was to replace the first certificate with a second certificate containing only 5 names, and then she was to replace the second certificate with a third certificate containing all 17 names.  King Dep. 116: 22-117:4.

**Undisputed Fact.**

37.    This process was highly unusual and has never occurred previously or since in her career. King Dep. 118:17-119:7.  King has never issued more than one certificate in a promotion context in a merit selection process.  King Dep. 123:6-9.  Nor can Welch recall  any instances in which three separate certificates were issued even though he has been at VOA for 20 years.  Welch Dep. 137:8-138:4.

38.    There is nothing in the Agency's personnel or selection policies that contemplates or allows such an action.  King Dep. 114:19-115:15.

39.    Having served as a selecting official at VOA for over a decade, Ismail Dahiyat, former Acting Director of the Arabic Service, has a basis for judging whether the issuance of multiple certificates was unusual.  Dahiyat Dep. 153:13-21.  He can recall no other occasion on which three separate certificates of eligibles were issued for the same vacancy announcement.  Dahiyat Dep. 153:22-154:6.  He has never heard of any situation where certificates are issued, interviews are commenced, everything is halted while new certificates are issued, candidates previously deemed ineligible are now considered eligible, and then interviews recommence – all of which happened here.  Dahiyat Dep. 152:10-19, 154:7-155:6, 159:19-160:1.

40. Candidates could be chosen from three separate pools/lists - merit promotion certificate, DEU certificate and/or lateral reassignment certificate.  Welch Dep. 152:7-153:15.

    **Undisputed Fact.**

41. There were enough candidates for Mr. Harb to choose from on the original Merit Promotion Certificate of Eligibles, the DEU Certificate and the Reassignment Certificate, without the need to issue a new Merit Promotion Certificate containing the name of every single applicant.  Welch Dep. 167:15-168:19.  In fact, before the Merit Promotion Certificate was amended for the third time to add the seven lowest ranked individuals, including that of selectee Beldi, Harb already had 19 certified candidates from which to choose.  Welch Dep. 173:1-6.

42. As indicated by a Memo sent to the Arabic Service from Welch, the intervention was spurred by complaints/questions raised by individuals who were notified that they did not make the certificate of eligible candidates:

    In the last several days, we have received a number of questions concerning the interviewing and selection procedure for the position of Supervisory International Radio Broadcaster (Arabic) GS-1001-13....  A certificate of eligibles containing the names of some Agency employees eligible for promotion was issued by the Office of Personnel late last week and interviews have been held.... However, because there are multiple openings for these positions and all Agency applicants were assigned high ratings by the rating panel.... [and] [b]ecause of the closeness of the scores assigned, I have determined that it is appropriate to refer all of these applicants for consideration for these promotional opportunities.
    Alkhateeb ROI, Exh. 6, p. A-11 (Memo from Jack Welch, Dir. of Personnel).

**Undisputed Fact.**

43.    Harb was aware that some of the individuals who applied for the GS-13 received notices from personnel that they were not referred because they were not among the best qualified.  Harb Dep. 237:18-238:3.

44.    At Harb's suggestion, some of these people complained.  Harb Dep. 238:1-4, 239:1-2.

45.    Mohammed Cherkaoui (selectee) complained to Harb and questioned his non-selection stating "I'm the man of the year.'"  Harb Dep. 238:16-22.  **Undisputed Fact.**

46.    Harb intervened on behalf of Wassila Beldi (selectee).  Harb was overheard asking Beldi "How come your name was not included?" to which Beldi responded, "I do not know, but I am not going to be quite [sic] about it."  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 3. Beldi related this conversation to Abdelrahman and indicated that Harb had told her "not to worry."  Abdelkarim ROI, Ex. 16, Abdelrahman Aff., p. 3; *see also* Abdelrahman Dep. (Jan. 8, 2007) 62:13-63:4.

47.    Beldi told Mohamed Elshinnawi, who supervised the Plaintiffs at VOA, that she complained to Harb about not being on the certificate of eligibles list, and Harb promised her they would reconsider.  Elshinnawi Aff. ¶ 20.

48.    Harb went to personnel and asked to see who applied and who made the certificate of eligibles.  Harb Dep. 387:3-4.  **Undisputed Fact.**

49.    When confronted with the fact that the lowest ranked selectee received a score of 17 out of 30, Welch is unable to justify his assertion in the memo that everyone received high ratings. Welch Dep. 95:3-14.

50.    There was also a DEU certificate of eligibles issued for the GS-13 position which

contained candidates' scores and listed candidates in rank order.  Alkhateeb ROI, Exh.

32;  King Dep. 64:7-22;  King Dep. Exh. 2 DEU Certificate of Eligibles.  **Undisputed**

**Fact.**

51.    The Merit Selection process for the GS-12 position was generally the same as that for the

GS-13.  King Dep. 132:1-133:3.  However, because only six candidates applied under the

merit promotion process, they were not rated and ranked, they were simply placed on the

certificate.  King Dep. 138:19-139:3.  **Undisputed Fact.**

52.    There was also a reassignment certificate issued containing the names of internal

candidates for non-competitive reassignment.  King Dep. 135:2-4; Abdelrahman ROI,

Exh. 33.  **Undisputed Fact.**

53.    There was a third Certificate issued from the DEU for outside candidates.  King Dep.

135:5-8.  Abdelrahman ROI, Exh. 32, DEU Certificate. **Undisputed Fact.**

54.    All candidates who eventually appeared on the various certificates of eligibles were

referred to the interview panel consisting of Moufac Harb, Sheila Gandji and Will Marsh,

and were interviewed.  **Undisputed Fact.**

**The Selections**

55.    With the exception of Elmasry who withdrew her application, all of the plaintiffs applied

for the subject GS-13 Supervisory IRB/Shift Editor positions, made the Certificate of

Eligibles and were interviewed.  Harb Dep. 117-122.  **Undisputed Fact.**

56.    None of them were selected.  Id.  **Undisputed Fact.**

57.    The selectees were Hala Arafa (Egyptian, 40), Wassila Beldi (Tunisian, 46), Mohammed

Cherkaoui (Moroccan, 41), George Shammas (Palestinian, 65), Nicola Zaboura

(Jordanian, 63), Mohammed Saad (Egyptian, 54), Daniel Nassif (Lebanese, 44, external

hire), Munir Nasser (Palestinian, 65, external hire), Usama Farag (Egyptian, 41), Diaa

Bekheet (Egyptian, 41).  Abdelkarim ROI, Tab 30; King Dep. Ex. 4; Ex. Xx (SF-52s

reflecting dates of birth).

58.    All of the plaintiffs applied for the subject GS-12 IRB positions, made the certificate of

eligibles and were interviewed.  **Undisputed Fact.**

59.    None of them were selected.  **Undisputed Fact.**

60.    Twelve individuals were selected under the posted vacancy announcement - 7 citizens

and 5 non-citizens.  Bates No. 000556.  **Undisputed Fact.**

61.    The selectees were Aida Akl (Jordanian, 44), Gamal Al Adle (Egyptian, 48), Elzubeir El

Tayeb (Sudanese, 48), Rachid Jaafar (Moroccan, 44), Maha Rabie (Palestinian, 50),

Mohammad Suleibi (Jordanian or Palestinian, 55), Emad Al-Khafaji (Iraqi, 42,

previously a contractor/POV), Reem Abaza (Egyptian, 30, non-citizen, promoted from

GS-11), Dalia Alaqidi (Iraqi, 33, non-citizen, promoted from GS-11), Elmigdad Gebril

(Sudanese, 43, non-citizen), Nassreddine Hssaini (Moroccan, 37, non-citizen, promoted

from GS-11), and Zahrat Abuzaid (Sudanese, 45, non-citizen).  Abdelkarim ROI, Tabs

