IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MOHAMED ABEDELKARIM, <u>et al</u>., )
                                    )
              Plaintiffs,           )
      v.                            )   Civil. Action No. 05-1783 (EGS)
                                    )
                                    )
JAMES K. GLASSMAN,                  )
Chairman, Broadcasting Board        )
      Of Governors,                 )
                                    )
              Defendant.            )
_____     )

## <u>DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

## <u>Introduction</u>

After extensive discovery, defendant filed a motion for summary judgment asserting that the plaintiffs cannot sustain their burden of proof to demonstrate that the articulated non-discriminatory reasons for not selecting the plaintiffs were pretext for discrimination.  Plaintiffs opposed defendant's motion and claim that the articulated non-discriminatory reasons are not "credible" and that there is sufficient evidence of pretext.  Subsequent to the initial briefing, this Circuit decided <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), addressing "single motive" and "mix motive" theories under Title VII and <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490 (D.C. Cir. 2008), addressing how the Court should analyze the burden of proof in a Title VII case particularly in the summary judgment context.

## **Applicable Title VII Law**

In any Title VII case, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that intentional discrimination was a motivating factor in his or her discriminatory treatment.[1]  This burden remains at all times with the plaintiff, <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  Generally, the triparte framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) is the method "to bring the court expeditiously and fairly to this ultimate question."  <u>Burdine</u>, 450 U.S. at 253.

In <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, <u>inter</u> <u>alia</u>, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision (<u>Id</u>. at 451).[2]

---

[1] Discrimination claim under Title VII and the Age Discrimination in Employment Act (ADEA) are analyzed under the <u>McDonald Douglas</u> standard.

[2] Plaintiffs have consistently espoused a "single motive" theory.  They contend that they are substantially more qualified than the selectees and that they were not selected solely because of their national origin and age.

Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[3] and may rely on direct or circumstantial evidence to meet that burden.  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, a plaintiff may attempt to establish that he or she was the victim of intentional discrimination on the basis of his race or national origin by relying on circumstantial evidence analyzed using the scheme first set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[4]  Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a <u>prima facie</u> case of discrimination.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  Once it is established that both parties have met their respective burdens of production (<u>i.e.</u>, plaintiff by presenting a <u>prima</u>

_____

[3] "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so.  <u>Hopkins v. Price Waterhouse</u>, 737 F. Supp. 1202 (D.D.C. 1990), aff'd 920 F.2d 967 (D.C. Cir. 1990); <u>Metropolitan Stevedore Company v. Rambo</u>, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose." (<u>Id</u>.)

[4] Reliance on the <u>McDonnell Douglas</u> scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  <u>See</u> <u>Fogg v. Gonzales</u>, 492 F.3d 447, 451 n.*

<u>facie</u> case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. <u>Hicks</u>, 509 U.S. at 510.  Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action.  <u>St. Mary's Honor Center</u>, 509 U.S. at 515-518.  This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor.   In the single motive case, <u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Whichever standard is employed, plaintiffs have the burden of

4

coming forward with evidence to create a triable issue.  As demonstrated below, the undisputed facts illustrate that plaintiff can not demonstrate that discrimination was a motivating factor, much less that it was the sole motivating factor in the challenged decision.

Under the D.C. Circuit Court's recent decision in <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490 (D.C. Cir. Mar. 28, 2008) the D.C. Circuit refines the burden-shifting analysis in <u>McDonald Douglas</u>, in a disparate treatment case.  The Court advised that once the defendant has articulated a legitimate non-discriminatory reason for its actions, the Court "need not-<u>and should not</u>" decide whether a plaintiff who suffered an adverse employment action established a <u>prima facie</u> case (<u>Id</u>. at 494)(emphasis in original). Instead, the Court was instructed to focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ." <u>See</u> <u>Short v. Chertoff</u>, ___ F. Supp. 2d ____ 2008 WL 2174856 *6(D.D.C.).