31-34.  **Undisputed Fact.**

62.    Only two other Arabic Service staffers applied, but were not selected, for either of the two posted GS-12 or GS-13 positions - both of these individuals were also of Egyptian national origin.  Abdelkarim ROI, Tab 36.  **Undisputed Fact.**

63.    At least one of them, Ziad Abdelrahman, was highly rated by the DEU rating panel.  King Dep. Ex. 2.  **Undisputed Fact.**

64.    After the selections for the posted GS-12 vacancy announcement, Harb still had four remaining slots, but opted not to fill them rather than select Plaintiffs.  Harb Dep. 224:10-13.  **Undisputed Fact.**

**Plaintiffs' Background, Experience and Qualifications**

Mohammed Abdelkarim

65.    Mohammed Abdelkarim is a 48 year old,[3] U.S. citizen of Egyptian origin.  Abdelkarim ROI Ex. 6, p. 2.  He received a bachelor's degree in languages from Am Shams University and also took courses at the Institute of Radio & TV in Cairo, Egypt.  Abdelkarim ROI, Exhibit 6, Tab a.  Prior to working for Defendant, Mr. Abdelkarim was a reporter and announcer with Radio Cairo and the Japanese Broadcasting Corporation.  Abdelkarim ROI, Ex. 6, Resume.  **Undisputed Fact.**

66.    He joined VOA as a GS-11 IRB on October 13, 1989.  Abdelkarim ROI Ex. 6, p. 2. In 1992, he was promoted to GS-12.  Abdelkarim ROI Ex. 6, p. 2.  During his career at VOA he received numerous awards for his exceptional performance.  Abdelkarim ROI,

---

[3]All the ages indicated herein are those of the individual at the time the disputed selections were made.

Exs. 6 (Tabs G-H) & 41; Marsh Dep. Ex. 6.  For example, in April 2002, during the same general time period as the selections, he received a within grade pay increase "in recognition of sustained high quality performance of official duties."  Abdelkarim ROI Ex. 41; Marsh Dep. Ex. 3; Marsh Dep. 93:3-6; Dahiyat Dep. 106:3-13.  Abdelkarim received two separate cash awards in 2001.  Abdelkarim ROI, Ex. 41.  In addition, he was nominated for and received a highly prestigious VOA Award of Excellence for his program "Mubarak/Copts/Human Rights" in 2001.  Marsh Dep. 93:13-94:8, 97:7-22; Marsh Dep. Ex. 4; Dahiyat Dep 79: 1-7, 77:17-20, 79:11-15, 105:3-18; Dahiyat Dep. Ex. 10.  **Undisputed Fact.**

67.    For each of the three years preceding the selections, Abdelkarim received an overall rating of "outstanding" from his supervisors, including William Marsh, and the narrative sections of the appraisals described his abilities in the superlative.  Abdelkarim ROI Ex. 41 (2000-2001 Performance Appraisal, 1999-2000 Performance Appraisal, 1998-1999 Performance Appraisal).  **Undisputed Fact.**

68.    Mohamed Ghuneim, former Chief of the Arabic Branch, described Abdelkarim as a topnotch, able, and dedicated broadcaster who is well versed in American and Arab politics and familiar with both cultures.  Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.  Abdelkarim is a "special person with special talents and qualifications."  Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.

<u>Zeinab Abdelrahman</u>

-17-

69.  Zeinab Abdelrahman is a 55 year old, United States citizen born in Egypt.  Abdelkarim
     ROI, Ex. 16, Abdelrahman Aff., p. 2.  She received a bachelor's degree in economics
     from Cairo University and completed a one-year program on German languages in West
     Germany.  Abdelrahman Dep. (Dec. 23, 2004) 6:7, 8:3.  Prior to working for VOA, Ms.
     Abdelrahman worked as a reporter, newscaster, programmer, and announcer with Radio
     Cairo, Sawat el Arab, Arab Radio and German radio (Deutsche Welle).  Abdelrahman
     Dep.  (Dec. 23, 2004) 7:15-10:21.  **Undisputed Fact.**

70.  Ms. Abdelrahman was hired in 1988 by the Arabic Service as a GS-11 IRB and was
     promoted to GS-12 in October 1993.  Id.   During her career she received numerous
     awards and recognition for her performance and abilities.  For example, in 1999, she
     received a Superior Accomplishment Award for outstanding performance as an Arabic
     Branch broadcaster and in recognition for her special talent for securing interviews on
     major developments in the audience area and the rest of the world.  Abdelrahman ROI,
     Ex. 6, Tab c.  She worked on the Accent on Youth program for seven years and won an
     award for the program.  Abdelrahman Dep. (Dec. 23, 2004) 15:18-16:2.  **Undisputed
     Fact.**

71.  For each of the three years preceding the selections, Abdelrahman received an overall
     rating of "outstanding" from her supervisors, including William Marsh, and the narrative
     sections of the appraisals extolled her exceptional abilities.  Abdelrahman ROI, Ex. 6,
     Tab c.  Of particular note was her repeated distinction as the most "prolific" interviewer
     in VOA Arabic Service. Id.  **Undisputed Fact.**

**Hayat Alkhateeb**

72.     Plaintiff Hayat Alkhateeb is a 59 year old, United States citizen, of Syrian national origin.

Alkhateeb Dep. 6:2-9.  Ms. Alkhateeb moved to Syria when she was five years old.

Alkhateeb Dep.  5:20-6:3.  She received a bachelor's degree in philosophy and sociology

from the University of Damascus and later took courses from Texas University, the

University of Maryland and Career University in the District of Columbia.  Alkhateeb

Dep., pp. 7:1-9:5.  **Undisputed Fact.**

73.     Prior to working for defendant, she worked as a broadcaster doing news and youth

programming for Syrian Radio and TV.  Alkhateeb Dep. 12:11-13:14.  Ms. Alkhateeb

was hired by the Arabic Service as a GS-11 IRB in 1981, and was promoted to GS-l2 in

1986. Id.  **Undisputed Fact.**

74.     She has repeatedly been recognized as an exceptional broadcaster and reporter, winning

approximately 22 awards during her tenure at VOA.  Alkhateeb Dep. 21:16-21;

Alkhateeb ROI, Ex. 6; Marsh Dep. Ex. 12.  In particular, one of her programs made it to

the finals of the prestigious, VOA-wide Excellence in Programming Awards.  Marsh

Dep. 167:2-16. Additionally, she was nominated for, selected for and successfully

completed a highly selective one year management/leadership program called "Women's

Executive Leadership."  Alkhateeb Dep. 8:14-20; Marsh Dep. Ex. 11.  During that

program she spent three months working at CNN on "World Report."  Alkhateeb Dep.

8:21-9:5.  **Undisputed Fact.**

75.     For each of the three years preceding the selections, she received an overall rating of
        "outstanding" from her supervisors, including William Marsh.  Marsh Dep. 177:13-16;
        Marsh Dep. Ex. 7, 10; Alkhateeb ROI, Ex. 41, Tab b.  The following is a typical
        description of her performance and capabilities:  "Ms. Alkhateeb is an all-around
        international radio broadcaster, who has proven her skill in virtually every radio
        broadcasting discipline - including hosting complex integrated airshows, translating
        house material, originating reports or panel discussions, and producing programs."
        Marsh Dep. Ex. 7. **Undisputed Fact.**

<u>**Amina El-Bishlawy**</u>

76.     Amina El-Bishlawy is 55 year old, United States citizen who was born in Egypt.
        Abdelkarim ROI, Ex. 15, El-Bishlawy Aff., 2. She earned a bachelor's degree in political
        science and economics and a high diploma (equal to a Masters degree) in radio and
        television journalism from Cairo University.  El-Bishlawy Dep. 6:20-7:3.  Prior to
        working for VOA, El-Bishlawy worked as a broadcaster for Radio Cairo.  <u>Id.</u> **Undisputed
        Fact.**

77.     Ms. El-Bishlawy was hired in 1986 as a GS-11 IRB for the VOA's Arabic Service, and
        was promoted to GS-12 in November 1991.  Abdelkarim ROI, Ex. 15, El-Bishlawy Aff.,
        pp. 1-2.  Like the other plaintiffs, she has received ample  awards and recognition for her
        outstanding work, including a VOA Superior Accomplishment Award.  Dahiyat Dep.
        84:18-85:1.