Furthermore, as the D.C. Circuit noted in <u>Brady</u>, although "a plaintiff need not demonstrate that he or she was treated differently from a similarly situated employee or that the position was filled by a person outside the plaintiff's group[,]

. . . such evidence (or the lack of such evidence) may be relevant to the determination at summary judgment or trial whether intentional discrimination occurred." <u>Brady</u>, 520 F.3d at 490, n.2.  Indeed, "[w]hile a Title VII plaintiff can resort to multiple methods of showing that the employer's stated reason for the employment action was a pretext, the most common method . . . is evidence suggesting that the employer treated other employees of a different race, gender, or national origin (or were younger) more favorably in the same factual circumstances. To prove that a plaintiff is similarly situated to another employee, a plaintiff must demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the allegedly comparable employee.'" <u>Laurent</u>, 2008 WL 1710912, at *3 (internal citations and quotations omitted).

"[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown <u>both</u> that the reason was false, and that discrimination was the real reason." <u>St. Mary's Honor Center</u>, 509 U.S. at 515 (emphasis in original).  "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." (<u>Id</u>. at 519)  Plaintiff bears the ultimate burden of persuasion on the issue of whether he or she was intentionally discriminated against.  <u>Burdine</u>, 450 U.S. at 253.

Even if the Court suspects that a job applicant "was

6

victimized by [] poor selection procedures", it "may not
'second-guess an employer's personnel decision absent
demonstrably discriminatory motive.'" <u>Fischbach v. District of
Columbia Dept. of Corrections</u>, 86 F.3d 1180, 1183 (D.C. Cir.
1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C. Cir
1977)) ("It is axiomatic that under the statutory scheme of Title
VII … an employer may make an employment decision for a good
reason, a bad reason, or no reason at all so long as racial or
other discriminatory distinctions do not influence the
decision."), <u>aff'd</u>, 595 F.2d 888 (D.C. Cir. 1979).  "Once the
employer has articulated a nondiscriminatory reason for its
actions … the issue is not the correctness or desirability of
[the] reasons offered … [but] whether the employer honestly
believes in the reason it offers." <u>Fischbach</u>, 86 F.3d at 1183
(internal quotation marks and citations omitted).  "It is not
enough for the plaintiff to show that a reason given for a job
action is not just, or fair, or sensible.  Plaintiff must show
that the explanation given is a phony reason." <u>Pignato v.
American Trans Air</u>, 14 F.3d 342, 349 (7th Cir. 1994), quoted in
<u>Fischbach</u>, 86 F.3d at 1183.

Because an employer's selection of one qualified candidate
over another qualified candidate raises no inference of
discrimination, plaintiff can <u>only</u> meet his burden of showing
pretext by presenting evidence from which a jury could conclude

7

that the plaintiff was <u>significantly</u> better qualified than the selectees. (emphasis supplied) <u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 83 (D.C. Cir. 1996); <u>Carter v. George Washington University</u>, 387 F.3d 872, 881-82 (D.C. Cir. 2004). A plaintiff must prove that his or her qualifications were "plainly superior" to the selectee's or summary judgment should be granted. <u>Lathram v. Snow</u>, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003); <u>Stewart v. Ashcroft</u>, 352 F.3d 422, 430 (D.C. Cir. 2003) (comparing rejected plaintiff's credentials with those of successful applicant, and finding plaintiff "simply not discernibly better" than applicant); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1294 (D.C. Cir. 1988); <u>Poarch v. Caldera</u>, EEOC Doc. No. 01964230, 1998 WL 685237 (E.E.O.C. Sept. 18, 1998); <u>see also</u> <u>Holcomb v. Powell</u>, 433 F.3d 889 (D.C. Cir. 2006).

The "plaintiff's subjective belief of [his/her] qualifications is not evidence that can be used to establish that [she] was qualified for the job." <u>Rasekh v. Veneman</u>, 357 F. Supp. 2d 70, 74 (D.D.C. 2004) (citing <u>Harris v. Univ. of the Dist. Of Columbia</u>, No. CIV.A.87-2631-LFO, 1990 WL 99316, at *5 (D.D.C. July 6, 1990) (citing <u>Morser v. AT&T Information Sys.</u>, 703 F. Supp. 1072, 1083 (S.D.N.Y. 1989)).