78.    Like the other plaintiffs, for each of the three years preceding the selections, she received

an overall rating of "outstanding" from her supervisors, including William Marsh.   ROI,

Ex. 6, Tabs A-B.  The narratives of her performance appraisals are similarly glowing,

indicating that she is entrusted with editing duties and other responsibilities that other

IRBs are not – duties that required "keen news judgment."  Id.  **Undisputed Fact.**

Faiza Elmasry

79.    Plaintiff Faiza Elmasry is a 46 year old, citizen of the United States born in Egypt and is a

Sunni Muslim.  Abdelkarim ROI, Ex. 14, Elmasry Aff., p. 2.   Ms. Elmasry earned a

bachelor's degree in economics and politics from Cairo University and a diploma (similar

to a master's degree) in political change in Yemen.  Elmasry Dep. (Jan. 9, 2007) 7-8.

Prior to joining VOA, she worked as a broadcaster, announcer, and programmer for Radio

Cairo and Radio Japan.  Elmasry Dep. (Jan. 9, 2007) 36:13-15.  **Undisputed Fact.**

80.    Ms. Elmasry was hired in 1989 as a GS-11 IRB, for VOA's Arabic Service and was

promoted to GS-12 in April 1992.  Abdelkarim ROI, Ex. 14, Elmasry Aff., pp. 1-2.   She

too received numerous awards and accolades for her performance and skills as an IRB.  In

1999, Elmasry received both a Quality Step Increase "in recognition of her sustained high

quality performance of her official duties" and a Collective Accomplishment Award for

superior coverage of the war in Kosovo. Marsh Dep. 211:12-21; Elmasry ROI, Ex. 6, Tab

E.  She has also received a prestigious "house" award for excellence in programming.

Elmasry ROI, Ex. 6, Tab E. **Undisputed Fact.**

81.   For each of the three years preceding the selections, she received an overall rating of "outstanding" from her supervisors, including William Marsh.   Elmasry ROI, Ex. 6, Tabs A-B; Marsh Dep. Ex. 17.  In fact, Ms. Elmasry received outstanding ratings for 10 years at VOA.  Elmasry Dep. (Jan. 9, 2007) 36:15-16.  Her performance appraisal narratives also teemed with superlatives.  Elmasry ROI, Ex. 6, Tabs A-B. For example, Marsh extolled: "She is, without question, one of the premier talents in the Arabic Branch." Marsh Dep. Ex. 17.  **Undisputed Fact.**

### Agency's Asserted Legitimate Reasons for the Non-selections

82.   Harb's asserted legitimate non-discriminatory reason for not selecting any of the Plaintiffs for either the GS-13 or GS-12 positions was that they were not even minimally qualified to perform the jobs.  Harb Dep. 167:14-168:4, 168:18-19 (none of the Plaintiffs were qualified for reassignment); Harb Dep. 148:18-21 (Abdelkarim not at all qualified); Harb Dep. 145:4-6 (Abdelkarim not qualified at all for GS-13 position); Harb Dep. 179:15-16 (Elmasry not qualified); Harb Dep. 181:7-8 (El-bishlawy not qualified); Harb Dep. 181:7-8 (Alkhateeb not qualified).

83.   Harb did not compare the qualifications of the Plaintiffs with the selectees; he simply concluded that each of the Plaintiffs was not qualified.  Harb Dep. 180:1-5. 180:14-17.181:7-8.

### Facts Disputing Defendant's Asserted Legitimate Reason for the Selections

84.    While a three person panel, consisting of Harb, Marsh and Gandji, interviewed the

candidates for the GS-13 and GS-12 positions, Harb alone made the selection decisions.

Gandji Dep. 151:17-20.

85.    After being pressed over their suggestions that the selection decisions were based on an

informed consensus by the interview panel, Marsh and Gandji both eventually admitted

that they completely deferred to Harb based on his knowledge of the Arabic language and

his assertions regarding his observations of these individuals' performance working in the

"new" format.   Marsh Dep. 207:1-9, 348:7-349:3.

86.    The panel's discussion of candidates proceeded from Harb's expressed preferences:

"...Moufac Harb said, '...these are the folks that I would like ... to have on the selection.'"

Marsh Dep. 295:1-3; *see also* id. at 220:22-221:16, 221:17-22; Gandji Dep. 36:17-21,

137:10-20; Harb Dep. 133:19-134:3.  Harb has the same recollection, only he further

states that he doesn't recall having any discussion with the panel after he presented his list

of names.  Harb Dep. 131:10-15.

87.    Marsh further attests that, "the other candidates were deemed better qualified *by Mr.

Harb, the selecting official....*  That was *his* judgment."  Marsh Dep. 396:15-397:5

(emphasis added).  Marsh admits he has no personal knowledge as to why given

candidates were not selected.  Marsh Dep. 397:6-15 (regarding the reasons for

Abdelrahman's non-selection).

88.    Gandji further confirms the falsity of the assertion that the panel jointly made the

selections:

There's one thing that Mr. Harb had that I certainly don't have and that is ... a command of the Arabic language and how to write.... so we could not judge, I could not judge, on the level of writing. And he had worked with them, and that's where most of the weight came in terms of writing news.... [Harb] knew the skill sets involved."

Gandji Dep. 37:17-38:16; *see also* id. at 39:22-40:2. Based on this, "[Harb] presented us with a list [and] I could not disagree with him." Gandji Dep. 136:22-137:7.

89. With respect to Alkhateeb, Marsh asserts that Harb's justification for her non-selection was as follows:

[T]he participants in the GS-12 interviews had already been doing the work that they ... would be hired to do at Radio SAWA. It was something Moufac Harb supervised on a day-to-day basis. There was a track record.... And I'm saying that she wasn't, according to Moufac Harb's choices, wasn't at the top tier of people he wanted on this, during this selection.

Marsh Dep. 192:9-193:15; *see also* Gandji Dep. 134:3-17 (asserting only Harb knows the reasons Abdelrahman was not selected).

90. Similarly, Marsh admits, "I don't know how [Alkhateeb] performed [while working at Radio SAWA] except that she – the candidates who were selected performed better, according to *Moufac Harb*." Marsh Dep. 200:18-201 (emphasis added).

91. Alkhateeb never worked at SAWA prior to the selections; she was not assigned there until after the selections had been made. Alkhateeb Dep. 16:15-17:2, 27:14-17.

92. Marsh claimed to be unaware of this fact. Marsh Dep. 201:2-5.

93. With respect to those plaintiffs who were temporarily assigned to Radio SAWA prior to the GS-12 selections, Marsh admits that, other than Harb's word, he has no personal knowledge of whether the selectees performed better at MERN/Radio SAWA than the plaintiffs. Marsh Dep. 207:1-9.

94.     With respect to Abdelkarim in particular, Marsh was so surprised to learn that he was not

        one of Harb's top candidates that Marsh directly questioned Harb about it:

        And following the interviews, when we gathered at this meeting, Moufac [Harb] talked
        about the people he wanted to select, and I did raise. I said, 'Wow. You know. So
        Gamal Al-Adel is one of them.' And he goes, 'Yeah.' And I asked the question. I said,
        'Is he better at this new format than somebody like ... Mohamed Abdelkarim?' And the
        answer was, 'Gamal is one of the best.'"

        Marsh Dep. 150:13-151:16, 310:7-12.

95.     Marsh cannot confirm whether Harb was fair in his assessment of the candidates or not.

        Marsh Dep. 201:14-22.