<u>**Argument**</u>

I.  <u>**Defendant's Articulated Non-discriminatory Reasons for the Non-selections.**</u>

Plaintiffs' assertion, that because the defendant concedes

that plaintiffs "qualified" for the positions at issue "destroys Harb's credibility" and leads to the conclusion that defendant's motion must be denied, is erroneous.  Plaintiffs' assertion is based a on a self-serving and simplistic characterization of the articulated non-discriminatory reasons articulated by defendant and what appears to be a fundamental misunderstanding of applicable law.

Plaintiffs virtually ignore (or reject) the radical change SAWA broadcasting brought to agency broadcasting in the Middle-East and the drastic change in style, format, and programming. The defendant has merely conceded that plaintiffs' qualifications established a _prima_ _facie_ case under existing case law, thus requiring the defendant to articulate non-discriminatory reasons for their non-selection.  In light of this Circuit's decision in _Brady_, the only issue before the Court is whether the plaintiffs have produced sufficient evidence for a reasonable jury to find the defendant's articulated non-discriminatory reason was not the actual reason and that the defendant intentionally discriminated against them because of their nationality (Egyptian-Syrian) and age. _See_ _United States Postal Service v. Aiken_, 460 U.S. 711, 715 (1983).  The defendant does not have the burden of persuasion when the Court considers a motion for summary judgment. Defendant's burden is one of production only. _McDonnell Douglas_, 411 U.S. at 792; _Burdine_, 450 U.S. at 254.  Moreover, the Court

may not make credibility determinations when considering a motion for summary judgment as urged by plaintiff. Hicks, 509 U.S. at 509 (a "determination that a defendant has met its burden of production and has thus rebutted any legal presumption of intentional discrimination can involve no credibility assessment.").

Defendant's recognition that the plaintiffs were qualified for the positions at issue is nothing more than recognizing the obvious.  The plaintiffs met the basic qualifications of the vacancy announcements, had long and distinguished service with the Arabic Service, and were referred to the selecting official for consideration.

The defendant will not repeat in detail the reasons for plaintiffs' non-selection nor the attributes of the selectees (See Motion, pp. 19-25).[5]  Briefly, four plaintiffs interviewed for the GS-13 Shift Editor positions and all five plaintiffs interviewed for the GS-12 News Writer positions and failed to demonstrate that they possessed significantly better skill sets for the new fast paced and dramatically different programming at

---

[5] Plaintiffs' opposition has over 40 pages entitled "Background" which is essentially plaintiffs' characterization of the evidence, opinions, speculation, unsupported conclusions and argument, which mirrors plaintiffs' statement of disputed and undisputed material facts filed in support of its opposition. The defendant has filed a response to plaintiffs' statement of disputed and undisputed material with citations to the record and will not repeat it here.

SAWA.  (Marsh Dep., Vol. I, 203, 105-106, 121-122, 187-190, 212-213, 224-225, 249-250, 273-275).  This judgment in no way reflects on their recognized accomplishments at the Arabic Service but, contrary to plaintiffs' misconception, they were not applying for their old positions in the Arabic Service.  They were applying for positions that involved a radical departure from anything previously done at VOA or the Arabic Service.  Indeed, their continued insistence that the Arabic Service's approach to broadcasting was superior to the new SAWA format indicates their resistance to the new programming and direction instituted by management and executed by Mr. Harb.

## II.  <u>SAWA Was A Radically Different Concept</u>

Contrary to plaintiffs' assertion, the undisputed record demonstrates that the creation of SAWA was a radical departure from the programming and style of the Arabic Service.  The Arabic Service had been losing audience share for a long time and had little impact, reaching only two percent of the Middle East population (Bates No, 002317).  Unlike the Arabic Service, SAWA's target audience was between eighteen and thirty (60% of the audience in the Middle East is under age 25 (Bates No. 002319); it was to broadcast twenty-four hours, seven days a week, with four hours a day tailored to local areas and would be presented by people who spoke colloquial Arabic, not classical Arabic (Bates No. 002321).  Music would be broadcast for most of the

hour to attract the younger audience.  News would be carried at 15 minutes and 45 minutes after the hour (Bates No. 002322). Most significantly, SAWA employees would be writing, for the first time, the news from the raw wire service copy and would have to write the stories for a new and quicker delivery style (Harb. Dep. Vol. I, pp. 100-103; Marsh Dep., Vol. I, pp. 116-117, 203, 276-277).  Finally, employees would have to not only voice the material, but use the material on the Dalet (digital) equipment without the help of a technician or engineer during the their presentation, unlike the Arabic Service (Id.).[6]