96.     Marsh informed Harb how wonderful the plaintiffs were. Marsh Dep. 232:8-17.

97.     Harb, who denies knowing almost anything positive about the plaintiffs' performance,

        also denies that Marsh ever told him anything about the plaintiffs. Harb Dep. 122:17-

        123:1, 123:14-16, 124:5-8.

**Interviews**

98.     With respect to Abdelkarim, Harb does not remember any questions that were asked of

        Abdelkarim or any of Abdelkarim's responses. Harb Dep. 114:2-6, 115:20-22,172:10-12.

99.     After being pressed about his qualifications, and despite her prior insistence that she

        could remember no specifics about the selection or interview process, Gandji suddenly

        claimed to remember that Abdelkarim performed poorly on the interview. Gandji Dep.

        66:11-67:20.

100.    Abdelkarim had three interviews, one for a temporary assignment and one for each of the GS-13 and GS-12 positions, and Gandji cannot remember on which of the three interviews he allegedly performed poorly.  Id.

101.    Gandji's interview notes for the GS-13 position provide no evidence to support the claim that he had a poor interview, with the possible exception of a note that he was only "okay" with contacts.  Gandji Dep. 123:22-127:16.  Her notes specifically indicate that he had supervisory experience.  Gandji Dep. 127:22-128:5.

102.    Marsh's interview notes further indicate that Abdelkarim gave a substantive interview and that he discussed his contacts.  Marsh Dep. 443:11-448:16.

103.    Like Gandji, when pressed about any specific deficiencies in Abdelkarim's interview, Marsh states, "I don't remember the specifics."  Marsh Dep. 105:2-10.  Marsh has no recollection of the GS-12 interviews and cannot state whether Abdelkarim performed well or poorly in that interview.  Marsh Dep. 146:15-147:3.

104.    With respect to Abdelrahman, Harb likewise has no memory of the interview and does not remember what asked her or how she responded.  Harb Dep. 16:16-20; Harb Dep. 118:4-6, 177:19-21.

105.    Not only do Gandji's notes fail to indicate that Abdelrahman interviewed poorly, they actively refute this assertion.  Her notes reflect that Abdelrahman had "experience in reporting; originates news stories; interviews and panel discussions."  Gandji Dep. 130:3-18.  Gandji's notes also indicated that Abdelrahman was "good on details" and that her other answers were "good to excellent."  Gandji Dep. 131:1-132:18.  Abdelrahman also

-26-

had "great contacts" and gave "great details."  Gandji Dep. 132:16-133:7.  Finally, Gandji

noted that Abdelrahman had supervisory experience and experience using DALET.

Gandji Dep. 133:8-20.

106.    With respect to El Bishlawy, none of the interview panelists can give any explanation or

examples of what was allegedly lacking in her interview.  Harb has no recollection of

anything asked or said during the interview.  Harb Dep. 117:18-118:1, 118:3, 181:4.  Nor

do Gandji's interview notes contain any information to support the assertion that El

Bishlawy performed poorly.[4/]  Gandji Dep. 142:9-145:3.

107.    Assertions that Alkhateeb performed poorly in the interview(s) are also contradicted by

available evidence.  For example, Gandji stated that Alkhateeb had "no managerial

experience," but her interview notes indicate Alkhateeb's answer to the managerial

question was "correct" and that Alkhateeb had team leader and/or coordinator experience.

Gandji Dep. 110:18-112:11.

108.    Identical to the other Plaintiffs, Harb does not remember any of the questions or any of

Alkhateeb's answers.  Harb Dep. 120:19-121:2, 121:15-17.

109.    There is also no evidence to support the assertion that Elmasry performed poorly on her

GS-12 interview.  Once again, Harb does not remember anything about the interview.

Harb Dep. 178:18-179:1.

---

[4/] Gandji's interview notes do contain one reference to El-Bishlawy having received only one training session on DALET.  Gandji Dep. 142:9-145:3.  However, Harb was solely responsible for decisions about who would be trained (and when) on the DALET system. Hooper Dep. 220:14-16.

110.    When asked why Elmasry was not selected for the GS-12, Gandji initially asserts that it

        was based on "the interviews and Mr. Harb's assessment of the writing and skills of the

        other candidates."  Gandji Dep. 181:12-19.  However, Gandji later admits that she recalls

        nothing about Elmasry's interview, her application or her past experience as a GS-12

        IRB.  Gandji Dep. 180:14-181:1.

111.    According to Marsh, the individual(s) who prepared the interview questions decided that

        the emphasis would be on news judgment, editing and language skills.  Marsh Dep.

        395:22-396:14.

112.    Marsh states that, in his view, none of the plaintiffs lacked language skills or news

        judgment.  Marsh Dep. 397:18-398:15.  Further, as set forth above, Abdelkarim and El

        Bishlawy had extensive editing experience and skills, which is important given that the

        GS-13 Supervisor IRB/Shift Editor position involved significant amounts of editing.

                        **Voicing Skills**

113.    Harb also impugned the plaintiffs' voicing skills, stating that SAWA "required a good

        voice, understandable, not monotone."  Harb Dep. 448:17-20.

114.    According to Marsh: "When [the Plaintiffs] worked for me, they were premier voices."

        Marsh Dep. 314:10-316:5; *see also* Elmasry Dep. (Jan. 9, 2007) 38:4-7 (Elmasry voice

        was always praised.)

115.    Marsh's statements with respect to Abdelkarim are well-documented.  In his performance

        appraisal, Marsh described Abdelkarim as having "one of the best males voices in the

        Arabic Branch." Abdelkarim ROI, Ex. 6, Tab H, 5-1-98 to 4-30-99 performance

appraisal, page 9. And, Marsh continues to believe Abdelkarim had one of the finest

voices in the Arabic Service. Marsh Dep. 80:18-81:4.

116.    When asked, "how is it possible that Mohamed Abdelkarim, who you said was one of the

best male voices at the VOA, could not ... possess the news reading/voicing skills

required under Radio SAWA? Explain that...," Marsh responded, "I can't." Marsh Dep.

313:7-17. "It goes without saying that Mr. Abdelkarim has one of the finest voices in the

Arabic Branch." Marsh Dep. Ex. 2, p. 9 ( 5-1-97 to 4-30-98 Performance Appraisal).

117.    Elshinnawi concurred, stating Abdelkarim's announcing skills were "unsurpassed".

Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 3.

**News Reporting and News Writing Skills**

118.    Marsh admits that all of the plaintiffs did news reporting while under his supervision.

Marsh Dep. 320:20-321:5. There is also specific evidence with regard to each plaintiff's

exemplary news writing and reporting skills.

119.    Mr. Abdelkarim hosted and coordinated VOA's prime time news hours, which required

"a keen news sense." Marsh Dep. Ex. 2: 5-1-97 to 4-30-98 Performance Appraisal p. 9.

120.    Marsh praised Abdelkarim's news reporting:

You have really outdone yourself this week. Your tireless pursuit of the story really paid
off for us in a big way. *No coverage angle was missed* ... by your *on-the-scene coverage*
at the White House, on the Hill, at the Copts demonstration ... It was really a first-rate
effort, and I was proud to watch you in action."
Marsh Dep. Ex. 1  - 4 emails from Marsh to Abdelkarim March 31, 2000.

121.    Abdelkarim's newswriting ability was practically "unsurpassed".  Abdelkarim ROI Ex.

17, Elshinnawi Aff., p. 3.

122.     Marsh's interview notes indicate Abdelkarim had experience writing original news based

on wires and other sources (Marsh Dep. 444:15-19).  Marsh's interview notes further

indicate Abdelkarim had originated material and prepared news for a fast paced news

show "Towards a Healthier Life."  Marsh Dep. 448:5-8.

123.    Marsh rejects the notion that Abdelkarim could not write a news story.  Marsh Dep.

204:4-9.