The former Chief of the Arabic Service, William Marsh, who supervised plaintiffs and served on the interview panels clearly recognized this change, even if plaintiffs did not.  Mr. Marsh recognized that SAWA was attempting something that had never been done in the past and required a new discipline and a different skill set than had been successful at the Arabic Service (Marsh Dep., Vol. I, pp. 116-117, 203, 276-277).  Similarly, Sheila Gandji, the-then Director of the West and South Asia Division, also recognized the significant difference in the two organizations.  (Gandji Dep., Vol II, pp., 169-170).

---

[6] The Arabic Service primarily produced block programming in long format using classical Arabic language used by Middle East government broadcasts (Bates No. 002318).  The Arabic Service translated already prepared news stories from the VOA English Language Central Newsroom into classical Arabic (Harb Dep. Vol I, pp. 100-103, Ganji Dep., Vol. I,  pp. 169-171; Marsh Dep. , Vol. I, pp. 116-117).

Plaintiffs' contention that SAWA was not radically different is disingenuous at best.  They and others were highly critical of the SAWA concept.  Even outside commentators cited by plaintiffs for their criticism of SAWA recognized a significant difference between the two.  Plaintiffs were literally appalled that classical Arabic was no longer used in the broadcasts and highly dismissive of the pan-Arabic approach taken by SAWA wherein local and regional dialects and colloquialisms were used (Abdelrahman Dep. (December, 2004), pp. 78-79; Alkhateeb Dep. (November, 2007), pp. 18-19).  Although plaintiffs are most critical of the Lebanese style, pronunciation and the new format designed to attract a younger audience, the undisputed record reveals that the selections reflect the diversity of the Arabic world.  Besides selecting an individual of Lebanese background, Mr. Harb selected individuals from Egypt, Tunisia, Morocco, Palestine, Jordan, Iraq and Sudan.  (See Defendant's Memorandum of Points and Authorities (Def. Memo.), pp. 22-31).

The undisputed record reflects, for better or worse, SAWA was, conceptually and stylistically, significantly different from the abolished Arabic Service.

### III. **Plaintiffs Qualifications**

Plaintiffs have failed to present sufficient evidence that would permit a reasonable fact-finder to conclude a reasonable employer would have found plaintiffs to be "significantly" better

13

qualified for the job. <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1294 (D.C. Cir. 2004). Plaintiffs repeatedly emphasize their superior qualifications, including their long service, dedication, outstanding performances, education and skill in classical Arabic. However, plaintiffs either ignore or minimize the admittedly radical departure from the type of radio broadcasting that they, and their previous supervisors, had been doing for years in the Arabic Service (<u>See e.g</u>. Marsh Dep., Vol. I, pp. 116-117, 203, 276-277). Moreover, it is clear that plaintiffs, having been classically trained in traditional style broadcasting which originated in Egypt at Radio Cairo, believe that the classical format and VOA's conventional broadcasting style to be superior to the pan Arab informal style of SAWA. Indeed, they appear to have contempt for the new format, particularly the change from classical Arabic to the colloquial and regional styles sought by SAWA (<u>see e.g</u>. Abdelrahman Dep. (December, 2004), pp. 78-79; Alkhteeb Dep. (November, 2007), pp. 18-19).

The change in target audience and language was a policy decision made by BBG/IBB/VOA unrelated to the plaintiffs, the selection of Mr. Harb to head SAWA, or Mr. Harb's selections. Title VII (or the ADEA) does not permit a Court to act as a super-personnel department that reexamines an employer's business decision. <u>Barbour v. Browner</u>, 181 F.3d 1342, 1346 (D.C. Cir.

14

1999); see also Milton v. Weinberger, 696 F.3d 94, 100 (D.C. Cir. 1982)(an employer may make an employment decision for a good reason, bad reason, or no reason at all, so long as impermissible discrimination does not influence the decision).