124.    Abdelrahman likewise had extensive news reporting experience.  Since 1994, she had

worked on a daily basis on an hour-long integrated news program called Around the

World.  Abdelrahman Dep. (Jan. 8, 2007) 65:18-23.  She had covered the White House

and State Department doing briefings and analysis while also translating speeches on the

air. Abdelrahman Dep. (Jan. 8, 2007) 66:1-7.

125.    Gandji's interview notes reflect her experience as a news reporter.  Gandji Dep. 130:3-18.

126.    Abdelrahman originated news for the program "Focus," and for her segments did all the

research, interviews, recording and compilation of the show.   Abdelrahman Dep. (Dec.

23, 2004) 18:14-19:4.  She received three awards for this work.  Abdelrahman Dep. (Dec.

23, 2004) 18:8-11.

127.    Gandji's interview notes indicate she had experience in originating news stories.  Gandji

Dep. 130:3-18.

128.  Alkhateeb won awards for her news reporting, for which Marsh nominated her.  Dahiyat Dep. 82:20-84:4.

129.  Alkhateeb received a VOA Special Achievement Award for her excellent work as a "*reporter* on the Middle east peace process and as a host/coordinator for Arabic primetime news hours."  Dahiyat Dep. Ex. 7 (emphasis added); *see also* Dahiyat Dep. 85:9-10.

130.  With respect to news writing, she was the writer and editor for the radio news hour and the TV shows Hello America and Weekly Forum.  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 2.

131.  Elmasry had been trained in writing for many different formats.  Elmasry Dep. (Jan. 9, 2007) 38:4-7.  While in Arabic Service she also originated news and wrote briefings for the State Department and DOD.  Elmasry Dep. (Jan. 9, 2007) 13:1-2.

**Editing Experience and Skills**

132.  Abdelkarim was described as "an up and coming news editor and back-half editor." Marsh Dep. 103:3-14.   In addition, "[h]e is among the few staffers regularly assigned to be a news editor..."  Abdelkarim ROI, Ex. 6, Tab H. According to his performance appraisals, he worked at least one day per week as a news editor during the 1999-2000 and 2000-2001 rating periods. Abdelkarim ROI Ex. 6, Tab H.

133.  He was considered one of the best news editors in the Arabic Branch. Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 3.

134.   Marsh's interview notes reflect a positive discussion regarding Abdelkarim's editing experience.  Marsh Dep. 448:11-14.

135.   The narratives of El Bishlawy's performance appraisals indicate that she too was entrusted with editing duties.  ROI, Ex. 6, Tabs A-B; Marsh Dep. 398:16-22.

136.   Similarly, Alkhateeb was an editor for Radio News hour and the TV shows Hello America and Weekly Forum.  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 2.

**Plaintiffs' Technical Skills**

137.   With respect to whether the plaintiffs had the necessary technical abilities for the positions, Marsh believed they were still learning the technical skills.  He also admits, however, that all of the candidates were still learning the technical skills.  Marsh Dep. 318:14.

138.   Gandji's interview notes confirm that Abdelrahman had experience with DALET and also that she had supervisory experience. Gandji Dep. 133:8-20.

139.   Similarly, documentary evidence indicates Abdelkarim had received praise for his use of actualities in news reports:

"[It] was a comprehensive, well-conceived wrap-up of the week's events, and was replete with sound and actualities.  It was really a first-rate effort, and I was proud to watch you in action."
Marsh Dep. Ex. 1  - 4 emails from Marsh to Abdelkarim March 31, 2000.

140.   Any deficiencies in plaintiffs' training and abilities with respect to using the new

DALET system are directly attributable to Harb.  Harb was solely responsible for deciding who would be trained (and when) on the DALET system.  Hooper Dep. 220:14-16.

### Evidence That Plaintiffs Were Not Only Qualified, But That They Were Better Qualified than Many of the Selectees

141.    The only objective evaluation of the candidates' experience and qualifications, as measured against the job requirements specified in the vacancy announcement, reveals not only that the Plaintiffs were qualified for both the GS-12 and GS-13 positions, but also that they were rated as more qualified than many of the selectees.  King Dep. Ex. 1

142.    King reviewed the applications of all the plaintiffs and determined that, based on their applications and experience, they were qualified for the GS-13 positions. King Dep. 40:6-41:12; King Dep. Exh. 1.  **Undisputed Fact.**

143.    Gandji specifically admits that Abdelkarim met the requirements for the GS-13 position. Gandji Dep. 62:3-64:10; 65:13-20.

144.    Elshinnawi, a former supervisor, states: "There is no reason why he should not have been a top candidate."  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 3.

145.    A candidate qualified for a GS-13 IRB position is certainly also qualified for a GS-12 IRB position.  King Dep. 198:18-21.

146.    Abdelkarim was given the highest average score of 97 points by the DEU rating and ranking panel for the GS-13 positions.[5/]  King Dep. Ex. 2.

---

[5/] The DEU rating and ranking panel evaluated candidates on a scale of 1 to 100.  The merit promotion rating and ranking panel evaluated candidates on a scale of 1 to 30.

147.    Abdelrahman received the fourth highest score of 94 points. King Dep. Ex. 2.

148.    These two plaintiffs were also ranked first and fourth respectively by the merit promotion rating panel.  King Dep. Ex. 1.

149.    Abdelkarim and Abdelrahman were rated significantly higher by the merit promotion rating panel than selectee Beldi, who was rated 14th out of 17 candidates, and received only 20 points out of a possible 30. King Dep. 75:4-12; King Dep. Ex. 1.

150.    All of the Plaintiffs were rated higher than Beldi by the merit promotion rating and ranking panel. King. Dep. Ex. 1.

151.    Similarly, all of the Plaintiffs were rated higher by the merit promotion rating and ranking panel than Usama Farag, who was rated 13th with a score of 20 points.  King Dep. Ex. 1.

152.    It is also noteworthy that the GS-13 merit promotion rating and ranking panel rated every single plaintiff higher than Gamal Al Adle, Maha Rabie and Aida Akl, each of whom were selected for GS-12 positions which required virtually identical KSA's.  Id.

153.    While Elmigdad Gebril was not ranked by the panel, his qualifications and application were scored against the selection criteria, with the result that he received a lower score than all but one of the plaintiffs. King Dep. Ex. 1.

154.    Because it was not necessary to do so, only two of the plaintiffs, Abdelkarim and Abdelrahman, applied under the DEU procedures and were rated by the DEU.

    **Undisputed Fact.**

155.    Harb received the DEU certificate, which included scores, so he knew Abdelkarim scored
        a 97 and Abdelrahman scored a 95; nonetheless he selected Nassif and Arafa who scored
        only a 92 and a 93 respectively.  King Dep. 75:4-12; King Dep. Ex. 2.  **Undisputed Fact.**

156.    In fact, four of the six selectees from the GS-13 DEU Certificate and the Merit Selection
        Certificate were among the lowest rated candidates.  King Dep. Exs. 1-2.

157.    Both Abdelrahman and Abdelkarim were rated higher by the DEU panel than Elmigdad
        Gebril, Elzubeir El Tayeb and Rachid Jaafar, all of whom were eventually selected for
        GS-12 positions. **Undisputed Fact.**

158.    Despite receiving the DEU Certificate of Eligibles for the GS-13 position listing
        candidates in rank order with their scores (King Dep. 92:18-93:6), Harb initially testified,
        under oath, that he was never told about or shown any documents reflecting the scores
        assigned to candidates by the various rating panels.  Harb Dep. 72:16-19.   Only later does
        Harb admit he knew about these ratings and the scores assigned by the rating and ranking
        panel, including the fact that Abdelkarim was the top rated candidate with 97 points. [6/]
        Harb Dep. 143:8-14, 144:12-15.

159.    Mohammed Cherkaoui (GS-13 selectee) was ranked lower than Abdelkarim and
        Abdelrahman by the rating panelists.  King Ex. 2.  Harb admits that there were problems
        with the structure of his writing and his spelling.  Harb Dep. 455:1-2, 458:3-6.  When
        Abdelkarim started as a news editor, he was editing Cherkaoui's and Beldi's work
        because they worked with him as translators.  Abdelkarim Dep. (Jan. 8, 2007) 53:24-54:1.