Plaintiffs' subjective assessment of their own qualifications completely ignores the significant qualifications of the various  selectees who have wide-ranging backgrounds, education, experience and skills (See Def. Memo., pp. 22-26; pp. 28-32).  Plaintiffs cannot show pretext by merely relying on their own subjective assessment of their own skills and abilities or their  subjective assessment of the skills and abilities of the selectees. Stewart v. Ashcroft, 352 F. 3d 422 (D.C. Cir. 2003); Hammond v. Chao, 383 F. Supp. 2d 47, 57 (D.C. Cir. 2005). Similarly, plaintiffs do not sustain their burden by demonstrating that the decisions were not just, fair, or even sensible. Green v. Dalton, 164 f.3d 671, 675 (D.C. Cir. 1999).

Plaintiffs' contention that they only had to demonstrate that they met the "basic" qualifications or that they only had to be "equally" qualified for the positions to prevail is misguided. They misunderstand both the facts and the law.

The Welch memorandum provides for an order of "consideration" of internal candidates not "preferential" selection of candidates (Bates No. 001069-001073).  There was no requirement that an employee from the Arabic Service, who met the

15

basic qualifications for the position, had to be hired.  Indeed, the logical consequence of plaintiffs' suggestion is that there would be no need for an interview panel or a selecting official or for that matter, any further competition beyond the review by the Office of Personnel.  Moreover, the vacancy announcements would not have been open to all applicants (Bates No. 000002). The Welch memorandum does not change the plaintiffs' burden of proof or modify this Circuit's holdings in <u>Aka</u>, <u>Holcomb</u>, and <u>Carter</u>.  The plaintiffs must demonstrate that they were substantially or significantly more qualified than their qualified competition.

Admittedly, if plaintiffs, as citizens, were equally qualified to non-citizens they would have to be selected under existing agency policy.  However, as to the GS-13 positions, the policy is not relevant.  There were no non-citizens selected for the GS-13 positions.[7]  As to the non-citizen GS-12 selections, they were determined to be better qualified for the new positions

_____

[7] The selections for the GS-13 positions were made on April 16, 2002 and became effective April 21, April 29, and May 13, 2002 (Bates Nos. 000008, 000061, 000125, 000137).  The plaintiffs did not contact an EEO counselor until September 9, 2002, more than 45 days after their non-selection for promotion to GS-13, as required (<u>See</u> Plaintiff's Statement of Fact, Paragraph No. 218; 29 C.F.R. 1614.105(a)(1)).  The plaintiffs failed to exhaust their administrative remedies as to the GS-13 positions. <u>Siegal v. Kreps</u>, 654 F.2d 773, 1776 (D.C. Cir. 1981).  Acceptance of this claim for processing by the agency does not waive this defense. <u>Saltz v. Lehman</u>, 672 F.2d 207 (D.C. Cir. 1982). Plaintiffs have completely failed to provide any equitable reason for not contacting an EEO counselor (<u>see</u> Opposition, p. 74-78).

at SAWA because of the different skill sets required for the new method of broadcasting to the Arab world.  (ROI, Ex. 35; <u>see</u> Bates No. 000561-000562 (justification for selections)).

### IV.  <u>Plaintiffs Numerical Rankings Fail to Demonstrate Pretext</u>

Plaintiffs' contend that they were rated and ranked higher than some of the selectees but this fails to demonstrate pretext. A rating and ranking panel conducted by the Office of Personnel is used to initially determine if the candidates qualify for a position.  They are frequently ranked in order to determine the best qualified or to narrow the list for referral to the selecting official when more than ten candidates qualify for a position.[8]  Here, under the procedures agreed to with the Union and ultimately approved by the Director of Personnel, all seventeen qualified inside applicants for the eight GS-13 positions were certified and forwarded to the selecting official and interview panel in alphabetical order without numerical rankings (Welch Dep., Vol. I, pp. 61-62; Vol. II, p. 139; King Dep., p. 56).  The selecting official and the interview panel received the list of candidates in alphabetical order without numerical rankings.  The same was true for the merit promotion

---

[8] The agency's Manual of Operations and Administration (MOA) requires a rating and ranking panel when there are more than ten qualified candidates for a position. (King Dep., p. 40).  The top five candidates are then forwarded to the selecting official (Id., pp. 77, 80).  Here there were eight GS-13 positions and twelve GS-12 positions.