---

[6/] George Shammas, who was already a GS-13, received the same score as Abdelkarim.

Elshinnawi never rated Cherkaoui as outstanding because he has serious shortcomings in voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19.

160.    In addition to being one of the lowest ranked candidates by the merit promotion rating and ranking panel, Marsh's interview notes reflect that Wassila Beldi (GS-13 selectee) had "very little DALET" experience.  Marsh Dep. 420:16-22.  Additionally, Beldi repeatedly missed deadlines and failed to provide the news headlines to some newscasters, including the Plaintiffs, before rushing to the studio to read the newscasts. El Bishlawy Dep. 80:2-82:20,   Dahiyat confirms that Beldi was a difficult co-worker and supervisor.  Dahiyat Dep. 93:19-94:3. When Beldi was selected Dahiyat was surprised and wondered why she would be promoted over other candidates.  Dahiyat Dep. 118:18-119:8.

161.    Munir Nasser (GS-13 selectee), an external hire, who should not even have been considered unless the internal candidates were deemed completely unqualified, also had shortcomings. Ms. Parmelee, a member of the rating and ranking panel, noted that he had "no track record in international broadcasting."  Harb Dep. 136:8-11; King Dep. Ex. 1. After he begain working at Radio SAWA it was apparent that he had little to no knowledge about using DALET, translating news or writing news.  Elmasry Dep. (Jan. 9, 2007) 21:15-17.  Moreover, he had never worked in any type of broadcast media. Elmasry Dep. (Jan. 9, 2007) 21:17-18; King Dep. Ex. 1, Porsella Notes.   Not surprisingly, then, he was ranked lower than both Abdelrahman and Abdelkarim by the DEU rating panel.  King Dep. Ex. 2.

162.    Daniel Nassif (GS-13 selectee) was another external hire who should have been selected

only if no internal candidates met the basic qualifications.  At the time of his selection he

had no experience in radio as expressly noted by two of the ratings panelists.  King Ex. 1,

Porsella and Parmelee notes.  Even Harb cannot deny that Nassif lacked this critical

experience.  Harb Dep. 153:12-18, 154:5-18. As explained above, Nassif was rated lower

than Abdelkarim and Abdelrahman by the DEU rating panel.  He would have been rated

even lower but for a disparately high score assigned to him by the third rater.   King Dep.

181:19-183:1; King Dep. Ex. 1  (Mengesha 30 points, Parmelee 20 points, and Porsella

17 points).  After his selection it became apparent that he had little knowledge of DALET,

had trouble writing news, and had no experience as a broadcaster.  Elmasry Dep. (Jan. 9,

2007) 21:15-18; Abdelkarim Dep. (Jan. 8, 2007) 57:23-24; Abdelkarim ROI Ex. 6

(Rebuttal Aff. p. 2).  He was ranked significantly lower than both Abdelrahman and

Abdelkarim by the DEU rating panel, receiving the lowest score they assigned to any of

the candidates.  King Dep. Ex. 2.

163.    As even Harb acknowledges the GS-13 vacancy announcement requires that the shift

editor be capable of serving as a broadcaster.  Harb Dep. 68:18-69:4; see also Abdelkarim

Dep. (Jan. 8, 2007) 41:14-15; Abdelkarim ROI, Ex. 27 p. 3 ("Incumbent will serve as an

announcer when required.").  **Undisputed Fact.**

164.    Neither Nasser or Nassif were capable of this because they had no prior experience, a

shortcoming which was expressly acknowledged by the rating and ranking panel and

which Harb was unable to refute.  Harb Dep. 136:8-14, 153:12-18, 154:5-18; King Ex. 2.

165. George Shammas's (GS-13 selectee) selection is also suspect. Remarkably, Gandji's interview notes reflect that Shammas was "not familiar with MERN format." Gandji Dep. 146:19-147:22. She also indicated that he failed to list stories in response to an interview question requiring him to do so. Id. Finally, Shammas did not know how to use DALET. Abdelkarim ROI Ex. 6 (Rebuttal Aff. p. 2); Abdelkarim Dep. (Jan. 8, 2007) 42:9-12. In short, he have a very poor interview.

166. Zahrat Abuzaid (GS-12 selectee), a non-citizen, could only legally be selected according to VOA's policy applying the Hatch-Mundt Act, if she is better qualified than the plaintiffs. At the time of her selection Harb was not aware that she was hired at VOA as a producer, not an IRB. Harb Dep. 418:3-6. She had been an IRB only since May 2001. Abuzaid failed to even address the KSA's for the position when she applied and, therefore, received a letter from personnel indicating that she was not qualified. King Dep. Ex. 5. She also received lower performance ratings than all of the plaintiffs. Marsh Dep. 358:20-359:2; Marsh Dep. Ex. 23.

167. Elmigdad Gebril (GS-12 selectee), who was a non-citizen, could only selected if he was superior to the plaintiffs and had only a high school education. Harb Dep. Ex. 4, Gebril's application for GS-13. Harb Dep. 350:12-351:4. There is no indication of whether he ever studied journalism or broadcasting. Id.; Harb Dep. 351:16-18. He was also one of the lowest rated candidates by the DEU rating panel from which he received the lowest score they assigned to any candidate. King Dep. Ex. 2.

168.   Nasreddine Hssaini, a non-citizen, was ranked dead last on the GS-12 DEU certificate. Abdelkarim ROI, Tab 31.  Additionally, he received lower ratings on his prior performance evaluations than all of the plaintiffs.  Marsh Dep. Ex. 22.

169.   Given the emphasis assertedly placed on interviews, Rachid Jaafar's selection is also questionable.  Gandji recalls he was more interested in sports than news and this dominated his interview. Gandji Dep. 199:14-22.

170.   Reem Abaza, who was a GS-11 and should not have been promoted unless none of the plaintiffs met the minimum qualifications for the GS-12 position, had serious shortcomings in voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19. She had only been an IRB since July 2000.  Abdelkarim ROI Ex. 22, Abaza Aff., 2.

171.   In addition to being rated second to last, with only 18 out of 30 possible points, by the merit promotion panel (King Dep. Ex. 1), Maha Rabie had performance issues. Elshinnawi never rated her as outstanding because she had serious shortcomings in voice delivery, translation and news judgment.  Elshinnawi Aff. ¶ 19. Marsh rated her lower on her performance evaluations that all of the plaintiffs and admits that her overall performance was less successful than the plaintiffs. Marsh Dep. Ex. 19; Marsh Dep. 293:3-8, 335:5-336:8, 338:19-339:3.

172.   Former supervisor Mohammed Siddiqi, was amazed to learn Abdelkarim was not selected because based on his experience with the selectees they were less qualified in terms of experience and quality of work.  Abdelkarim ROI, Ex. 18, Siddiqi Aff., p. 3.

173.    As a former rating officer, Elshinnawi vouched that far less qualified staffers were selected because they were not Egyptians.  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 4.

174.    Diaa Bekheet believes the plaintiffs were subjected to discrimination because the selectees included many with no proven experience as well as non-citizens.  Abdelkarim ROI, Ex. 19, Bekheet Aff., p. 4.

175.    After meeting two of the selectees, Mohammed Ghunheim concluded they were extremely inferior to Abdelkarim.  Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.

176.    Dahiyat served as Acting Director of the Arabic Branch from the time Marsh left until Harb arrived. Dahiyat Dep. 11:18-13:1.  He supervised all of the plaintiffs and most of the selectees.  Dahiyat Dep.  50:13-55:1.  He testified that he was surprised to learn the plaintiffs were not selected for either a GS-13 or GS-12 position with Radio SAWA: "Because I knew them in the Arabic Service and I knew they were excellent employees." Dahiyat Dep. 163:22-164:5.  He further states that "the plaintiffs in my opinion have length of experience, breadth of experience that's more than the others."  Dahiyat Dep. 123:19-124:1.