certificate for the GS-12 selections.  The promotion certificate was in alphabetical order.   The one exception is the Delegated Examining Unit (DEU) certificates which rate and rank outside candidates and employees who chose to apply under this procedure. DEU certificates are issued in rank order (Welch Dep., Vol II, pp. 52-53, 139; Bates No. 000006; King Dep., p. 64).  Except for the DEU certificates, neither Mr. Harb nor the interview panel were aware of the relative rankings on the merit promotion certificates (Id.).  The numerical range on the DEU certificate for the GS-13 positions varied by only 5 points.  There were 13 citizen candidates on the DEU certificate: 2 had a score of 97; one had a score of 96; 4 had a score of 95; 2 had a score of 94; 2 had a score of 93; and 2 had a score of 92 (Bates No. 000006). The DEU certificate for the GS-12 positions have roughly the same variance in score with all but one DEU applicant being selected. The score for citizens ranged between 99-93 and for non-citizens ranged between 95-91.  These differences in score hardly demonstrates the "substantially" more qualified standard required under Aka and Carter.

    **V.**   **The Selection Procedure**

Plaintiffs complain that the issuance of three merit promotion certificates of eligibles for the GS-13 positions was irregular.  Admittedly, the procedure for selections were somewhat unusual but the elimination of the Arabic Service and

18

the creation and staffing of a completely new radio station was different than anything VOA had done previously (Marsh Dep., Vol. I, pp. 116-117, 203, 276-277).  The defendant has fully explained the circumstances surrounding the certificate of eligibles for the GS-13 position (See Def. Memo., pp. 15-17).  Ms. King, the personnel specialist, initially issued a certificate to the selecting official containing ten names in alphabetical order. Ms. King was advised by her new supervisor that the certificate of eligibles should only contain five names on it and she should retrieve it from Mr. Harb (King Dep., pp. 78, 80; Harb Dep., Vol. I., pp. 45-54).  It was retrieved and the interviews suspended (Id., pp. 71-73).  Before the certificate containing five names was issued, the Director of Personnel, Mr. Welch became aware of the situation (Welch Dep., Vol. I, p. 22).  He reviewed the rankings.  Given the number of vacancies to be filled and the insignificant difference between each candidate's individual score, he recommended to senior management that all qualified candidates be referred on the certificate of eligibles.  Senior management agreed (Welch Dep., Vol. I, pp. 22, 37-43; King Dep., pp. 70-71).

There is nothing in this procedure to suggest that it was designed with discriminatory intent.  Indeed, all qualified candidates were considered.  Plaintiffs' suspicions of a nefarious motive on the part of the Director of the Office of

19

Personnel, or other unnamed officials, are insufficient to demonstrate pretext.  That an individual who was not initially on the merit promotion certificate containing ten names was selected fails to demonstrate pretext.  Interestingly, two of the plaintiffs Ms. El-Bishlawy and Ms. Alkhateeb were not among the top ten.  Mr. Welch's decision permitted them to qualify and compete.  A selection of one qualified candidate over another qualified candidate does not raise an inference of discrimination.  <u>Fishbach</u>, 86 F.3d at 1183.  Even if the Court believes that the employer used poor selection procedures, it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." (<u>Id</u>.)  There is absolutely no evidence in the record to suggest that Mr. Welch 's motive was to impermissibly discriminate against the plaintiffs or that Mr. Harb influenced his decision as plaintiffs imply.

**V.    Plaintiff Fails to Demonstrate Sufficient Evidence of Discriminatory Bias**

The plaintiffs argue that Mr. Harb's selections alone evidence bias because four Egyptian plaintiffs and one Syrian IRB was "eliminated."  There was a policy decision to eliminate the Arabic Service and it was known at the outset that BBG/VOA had authorized only 32 slots for SAWA's initial hiring.  This initial allotment included eight GS-13 editors and twelve GS-12 newswriter positions.  It was clear at the outset that seven Arabic Service IRBs would not be selected (Bates Nos. 002310-