177.    He specifically takes issue with Harb's statements regarding the non-citizens selected for the GS-12 positions, wherein Harb claims that the non-citizens were selected because they were "superior" to the plaintiffs:  "In my experience supervising and working with those individuals, I do not agree with that statement."  Dahiyat Dep. 179:8-180: 12-14.

178.    Dahiyat would have selected any of the plaintiffs over GS-12 selectees Dalia Alaqidi and/or Reem Abaza. Dahiyat Dep. 119:15-120:21, 121:14-122:3.

179.    Based on the qualifications and duties set forth in the GS-12 job announcement, Dahiyat would have selected Abdelkarim, Elmasry and Alkhateeb over GS-12 selectees Rabie (Dahiyat Dep. 130:16-131:5), Abuzaid (Dahiyat Dep. 130:3-15), Akl (Dahiyat Dep. 131:6-17), Elzubeir Eltayeb (Dahiyat Dep. 131:18-132:13), and Suleibi (Dahiyat Dep. 132:14-133:3).

180.    There is other evidence of the plaintiffs' superior qualifications, as well.  Outstanding performance appraisals for many consecutive years is strong evidence of a person's qualifications for a position at that same grade level with the same job title.  Dahiyat Dep. 161:17-21.

181.    Welch further explained that candidates are required to attach performance appraisals to their applications because "it is one indicator that we suggest that supervisors, selecting officials, take into consideration in making that judgment."  Welch Dep. 244:9-13.

182.    Performance awards should also be taken into account in the hiring/promotions process. Dahiyat Dep. 161:22-162:3.

183.    After their non-selections, the plaintiffs were required to train some of the new IRB's, who lacked broadcasting skills and did not know how to write a news report and/or how to translate.  Abdelkarim Dep. (Jan. 8, 2007) 16:2-8; Abdelkarim ROI, Ex. 15, El-Bishlawy Aff., 5; Abdelkarim ROI, Ex. 14, Elmasry Aff., p. 5; Abdelrahman Dep. (Dec. 23, 2004) 66:6-9.  Even one of the selectees, Diaa Bekheet, confirms that the plaintiffs had to train newcomers.  Abdelkarim ROI, Ex. 19, Bekheet Aff., p. 4.

184.    Abdelrahman understandably expressed confusion at why she would be asked to train

        new IRB's for Radio SAWA after Harb professes to have concluded that she did not

        possess the minimum qualifications for the job.  Abdelrahman Dep. (Dec. 23, 2004) 66:6-

        9.

185.    Even after declining to select any of the plaintiffs for a GS-12 position, even though there

        were still four unfilled positions after the first GS-12s were selected and the Plaintiffs

        rejected, Harb also continued to utilize Plaintiffs' services as IRBs despite his claims that

        they simply were not qualified for the job.  Abdelkarim ROI Ex. 6, p. 8.  For example,

        Abdelkarim continued performing full job duties from March 2002 until he was

        reassigned out of Radio SAWA in December 2002.  Abdelkarim ROI Ex. 6, p. 8.  SAWA

        relied heavily on him for writing, translating and voicing the news.  Abdelkarim ROI Ex.

        6, p. 8.  Harb sent him to cover congressional events and used his reports in newscasts.

        Abdelkarim ROI Ex. 6, p. 8.  Despite being deemed "unqualified," Abdelrahman was

        required to continue preparing the news, broadcasting the news, calling correspondents,

        getting the actuality and reports, and preparing and broadcasting the headlines for Radio

        SAWA.   Abdelrahman Dep. (Dec. 23, 2004) 22:6-23:4.

186.    Shortly after the plaintiffs departure from Radio SAWA, serious problems arose.  In

        February 2003, Hooper memorialized some of the ongoing problems:

        We are deeply concerned about *continuing* problems with grammar and spelling errors in
        the scripts for newscasts which are read over the radio and provided to the Internet staff
        for up-link.

        Hooper Dep. Ex. 2 Feb. 14, 2002.

187.   The SAWA editors at the time this memo went out were those who were selected under

the GS-13 vacancy announcement at issue in this case.  Hooper Dep. 139:2-17.

188.   Dahiyat listened to Radio SAWA "quite often" and heard some grammatical mistakes.

Dahiyat Dep. 165:15-19, 166:20-167:6.[7]

189.   The poor grammar and English language skills of Harb's chosen broadcasters has even

attracted critical news coverage:

One broadcaster, for instance, reportedly had trouble pronouncing the phrase "chicken
breeders" in the "classical Arabic" used to address audiences that speak different dialects
-- and so it came out sounding like "vaginas." That red-faced moment was hardly the
network's only error. Early on, Radio Sawa announcers referred to "Colin Bowell," and
two panels of Arabic specialists convened by the State Department inspector general's
office concluded that mistakes on the network were "humiliating for Arabic speakers."

Art Levine, *The American Prospect*, http://www.prospect.org/cs/articles?articleId=10595,

Nov. 7, 2005.


**Statements/Actions Indicating Bias**

190.   Harb complained openly and bitterly that the Arabic Service was "dominated" by

Egyptian broadcasters. A Lebanese journalist, Hesham Elhem of Al-Arabiya TV, related

that in or around April 2002 Harb stated that he would "clean the Arabic Branch of the

Egyptians."  Elshinnawi Aff. ¶ 16.

_____

[7] Dahiyat attests that all five plaintiffs had excellent grammar skills.  Dahiyat Dep.
167:11-16.

191.   Harb stated, within Alkhateeb's hearing, that there were too many Egyptians in the Arabic Service and they needed to be reduced.  Abdelkarim ROI, Ex. 13, Alkhateeb Aff., p. 5.

192.   Elshinnawi offered to help out with Radio SAWA by serving as a GS-12 Washington correspondent for SAWA when it had no correspondents; Harb rejected the idea without interviewing him and hired a Lebanese journalist instead.  Abdelkarim ROI Ex. 17, Elshinnawi Aff., p. 4.

193.   When Harb started at VOA he was the only individual there of Lebanese origin.  Harb Dep. 464:7-10.

194.   After the selections at issue and the rash of hiring that followed closely after, Harb had added 9 individuals of Lebanese origin, including Nassif who was quickly promoted not once, but twice since his original selection as a GS-13 IRB.  Harb Dep. Ex. 15.

195.   Harb denies that many of the people in SAWA are now Lebanese.  Harb Dep. 464:11-14.

196.   Harb began expunging VOA's radio broadcaster style book of Egyptian phrases and pronunciation styles, and replacing them with Lebanese phrasing and pronunciation instead.  Elmasry Dep. (Jan. 9, 2007) 15:11-13; Abdelrahman Dep. (Jan. 8, 2007) 29:2.

197.   Harb "put down" the Egyptian dialect.  Elmasry Dep. (Jan. 9, 2007) 12:2-3.  He indicated disdain by dismissively declaring:  "this is not Radio Cairo."  Elmasry Dep. (Jan. 9, 2007) 15:24. On almost a daily basis, he ridiculed Egyptian culture and icons.  Elmasry Dep. (Jan. 9, 2007) 16:18-23.

198.   In the Arabic world, there are two different ways to pronounce the letter "G" - with some regions using a hard "G" and others using a soft "G" that sounds more like a "D."  Harb

insisted that all broadcasters use the pronunciation preferred in Lebanon, even though that

was not the pronunciation used by most Arabic speakers. Abdelkarim Dep. (Jan. 8, 2007)

65:10-68:19; Abdelkarim ROI, Ex. 24, Ghuneim Aff., p. 3.

199.    Harb also chastised one of the selectees, Hala Arafa, for using the word "Istekhbarat"

instead of "Mukhabarat," which is a word used in the Lebanese media. Abdelkarim ROI

Ex. 6, p. 6.