20

002313).  In addition, the competition for the positions was
expanded to include outside candidates (Vacancy Announcements,
Bates Nos. 000025-000033, 000587-000593).  Mr. Harb selected four
Egyptians (Hala Arafa (age 41); Mohamed Saad (age 55); Gamal Al
Adle (age 49); Reem Abaza (age 30)).  He also selected
individuals from Tunisia, Morocco, Palestine, Jordan, Lebannon,
Iraq, and Sudan that represented the diversity of the Arab world
and the diversity of the audience that the agency sought to
target (Def. Memo., pp. 18-29; Harb Dep., Vol. I, pp. 40-42).
The defendant has articulated non-discriminatory reasons for the
selections.  Any inference of discrimination raised by
plaintiffs' non-selection disappears. Hicks, 509 U.S. at 510.
Thus, plaintiffs' non-selection alone fails to demonstrate
pretext.

    Similarly, plaintiffs bitterly complain that SAWA used
Lebanese phrasing, colloquialisms, and pronunciations in
promotional spots rather than classical Arabic used by Radio
Cairo and Al-Jazeera.  The decision to use colloquial Arabic,
rather than classical Arabic, was a policy decision made by
BBG/IBB/VOA management at the inception of SAWA before the
initial staffing selections at issue here (Bates Nos. 002319,
002321).  Moreover, SAWA was not broadcasting in Egypt until 2003
(Harb Dep., Vol. I, pp. 40-42).  Although plaintiffs may
strenuously disagree with the merits of this policy decision,

they fail to demonstrate pretext.

Finally, plaintiffs point to several off-hand isolated comments by Mr. Harb taken out of context to demonstrate discriminatory intent.  Isolated comments such as these fail to sustain plaintiffs' burden of either national origin or age discrimination. See Treadgill v. Spelling, 377 F. Supp. 2d 158, 164; Dunaway v. Int'l Brotherhood of Teamsters, 310 F.3d 758 (D.C. Cir. 2002); see generally Price Waterhouse v. Hopkins, 490 U.S. 228, 227 (1999 (O'Connor, J., concurring).

Plaintiffs may not rely on their unsupported opinion, no matter how strongly held, and their subjective conclusions to create a factual issue for trial. Liberty Lobby, Inc., 477 U.S. at 248 (1986); Green v. Dalton, 164 F.3d at 675.

## VI.  **Plaintiffs Cannot Show That Age Was a Determining Factor**.

Plaintiffs challenge the defendant's reliance on the 10 year rule addressing prima facie cases in ADEA cases and complain that defendant fails to include all the GS-13 and GS-12 selections made by Mr. Harb.  Contrary to plaintiffs' assertions, the defendant did address all the GS-12 and GS-13 selections that are at issue here.  Plaintiffs attempt to include subsequent selections but fail to note that they did not apply for these positions and fail to provide the ages of the candidates who competed for them.

Regardless, following the instructions of this Circuit in

<u>Brady</u> in the Title VII context, the Court analysis should focus on plaintiffs proffered evidence of pretext.  Again, plaintiffs only proffer isolated and allegedly age related comments taken out of context.  None of the comments, supported mostly by declarations prepared more than five years after the fact, are directly related to the plaintiffs non-selection.  The comments are general in nature and reflect SAWA's attempt to capture a younger ("hip" or "with it") audience.  SAWA was not designed to appeal to the audience targeted by the former Arabic Service and sought to substantially change the style of broadcasting.

Plaintiffs have completely failed to demonstrate with credible and probative evidence that age was a determining factor in the selections by Mr. Harb. <u>Krodel v. Young</u>, 748 F.2d 70, 706 (D.C. Cir. 1984).  More specifically, plaintiffs cannot prove that age made a difference in the employer's decision in the sense that "but for" the discriminatory motive, plaintiffs would have been selected. <u>Cuddy v. Carmen</u>, 694 F.2d 853, 857-58, n. 23 (D.C. Cir. 1982).

## Conclusion

For the foregoing reasons and the reasons set forth in Defendant's Motion for Summary Judgment, defendant's motion should be granted and summary judgment entered in his favor.

Respectfully submitted,


\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


\_\_/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205


Of Counsel:
ELIZABETH A. PARISH
Office of General Counsel
Broadcasting Board of Governors