200.    Arafa even asked Harb why he was trying to "Lebanize" the station. Abdelkarim ROI Ex.

6, p. 6.

201.    This problem is so apparent to  Arabic speakers that it has generated public discussion

and news coverage:

> Independent observers say that [Harb's] networks have been marred by an
> unprofessional, freewheeling approach to hiring and firing, shoddy journalism,
> and distorted news priorities that usually downplay tough coverage of Arab
> regimes and even terrorist organizations -- while often overemphasizing news
> from Lebanon, which happens to be Harb's homeland.

Art Levine, *The American Prospect*, *supra.*

202.    Another example of Harb's bias is reflected in Harb's changes to promotional spots.  In

the Arabic Service, promotional spots were done in classical Arabic.  Under Harb,

however, the promotional spots were done by individuals with Lebanese accents using

Lebanese slang.  Abdelkarim Dep. (Jan. 8, 2007) 64:18-19; Abdelkarim ROI, Ex. 14,

Elmasry Aff., p. 6.; Abdelkarim ROI Ex. 24, Ghuneim Aff., p. 3.

203.    When asked by the EEO investigator why promos were being done in a local Lebanese

dialect, Harb denied it stating, under oath, that all promotional spots were done in

classical Arabic.  Abdelkarim ROI Ex. 7, Harb Aff., p. 7. During his deposition, however,

Harb changed his testimony, and admitted that some people doing promos have Lebanese

accents.  Harb Dep. 496:20-22.

204.    In addition to the hiring decisions Harb made in association with the vacancies at issue

herein, he also made numerous additional personnel decision regarding IRB positions

after refusing to select the plaintiffs.  For example, Thabit Sawan (Lebanese) was selected

for GS-12 position, but subsequently given a 120-day temporary promotion to GS-13, that

Harb anticipated would become permanent.  Abdelkarim ROI Ex. 34; Harb Dep. 224:3-5,

480:10; 481:10-11.  Harb acknowledges that a requirement for a GS-13 position is a

college degree (Harb Dep. 231:2-4), but denied that Sawan lacked such a degree (Harb

Dep. 346:17-20).  After being confronted with Sawan's application, however, Harb

admitted that Sawan's highest level of education was high school.  Harb Dep. 347:20-

348:7.  Like Daniel Nassif,[8] Sawan was promoted through the ranks very, very quickly

despite the fact that it usually takes years for IRBs with PhDs or Masters degrees to

qualify for grades 12 or 13 and very few ever reach grades 14 or 15.  Abdelkarim ROI Ex.

23, Hopkins Aff., p. 4.

205.    Harb also hired nine Lebanese IRBs.  Harb Depo Ex. 15.  Saada Abdullah had been

working for Lebanese TV as an assignment editor when she was hired as a GS-12 IRB.

Harb Dep. 486:10-17; Harb Depo Ex. 15.  Harb hired Katia Wakim who was of Lebanese

---

[8] After just one year, Harb promoted Nassif to GS-14 managing editor, and then
gave him a temporary promotion to GS-15.  Harb Dep. 230:13-19.

origin and had been working for TV in London as a contractor. Harb Dep. 486:18-22. Wakim was allegedly hired because Harb had been told to expand news coverage and to do so he needed more people. Harb Dep. 487:1-7. He hired Antoine Issa from a radio station in Lebanon. Harb Dep. 488:1-4, 480:10, 16-19. Anna Abd al-Massih was hired from Lebanon as a contractor. Harb Dep. 488:11-17. Greta Ghacibeh and Khattar Torbey were both hired as contractors. Harb Dep. 480:10; 481:13-18, 480:10, 481:1-5.

206. During the same time frame that Harb was hiring all these Lebanese broadcasters, he was also removing or discontinuing the services of numerous Egyptian staffers other than the plaintiffs. Harb Dep. 616:11-12. These include Badia Rifaai, who left after being told her pace of reading was not suitable for SAWA. Harb Dep. 614:18-19, 616:17-20. Additionally, Harb discontinued the services of Kamal and Mona Bekheet, both Egyptian, during this period. Harb Dep. 614:20-615:1, 617:6-10. Harb fired Abdullah Hamed Omar, Egyptian, a POV and finalist on a VOA waiting list for hiring, and replaced him with a Lebanese individual. Elshinnawi Aff. ¶ 29.

207. At the conclusion of Harb's hiring spree for SAWA, he had hired 58 employees: nine were Lebanese but only six were Egyptian. Harb Depo Ex. 15.

208. Mr. Harb said that he was having problems because he could not get rid of many of the "old people that came from the Voice of America." Fandy Aff. ¶ 10. Mr. Harb's goal was to hire people who were "with it" and specifically "younger" people who do not have the "hangups of older people." Fandy Aff. ¶ 11. In April 2002, Mr. Harb also commented that "[w]e need young blood. We are for the younger generation." Freij Aff. ¶ 8.

**Differences in Format Between VOA Arabic Service and Radio SAWA**

209.    By Defendant's own admission, SAWA primarily played music, had only two brief

newscasts per hour, one of which was only 90 seconds long, and had only occasional

short features.  Defendant's Memorandum of Points and Authorities 8-9; Hooper Dep.

238:4-9.  **Undisputed Fact.**

210.    As a result of the infrequent, short newscasts SAWA was much easier, despite any

increase in pace.  Elmasry Dep. (Jan. 9, 2007) 9:16-21; Abdelrahman Dep. (Jan. 8, 2007)

19:17-20:6.

211.    After initial denials, VOA management officials also admit that VOA Arabic Service had

similarities to Radio SAWA.  For example, Hooper acknowledged that there was

breaking news at VOA Arabic that the IRB's, including Plaintiffs, covered.  Hooper Dep.

241:3-9.   Additionally, VOA Arabic received news from correspondents in the field,

something that SAWA also does.  Hooper Dep. 242:13-15.  Arabic Service news was not,

as the Defendant has claimed, pure translation.  Arabic Service newscasters also often

incorporated other news or interviews.  Abdelkarim Dep. (Jan. 8, 2007) 77:3-12, 20-25.

212.    SAWA staffers indicate that the pace is frenetic or fast only when there is a breaking

news event and that otherwise it could be "leisurely".  Abdelkarim ROI Ex. 21, Abuzaid

Aff., p. 3; Abdelkarim ROI Ex. 22, Abaza Aff., 3.

213.    Elmasry's style and shows at VOA Arabic Service were always fast-paced.  Elmasry Dep.

(Jan. 9, 2007) 38:1-4.

214.    Similarly, Marsh's interview notes indicate that Abdelkarim had originated material and

prepared news for a fast paced news show "Towards a Healthier Life."  Marsh Dep.

448:5-8.

### Failure to Follow Designated Order of Consideration for Candidates

215.    Marsh recalls no attempts to make a determination whether or not the non-U.S. citizens

who were selected for the GS-12 positions were better qualified than the Plaintiffs, who

were US citizens, seeking reassignment to those same positions. Marsh Dep. 412:8-14.

216.    Gandji cannot or will not answer whether there was any determination made that no

current staff member met the requirements for the position, before Harb selected external

candidates and/or contractors.  Gandji Dep. 58:12-64:10.

217.    Harb initially claims that he always gave priority to citizens when they were qualified for

the job, but in this instance because Plaintiffs were not qualified, he chose non-citizens.

Harb Dep. 257:15-19.  Yet, Harb also admits that he did not compare the qualifications of

the non-citizen selectees with the plaintiffs' until *after* the selections had been made.

Harb Dep. 259:3-10.

Respectfully submitted,


_____S/_____

Tracy L. Gonos, D.C. Bar No.  479160


_____S/_____

Elaine L. Fitch, D.C. Bar No.  471240

Kalijarvi, Chuzi & Newman, PC

1901 L Street, NW, Suite 610

Washington, DC 20036
(202) 331-9260

Attorneys for Plaintiffs